UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIRST NBC BANK,<br><br>                     Plaintiff,<br><br>vs.<br><br>MUREX LLC f/k/a MUREX N.A. LTD.,<br><br>                     Defendant. | Civil Action No. _____<br><br>**COMPLAINT** |

Pursuant to Rule 3 of the Federal Rules of Civil Procedure, Plaintiff First NBC Bank, by its attorneys Holland & Knight LLP, files its Complaint against Defendant Murex LLC f/k/a Murex N.A. Ltd., alleging as follows:

### PARTIES, JURISDICTION & VENUE

1. First NBC Bank ("FNBC") is a state chartered bank organized and existing under the laws of the State of Louisiana with its registered office and principal place of business in the Parish of Orleans, State of Louisiana. FNBC is a public company whose stock trades on the NYSE, and it is a citizen of the state of Louisiana.

2. Murex LLC f/k/a Murex N.A. Ltd. ("Murex"), is a limited liability company with its principal place of business at 7160 N. Dallas Pkwy., Suite 300, Plano, Texas 75024. Murex is a citizen of the state of Texas. Murex's members are citizens of Texas and Florida and, accordingly, Murex is a citizen of Texas and Florida.

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is appropriate and this Court has personal jurisdiction over Murex pursuant to a contractual choice of forum clause contained in Section 16.11.3 of a Corporate Seller Program Agreement, dated November 4, 2013, signed by Murex.

## GENERAL ALLEGATIONS

5. Defendant Murex markets and provides distribution services for ethanol and other gasoline blendstocks.

6. During the years 2013 through 2015, Abengoa Bioenergy Company, LLC ("ABC") was a significant customer of Murex. Upon information and belief, on at least some occasions Murex sold ethanol to Abengoa Bioenergy Company, LLC ("ABC").

7. Murex's invoices to ABC generally required payment within net 15 days, and Murex depended on ABC's line of credit that enabled ABC to pay for the ethanol it purchased from Murex.

8. ABC became credit-constricted, and was perilously close to exceeding the limits of its credit facility, the effect of which would render ABC unable to purchase ethanol from Murex.

9. Upon information and belief, ABC's financial situation and credit facility structure was such that it would not have been able to obtain additional credit or financing had it applied for such with Plaintiff.

10. ABC never applied to Plaintiff FNBC for credit or for a loan.

11. At some time presently unknown to Plaintiff, but well-known to Defendant and others in active concert with it, Murex conspired with ABC and possibly others to circumvent the limits of ABC's existing constrained credit facility and to embark on a scheme to fabricate transactions for the purported sale, and purported re-purchase, of ethanol among other reasons as a way to provide greater working capital to ABC, to enrich Murex through payments from ABC

to Murex of millions of dollars, and to mislead and to induce Plaintiff unwittingly into becoming one of ABC's largest creditors.

12. Murex and ABC agreed that Murex would sell ethanol to ABC on extended terms, and that Murex would re-purchase the ethanol for cash. For each sale or purported sale of ethanol by Murex to ABC, there was a purported offsetting re-purchase of the ethanol by Murex from ABC.

13. Thus, Murex transferred money immediately to ABC in exchange for ABC's promise to repay the money after a time certain, usually 180 days. Following each "transaction," ABC ended up with cash in the amount of the goods sold to and re-purchased by Murex and an extended payable, usually not due for 180 days.

14. In fact, however, no underlying transaction giving rise to the receivables that are the subject of this action ever occurred.

15. No ethanol related to the receivables was ever sold or delivered to ABC.

16. Defendant Murex created phony commercial investment paper purporting to reflect transactions for the sale of ethanol to ABC that never in fact occurred, giving rise to "manufactured" receivables that the fraudulent paper trail made look like bona fide receivables created in the ordinary course of business.

17. In effect, Murex simply created a piece of paper "out of thin air" purporting to represent an account receivable for the sale and delivery of ethanol to ABC, which sale and delivery never took place. The falsified papers manufactured by Murex and ABC were created to disguise the true nature of their agreement, and for the purpose of deceiving or misleading others into believing that the transaction was part of an ongoing trading relationship between Murex and ABC in the ordinary course of their businesses.

18.     Murex simply paid money to the struggling ABC allegedly as payment for it "re-purchasing" the ethanol from ABC.

19.     Murex and ABC, however, never intended that Murex would serve as ABC's creditor extending additional working capital and credit to ABC.  Instead, Murex embarked on a scheme to dupe Plaintiff FNBC into unwittingly becoming ABC's largest creditor by marketing the phantom receivables it manufactured to FNBC as an investment.

20.     Murex did not sell the phony receivables from its sham transactions to FNBC directly.  Instead, Murex used or employed a third party functioning as an unlicensed broker-dealer named The Receivables Exchange, LLC (TRE") that purported to operate an arms-length electronic auction platform which connected buyers and sellers, but which in practice communicated directly with prospective buyers and sellers in order to broker sales of receivables at a negotiated discount in exchange for a commission.

21.     Murex executed a contract with TRE entitled the Corporate Seller Program Agreement ("CSP").  Murex knowingly and intentionally employed a device, scheme, or artifice to defraud, made material misstatements and omissions, and engaged in acts or practices operating as deceit on FNBC

22.     All buyers of receivables over the TRE Platform, including FNBC, are expressly named as third-party beneficiaries to the CSP Agreement.

23.     Upon information and belief, over a period of months, Murex's sales of receivables from its sham transactions using TRE increased ABC's indebtedness by an amount as yet undetermined but believed to be in excess of $125,000,000 at a time when ABC would not have been able to satisfy the underwriting requirements, or to otherwise qualify, for credit in excess of its already "maxed out" existing line of credit from any traditional financial institution.

24. Murex received consideration from ABC for participating in the scheme to increase its credit and liquidity.

25. Like over-inflating a balloon until it pops, and playing a game of "musical chairs," Murex kept increasing the credit it purportedly was extending to ABC until ABC's ability to repay the increased indebtedness evaporated, at which point Murex unloaded the "straw that broke the camel's back" onto FNBC by selling the last of its receivables for the fake transactions to FNBC.

26. Following this last sale of fabricated receivables to FNBC, Murex immediately ceased to sell any receivables over the TRE exchange.

27. The only receivables Murex ever sold over the TRE exchange were its receivables from ABC.

28. Murex did not routinely or as part of its business sell its accounts receivable from other customers besides ABC over the TRE exchange.

29. Between July 8, 2015, and September 17, 2015, using TRE Murex sold Plaintiff FNBC receivables from fictitious transactions with ABC for the purported sale of ethanol to ABC for the purchase price paid by FNBC of $69,133,120.38 (collectively, "the Receivables").

30. At the time Murex sold the Receivables to FNBC over the TRE exchange, although ABC had voluntarily suspended payment of certain of its obligations, ABC had not yet filed any insolvency or restructuring proceedings, or petitioned for insolvency or bankruptcy.

31. Murex was paid for the Receivables through TRE.

32. TRE actively solicited FNBC to purchase the Receivables on behalf of Murex.

33. TRE communicated directly with FNBC about purchasing the Receivables from Murex.

5

34. FNBC was provided with information about the Receivables, Murex, ABC and the fabricated transactions allegedly giving rise to the Receivables (the "Information").

35. Upon information and belief, the Information given to FNBC through TRE originated with or was provided by Murex. The information was incomplete, misleading, and omitted material information about the Receivables and the underlying transaction.

36. Upon signing the CSP, Murex made specific representations and warranties to all buyers, including FNBC as a third-party beneficiary to the contract.

37. Among other things, the CSP requires that any account receivable a seller offers for sale must relate to an actual, unconditional sale of goods or services by the seller, and in each case must arise out of the sale of goods or the rendering of services by the seller.

38. Murex represented that the Receivables arose by reason of an agreement between Murex and ABC for Murex to provide ethanol to ABC.

39. Murex never disclosed, and in fact concealed from FNBC, that its Receivables from ABC did not involve arm's length sales of ethanol, but rather were sham transactions offset in each case by same-day "sales" of identical quantities of ethanol from ABC back to Murex.

40. For each "manufactured" Receivable from the alleged sale of ethanol by Murex to ABC, Murex and ABC schemed that there would be an undisclosed and offsetting re-purchase of the ethanol by Murex from ABC.

41. Murex did not inform FNBC about the second part of its agreement with ABC: that each purported sale was offset by Murex re-purchasing the ethanol it purportedly had just sold to ABC.

42. In fact, the Receivables sold to FNBC were manufactured and did not arise from the sale of any ethanol by Murex to ABC.

43. This concealed fact changed the entire nature of the transaction. In reality, these were not bona fide, arm's length sales of ethanol from Murex to ABC, and instead were nothing more than mere window dressing for a risky, over-leveraged financing arrangement, albeit completely undisclosed and unknown to FNBC, a federally insured bank.

44. All conditions precedent to Plaintiff's right of recovery have occurred, been satisfied or are waived.

45. In breaching its promises, warranties, representations and covenants, Murex has acted in bad faith, has been stubbornly litigious and, as a result, has caused FNBC unnecessary trouble and expense.

## COUNT I

46. FNBC repeats and re-alleges the allegations contained in paragraphs 1 through 45 as though fully set forth herein.

47. Pursuant to the CSP, Murex is required, and absolutely, unconditionally and irrevocably agreed, to repurchase the Receivables from FNBC in certain circumstances including, among other things, if ABC failed to pay a Receivable in full by the Repurchase Date, unless an Account Debtor Insolvency Event (as defined in the CSP) has occurred on or prior to such Repurchase Date.

48. ABC failed to pay the Receivables when due.

49. No Account Debtor Insolvency Event (as that term is defined in the CSP) with respect to the Receivables occurred prior to the Repurchase Date.

50. Murex has failed to repurchase the Receivables despite being obligated to do so.

51. Murex's failure to repurchase the receivables constitutes a breach of contract under Section 8.2.1, and Section 8.3.1, and, as a result, FNBC has been damaged as a proximate

result of said breaches in an amount to be determined at trial, in addition to interest, costs, and attorneys' fees.

## COUNT II

52. FNBC repeats and re-alleges the allegations contained in paragraphs 1 through 51 as though fully set forth herein.

53. Murex made extensive representations and warranties in CSP § 10 in order to induce FNBC to purchase the Receivables it manufactured from its fictitious transactions with ABC.

54. Pursuant to the CSP, Murex "absolutely, unconditionally and irrevocably agree[d] to repurchase" the Receivables from FNBC if any representation or warranty made by Murex under was materially inaccurate or materially incorrect when made.

55. Murex expressly but falsely warranted that its invoice for the (as FNBC now knows) fabricated underlying transaction accurately described the transaction in all material respects, that no Insolvency Event had occurred, that the Receivables arose out of a bona fide, arm's length sale of goods or services in the ordinary course of Murex's business, that ABC had accepted the goods or services billed, and that all applicable taxes pertaining to the transaction for the sale and shipment of ethanol had been paid. Murex further expressly warranted that the Receivables validly existed against ABC and were not subject to any rebate, discount, allowance or other price or payment adjustment, and that they were not part of any other arrangement such as a conditional sale or delivery, and were payable without being subject to any right of set-off or recoupment including the off-setting manufactured sales of identical amounts of ethanol that,

pursuant to its agreement with ABC, relieved Murex from the contractual obligation to deliver the ethanol to ABC.

56. Murex also expressly warranted that the Receivables were governed by a sales contract between it and ABC and were subject to the same terms and conditions that apply to Murex's sales of goods and furnishing of services to Murex's customers, and that the Receivables together with the sales contract underlying them were originated in compliance with and did not contravene each law, rule or regulation applicable thereto.

57. Among other things, Murex's phony transaction for the purported sale of ethanol to ABC failed to comply with numerous state and federal laws, including upon information and belief those of the Environmental Protection Agency ("EPA"), regulating and pertaining to the sales and shipment of ethanol and the reporting of Renewable Identification Numbers (RINs) connected thereto.

58. A RIN is a serial number assigned to a batch of biofuel for the purpose of tracking its production, use, and trading as required by the United States Environmental Protection Agency's Renewable Fuel Standard implemented according to the Energy Policy Act of 2005 and the Energy Independence and Security Act of 2007.

59. Under the Energy Policy Act of 2005, the EPA is authorized to set annual quotas dictating what percentage of the total amount of motor fuels consumed in the US must be represented by biofuel blended into fossil fuels. Anyone who owns RINs must register with the EPA on an annual basis and obey mandated record-keeping requirements. All RINs are required to be reported to the EPA after creation.

60. It is unclear what portions of the agreement involving off-setting identical manufactured sales of ethanol between ABC and Murex might be subject to federally mandated

record keeping and reporting requirements, but upon information and belief Murex did not maintain any records or comply with any reporting requirements relating to the alleged underlying sale and transfer of ethanol giving rise to the Receivables, if any, because, among other reasons, the transactions were fabricated.

61.     Upon information and belief ABC did not maintain any records or comply with any applicable reporting requirements, if any, relating to the alleged underlying sale and transfer of ethanol giving rise to the Receivables.

62.     Murex is involved currently with the EPA on a matter involving RIN fraud.

63.     Murex further represented and warranted pursuant to the CSP Agreement that the information it shared with respect to ABC for the Receivables was complete and accurate in all material respects, and that FNBC would have good and marketable title to and ownership of the Receivables upon completion of the sale free of all security interests.

64.     Following the sale of the Receivables, Murex never transferred title to the Receivables to FNBC.

65.     Murex also warranted that there was no dispute with respect to the Receivables or the sales contract giving rise thereto, even though in fact the expectation of payment, delivery and performance was in dispute because Murex's agreement with ABC for simultaneous off-setting exchanges of ethanol secretly excused performance, delivery and payment, as between the two of them. Neither Murex nor ABC expected that the other would perform the contract by delivering any ethanol or by ABC paying for ethanol that was not delivered by Murex.

66.     In addition, Murex warranted that the Receivables did not bear stated interest when in fact, due to payments between and among TRE, ABC and Murex, Murex either did or

could receive additional monies effectively constituting interest depending on the timing of ABC's payment of the Receivables.

67. In order to induce FNBC to purchase the Receivables, Murex made a myriad of additional representations and warranties regarding performance of the contract, rules and regulations governing it and Murex, and that there were no pending or threatened actions or proceedings before any court or administrative agency related to or in any way connected to the Receivables when it knew of activity that impaired repayment of the Receivables directly by ABC or by its Affiliates, or by its parent, which had guaranteed payment of the Receivables and which was subject to proceedings in Spain and upon information and belief in other jurisdictions that impaired the guaranty and deprived FNBC of the full value of its bargain, instead increasing the risk associated with the Receivables that they would not be repaid.

68. In CSP § 11 Murex also made express affirmative and negative covenants in favor of FNBC in the CSP Agreement, agreeing to refrain from prejudicing FNBC's rights to payment of the Receivables, to notify FNBC in the event of occurrence that might affect the ability of ABC to perform, or of any adverse change in the timeliness of Murex receiving payments from ABC, and to make full disclosure to FNBC with respect to the Receivables required by law. Murex's actions also violate implied obligations including its covenant of good faith and fair dealing owed to FNBC.

69. Murex breached the foregoing express and implied representations, warranties and covenants and, as a result, FNBC has been damaged as a proximate result of said breaches in an amount to be determined at trial, in addition to interest, costs, and attorneys' fees.

## COUNT III

70. FNBC repeats and re-alleges the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

71. Murex's failure to reveal to FNBC the entirety of its reciprocal off-setting identical sales agreement with ABC giving rise to the Receivables, or that the Receivables were manufactured and did not arise from the delivery of ethanol in the ordinary course of Murex's business, was negligent or grossly negligent, as was Murex's failure to provide complete and accurate information concerning the Receivables and the Information.

72. Murex further was negligent or grossly negligent in failing to manage the account relationship with ABC on FNBC's behalf in substantially the same manner and with substantially the same degree of care that it uses in managing its account relationships with its obligors other than ABC. Murex's actions or omissions also constitute willful or wanton negligence or recklessness.

73. FNBC sustained damage as a direct consequence of Murex's actions or omissions and, as a result, FNBC has been damaged as a proximate result of said breaches in an amount to be determined at trial, in addition to interest, costs, and attorneys' fees.

## COUNT IV

74. FNBC repeats and re-alleges the allegations contained in paragraphs 1 through 73 as though fully set forth herein.

75. Alternatively, Murex intentionally and fraudulently represented that the complete transaction giving rise to the Receivables consisted of its sale of ethanol to ABC when in fact it concealed from FNBC of the entirety of its reciprocal off-setting identical sales agreement with ABC giving rise to the Receivables.

76. Murex intentionally and fraudulently concealed that the Receivables were manufactured and that no transaction resulting in the sale and delivery of ethanol ever occurred, and that the Receivables did not arise from the delivery of ethanol in the ordinary course of Murex's business. Murex intentionally misrepresented the nature of the transaction giving rise to the Receivables, and that they were materially compliant with the representations and warranties in the CSP, and with the Information.

77. Murex suppressed material facts and omitted to disclose material facts that it was under an obligation to communicate in order to make Murex's other representations, in light of the circumstances in which they were made, not misleading or fraudulent.

78. All of these misrepresentations and omissions, statements and activities, were known to be false when made or omitted by Murex and were made willfully, in bad faith and with the intent that FNBC rely on them and with the further intent to deceive FNBC, which justifiably relied on them to its detriment. Alternatively, all of these misrepresentations and omissions were made or occurred with severe reckless disregard for the truth.

79. Murex's misrepresentations and omissions constitute actual, or alternatively, legal fraud.

80. Murex's statements and activities, or omissions, were material, and were intended to deceive FNBC, who justifiably relied on them to its detriment, proximately causing it damage in an amount to be determined at trial, in addition to interest, costs, and attorneys' fees.

81. Murex's conduct was and is willful, wanton and in bad faith, and by reason thereof, FNBC is entitled to punitive damages against Murex to deter similar misconduct in the future, in an amount to be determined at trial, including reasonable attorneys' fees.

13

## COUNT V

82. FNBC repeats and re-alleges the allegations contained in paragraphs 1 through 81 as though fully set forth herein.

83. In the alternative, FNBC elects to rescind any and all transactions between it and Murex pertaining to the Receivables as a result of the Defendant's actions which actions among other things, constitute legal and actual fraud, or misrepresentation as to material facts, and have rendered the contract provided to FNBC wholly without value, resulting in a total failure of consideration to support the aforesaid sales and purchases of the Receivables.

## COUNT VI

84. FNBC repeats and re-alleges the allegations contained in paragraphs 1 through 83 as though fully set forth herein.

85. Murex owed FNBC fiduciary duties as FNBC's agent and as Account Manager of the account relationship with ABC, including but not limited to the following:

   (a) the duty of loyalty;

   (b) the duty of full disclosure;

   (c) the duty of good faith and fidelity;

   (d) the duty to act fairly;

   (e) the duty of confidentiality;

   (f) the duty to account;

   (g) the duty of faithfulness to the principal; and

   (h) the duty of care.

86. Defendant Murex has breached fiduciary duties and implied covenants of good faith, fair dealing and loyalty owed to FNBC arising out of its agency and Account Manager relationship, as well as its relationship of trust and confidence as a fiduciary of FNBC.

87. Defendant Murex has breached its fiduciary duties, among other ways, by:

  (a) failure to disclose;

  (b) breach of a duty to provide accurate information;

  (c) failure to act in FNBC's best interest;

  (d) misrepresentations and omissions of facts and events;

  (e) misuse of superior knowledge;

  (f) failure to disclose;

  (g) rendering inappropriate advice;

  (h) misuse of supervisory positions;

  (i) less than the highest ethical conduct;

  (j) elevating its own interests above those of FNBC insofar as ABC's Receivables are concerned; and

  (k) failure to make full, fair and prompt disclosure of all facts that threaten its principal's interests or that influence the agent's actions.

88. Murex has misled FNBC by ambiguous and incomplete representations designed to cause FNBC not to make further inquiry concerning the facts involved, and to conceal and prevent FNBC from discovering Murex's wrongful actions and breaches, and its true arrangement with ABC. Among other things Murex failed to perform its obligations as FNBC's agent, reached agreements with ABC without consulting with or obtaining FNBC's permission, and failed to advise FNBC concerning events and conditions that served to increase FNBC's risk.

89. Murex has refused to turn over to FNBC the documents it is obligated to make available to FNBC relating to ABC and the transactions giving rise to the Receivables, and has

falsely denied knowledge of true facts or concealed them when questioned by FNBC, for the purpose of preventing or delaying FNBC from learning the true facts.

90. As a natural, direct and proximate result of the Murex's actions, FNBC has sustained actual, incidental and consequential damages in an amount as yet undetermined, but to be proven at trial.

91. Murex's conduct was and is willful, wanton and in bad faith, and by reason thereof, FNBC is entitled to punitive damages against Defendant Murex in an amount to be determined at trial, including reasonable attorneys' fees.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff FNBC hereby demands a trial by jury as to all issues so triable.

**WHEREFORE**, Plaintiff FNBC respectfully requests judgment in its favor and against the Defendant, as follows:

(A) Actual, incidental, special and consequential damages in an amount to be proven at trial on the allegations of Plaintiff's Complaint;

(B) Exemplary damages in an amount to be proven at trial;

(C) Judgment ordering an accounting of all present and future gains, profits and advantages derived by Defendant in furtherance of its scheme, and requiring that Defendant be required to disgorge said amounts, including all payments received by it from ABC for participating in the scheme;

(D) Judgment granting FNBC its costs and expenses of litigation due to Murex's frivolous, wanton and willful conduct, including reasonable attorneys' fees; and

(E)     Judgment granting FNBC such other, further and different relief as this Court may deem just, equitable and proper, including rescission of the CSP and all agreements relating to the Receivables.

Dated: September 30, 2016.

                                     **HOLLAND & KNIGHT LLP**

                                By: _____
                                    Robert J. Burns
                                    Benjamin R. Wilson
                                    31 West 52nd Street
                                    New York, NY 10019
                                    Tel.: 212-513-3490
                                    Fax: 212-385-9010
                                    E-Mail: robert.burns@hklaw.com

                                    and

                                    J. Allen Maines
                                    Georgia Bar No. 466575
                                    *Pro Hac Vice pending*
                                    Cynthia G. Burnside
                                    Georgia Bar No. 097107
                                    *Pro Hac Vice pending*
                                    Grant E. Schnell
                                    Georgia Bar No. 106794
                                    *Pro Hac Vice pending*
                                    1180 West Peachtree Street
                                    Suite 1800
                                    Atlanta, GA 30309
                                    Tel.: 404-817-8525
                                    Fax: 404-881-0470
                                    E-Mail: allen.maines@hklaw.com
                                    E-Mail: cynthia.burnside@hklaw.com
                                    E-Mail: grant.schnell@hklaw.com

                                    *Attorneys for First NBC Bank*

#48198406_v1