UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4-28-17

------------------------------------------------------------------------X
:
FIRST NBC BANK,                                            :
                                                          :        16 Civ. 7703 (PAE)
                              Plaintiff,                   :
                                                          :        OPINION & ORDER
            -v-                                            :
                                                          :
MUREX, LLC, f/k/a MUREX N.A. LTD.,                         :
                                                          :
                              Defendant.                  :
                                                          :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to disqualify counsel. Defendant Murex, LLC ("Murex")

moves to disqualify the law firm Holland & Knight LLP ("H&K"), which, on behalf of plaintiff

First NBC Bank ("FNBC") brought this 13-count lawsuit, claiming that Murex sold FNBC bogus

receivables, and accusing Murex of, *inter alia*, breach of contract, breach of fiduciary duty,

fraud, tortious interference with contract, and racketeering.

Murex's motion to disqualify is based on the fact that Murex was an H&K client: At the

time that H&K's litigators in Atlanta were readying to sue it, Murex alleges, its Washington,

D.C., office was separately representing Murex in regulatory work. H&K's representation of

Murex began as a lobbying representation, but, Murex contends, it grew to include legal services,

triggering an attorney-client relationship and the canons of professional responsibility. Most

notably, Murex contends, H&K helped Murex defend itself against an enforcement action that

the Environmental Protection Agency ("EPA") had threatened. When eventually notified that

H&K also represented FNBC and wished to sue Murex on FNBC's behalf, Murex refused to

consent. Murex thus argues that H&K engaged in an unconsented-to concurrent representation

1

of a client (Murex) and a party with interests adverse to it (FNBC), *prima facie* improper under professional canons. Murex argues that allowing H&K to represent FNBC in this lawsuit would give rise to an actual and apparent conflict of loyalties and taint this lawsuit. H&K, backed by FNBC, opposes the disqualification motion.

For the reasons that follow, the Court grants the motion to disqualify.

## I.  Background[1]

Murex's motion to disqualify implicates two of H&K's client representations.

The first, of Murex, extended from late January 2016 through April 2016. The Murex representation was originally contemplated to consist of lobbying services only and was subject to an engagement agreement that permitted H&K to represent clients adverse to Murex. Murex contends that, in fact, H&K's representation of it broadened beyond lobbying work, including helping Murex defend itself against a threatened EPA enforcement action, and briefly counseling Murex on a pending lawsuit in which Murex was represented by a different law firm.

H&K's second representation, of FNBC, a Louisiana bank, extended from December 2015 to the present. It entailed readying—and, in September 2016, filing—this lawsuit, which accuses Murex of participating in a scheme to defraud FNBC by knowingly selling it receivables

---

[1] The Court draws this background from the parties' extensive submissions on the motion to disqualify, which consisted of declarations and attached exhibits. Murex submitted declarations by Rick Bartel ("Bartel Decl."), Jennifer LeRow ("LeRow Decl."), Joseph M. Coleman ("Coleman Decl."); and Robert M. LeMay ("LeMay Decl."); it also attached exhibits to its memorandum of law ("Murex Mem."). H&K, for FNBC, submitted declarations of Michael McAdams ("McAdams Decl."), Andrew H. Emerson ("Emerson Decl."), Bonni Kaufman ("Kaufman Decl."), J. Allen Maines ("Maines Decl."), John T. Heim ("Heim Decl."), and Hermann "Buck" Moyse ("Moyse Decl."). Aspects of these materials were redacted from the parties' public filings, out of respect for Murex's attorney-client privilege and/or business interest in confidentiality. The Court also draws, for context, on FNBC's Complaint ("Compl.", Dkt. 1, and Amended Complaint ("Am. Compl."), Dkt. 51, and on representations by counsel at the February 13, 2017 argument on the motion to disqualify. *See* Dkt. 60 ("Tr.").

owed by Abengoa Bioenergy Company LLC ("ABC") that allegedly were fraudulent, because they were based on sales of ethanol that FNBC claims never took place.

Because the parties' arguments on the disqualification motion turn on the specifics of H&K's representations, the Court reviews them in detail.

### A. H&K's Representation of Murex

#### 1. Background to H&K's Engagement

Murex markets and provides distribution services for ethanol and other gasoline blendstocks. Am. Compl. ¶ 13.

Since approximately 2007, Murex has marketed and sold Renewable Identification Numbers ("RINs"). Bartel Decl. ¶ 3. RINs are 38-digit serial numbers assigned to a batch of renewable fuel, such as ethanol, for the purpose of tracking its production, use, and trading, as required by the EPA's Renewable Fuel Standards ("RFS") program. RINs are generated by renewable fuel producers, not by traders in such fuels such as Murex. McAdams Decl. ¶¶ 11–12. Under federal regulations, obligated parties (*e.g.*, refiners, importers, and certain blenders of gasoline) must hold enough RINs to meet regulatory "renewable volume" obligations; a market participant who does not hold a sufficient number of RINS must pay a civil penalty. *Id.* ¶ 12 (citations omitted). Companies such as Murex purchase, aggregate, and resell RINs for a profit. *Id.*

In or about 2010, it became clear that some biofuel producers had begun selling fraudulent RINs into the marketplace for RINs. Although FNBC initially implied otherwise in this lawsuit, *see* Compl. ¶ 62, the parties now agree that Murex was solely a victim of such fraud; it purchased fraudulently-created RINs from some producers, and resold these RINs in good faith to market participants. The producers from whom Murex bought fraudulent RINs include GRC

Fuels, Inc. ("GRC"), Southern Resources and Commodities ("SRAC"), and Gen-X Energy Group ("Gen-X").  McAdams Decl. ¶ 13; Bartel Decl. ¶ 5; LeRow Decl. ¶ 6.

In August 2015, Murex's chief financial officer, Rick Bartel, and director of compliance, Jennifer LeRow, sought to hire counsel to deliver a demand letter to GRC seeking compensation for damages suffered as a result of GRC's RIN fraud.  Bartel Decl. ¶ 5.  In connection with this proposed representation, LeRow sought a recommendation of counsel from Michael McAdams, a senior policy analyst in H&K's Washington, D.C. office.  McAdams was known to Murex in his capacity as president of the Advanced Biofuels Association ("ABFA"), a trade association of approximately 30 advanced biofuels and feedstock companies, of which Murex, since 2011, has been a member.  LeRow Decl. ¶ 4; McAdams Decl. ¶¶ 6, 8.  Although a law school graduate, McAdams is not a licensed attorney.  McAdams Decl. ¶ 3.  McAdams referred Murex to H&K partner Bonni Kaufman and associate Andrew Emerson, both also based in Washington, D.C. After preliminary communications and/or emails among LeRow, McAdams, Kaufman, and Emerson, H&K determined that a business conflict prevented H&K from taking on the GRC representation.[2]  Bartel Decl. ¶ 6; LeRow Decl. ¶ 7; McAdams Decl. ¶ 10; Emerson Decl. ¶¶ 3– 6; Kaufman Decl. ¶¶ 3–8 & Exs. 1–2.  Murex later retained the firm of Kane Russell Coleman & Logan PC ("KRCL") to represent it in connection with its claims against GRC relating to fraudulent RINs.  Later in 2015, through KRCL, Murex sued GRC regarding its alleged creation and transfer of such RINs.  That lawsuit is pending in United States District Court for the Northern District of Texas.  Coleman Decl. ¶ 3.

---

[2] The business conflict has been explained to the Court.  It does not relate to FNBC.  LeRow Decl. ¶ 7.

### 2.    Murex's Retention of H&K for Lobbying

On January 20, 2016, Murex retained H&K to provide, over the three-month period beginning February 1, 2016, lobbying services in connection with RINs.  LeRow Decl. ¶ 8; McAdams Decl. ¶ 15 & Ex. 2.  Of particular concern to Murex was securing a cap on the replacement obligations of entities like Murex who had purchased fraudulently-created RINs in good faith.  For the years 2014 through 2016, the EPA had capped such parties' replacement obligations so as to require them to replace only 2% of the fraudulently created RINs that they resold.  However, for 2013 and all preceding years, the EPA left the obligated party ostensibly required to replace 100% of the fraudulently-created RINs that it resold.  Many RINs resold by Murex that had been deemed fraudulent had been generated before 2014.  Murex notified McAdams of its concern that it might be obliged to make good on all pre-2014 fraudulent RINs, potentially costing Murex many millions of dollars.  McAdams's lobbying effort was to focus on convincing the EPA to apply the 2% replacement cap to all fraudulently-created RINs that were resold, not just those created during 2014–2016.  McAdams Decl. ¶ 14; *see also* LeRow Decl. ¶ 8 (H&K was retained "to advise Murex on EPA regulatory issues" and "to effect policy changes within the EPA beneficial not only to Murex but to other RIN buyers"); Tr. 27 (lobbying goal was to "move the two percent cap forward in time so it would cover years 2011 through 2013").

Before opening the Murex matter, McAdams ran a conflict check.  It disclosed conflicts searches regarding Murex by two H&K lawyers, including Atlanta-based H&K partner J. Allen Maines.  McAdams did not contact either partner about the "potential conflict," "based on my understanding that the nature of my work, nonlawyer lobbying, would not present an attorney-client conflict."  McAdams Decl. ¶ 16.

The engagement letter between H&K and Murex, signed by McAdams and by Murex's president, Robert Wright, provides, in pertinent part:

Thank you for engaging Holland & Knight to provide EPA regulatory consulting services to Murex LLC. We look forward to serving your needs in this matter and developing a mutually satisfactory relationship.

Under the scope of this engagement H&K will provide Murex with the following: an overview of current EPA regulations and the impacts to Murex operations to date; secure meetings with key decision and policy makers at EPA regarding the implications of current regulations to your company and the RIN market in general; and H&K will seek support from the relevant congressional staff to reinforce your position with EPA if appropriate.

This agreement is effective as of February 1st for three months unless extended at the option of the client. As agreed, Holland & Knight LLP's fee in this matter will be $10,000 [per month plus any reimbursable expenses. . . .

In addition, please be aware that the services for which you have engaged Holland & Knight are "law-related services" and *not* "legal services." In other words, the firm will not be acting as your lawyers in this matter but rather in a lobbying capacity utilizing nonlawyer personnel. As such, the protections which accompany an attorney-client relationship do not apply. For example, while the firm will keep your information confidential, the specific rules governing lawyers and client confidential information do not apply. Further, the firm's lawyers would not be prohibited from providing legal services to clients in unrelated legal matters that are adverse to you. While conflicts of interest rules applicable to lawyers would not apply, we, of course, would not undertake lobbying services for another client adverse to the matter on which you have engaged our services.

McAdams Decl. ¶ 17 & Ex. 2. McAdams notified LeRow that H&K "could also provide other services to Murex, including legal services," but, McAdams attests, he did not commit H&K to undertaking such work. *Id.* ¶ 18.

### 3. The EPA's Notice to Murex of Potential Enforcement Action

On January 29, 2016, three days before H&K's lobbying engagement was to commence, Murex received a notice from the EPA. *See* Bartel Decl. ¶ 9 & Ex. B ("EPA Notice"). The EPA Notice was entitled: "ACTION REQUIRED—Affirmative Defense Notice for Potentially Invalid RINs." It notified Murex that it "may own, have transferred, or used potentially invalid renewable identification numbers (RINs) to comply with your Renewable Fuel Standard (RFS) Renewable Volume Obligation (RVO) for one or more compliance years." The EPA Notice

stated that the majority of these RINs had been verified as "A-RINs"—a species of RIN—during the period between February 21, 2013 and December 31, 2014. It stated that the fraudulent RINs had been generated by Gen-X or SRC, and were believed invalid based on a federal court plea agreement in the case of *United States v. Scott Carl Johnson*, "and associated court filings." *Id.*[3]

The EPA Notice then recapped the law pertinent to such conduct. It notified Murex that under federal regulations, parties are generally prohibited from either transferring invalid RINs or using invalid RINs to meet their RVOs. *Id.* (citing 40 C.F.R. § 80.1460(b)(2) & (c)(1)). But, the EPA Notice stated, a company which had done so "may assert an affirmative defense to these actions." *Id.* (citing 40 C.F.R. § 80.1473(a) & (c)). The EPA Notice then reviewed the criteria for this defense to the transfer or use of invalid RINs to apply. *Id.* If Murex could satisfy these criteria, the EPA Notice stated, "it will NOT have to replace these potentially invalid A-RINs, resubmit any prior compliance reports . . ., or be subject to any civil penalties for such conduct." *Id.* The EPA Notice stated that it was being sent to parties whom the EPA had concluded "may own, have transferred, or used potentially invalid A-RINs as described above." *Id.* It added that the EPA would separately contact parties whom it determined may have owned, transferred, or used Q-RINs (a different type of RIN). *Id.*

---

[3] According to public filings, the plea agreement in *United States v. Johnson*, a cooperation agreement, was filed on November 24, 2015. *See* 4:15-cr-06042-SMJ (E.D. Wash. 2015) (Dkt. 15). It provided that Johnson would plead guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 139, and to conspiracy to defraud the Government by means of false, fictitious, and fraudulent claims for income tax refunds, in violation of 18 U.S.C. § 286. It stated that Johnson was president of Gen-X and a corporate officer of SRC; it contained his admission that he had participated between approximately October 2012 and April 2015 in a conspiracy to fraudulently generate at least 72 million RINs based on renewable fuel that was either never produced or was re-processed at the G[en]-X facilities. Johnson also admitted that the scheme resulted in Gen-X's receiving more than $9.5 million in undeserved refunds from the IRS. *Id.*

The EPA Notice concluded by giving Murex 30 days to provide the EPA a written report asserting the elements of an affirmative defense. The EPA Notice recapped these as including that (1) the RINs in question had been "verified through a quality assurance audit" consistent with 40 C.F.R. § 80.1472; (2) Murex "did not know of have reason to know that the RINs were invalidly generated prior to being verified" by an independent third-party auditor; the notice directed Murex to have its "Responsible Corporate Officer" provide a signed statement confirming this; (3) Murex "did not cause the invalidity"; (4) Murex "did not have a financial interest in the company that generated the invalid RINs"; and (5) "[a]ll other supporting documentation" for an affirmative defense were provided. *Id.* ("[a]ny supporting information or documentation must be specific enough to allow the EPA to evaluate that each of the above criteria have been met"). If Murex did not submit a timely written report, or if the EPA found the elements of an affirmative defense not satisfied, the EPA Notice stated, "the EPA may require your company to replace potentially invalid A-RINs, resubmit any compliance reports involving use of potentially invalid A-RINs, and pay a civil penalty." *Id.*

### 4. H&K's Interactions With Murex Involving the EPA After Receiving the EPA Notice

The relevant personnel at Murex and H&K have submitted declarations chronicling the—or significant aspects of the—interactions between Murex, H&K, and the EPA that followed the EPA Notice. As discussed more fully below, H&K contends that its ensuing services to and communications with Murex consisted exclusively of lobbying, within the scope of the parties' January 20, 2016 engagement letter. *See, e.g.*, McAdams Decl. ¶ 20 (his work for Murex "was directed to the EPA in its agency or administrative capacity" and was "within the scope of what is commonly done by nonlawyer lobbyists"). Murex contends that, although the parties never modified their engagement letter, H&K's work regarding the EPA expanded beyond the bounds

set by the letter, including guiding Murex in the defense of the enforcement action threatened by the EPA Notice. *See, e.g.*, LeRow Decl. ¶ 9 ("During the course of H&K's engagement, McAdams routinely provided detailed legal analysis and opinions regarding the application of various regulations and statutes to Murex's business operations.")  The Court reviews the communications among Murex and H&K in detail, to elucidate H&K's work for Murex.[4]

Murex received the EPA Notice on at 2:56 p.m. on Friday, January 29, 2016.  At 3:10 p.m., Murex's LeRow forwarded the notice by email, with a summary, to McAdams, copying Murex's president, Wright, and its CFO, Bartel.  Bartel attests that he directed LeRow to contact McAdams because Bartel "had significant concerns about the financial ramifications of an EPA enforcement action against Murex," in that, "[if] Murex failed to prove its affirmative defenses, the EPA may have required Murex to: (1) replace potentially invalid RINs, causing Murex damages; (2) submit to the EPA certain compliance reports detailing the use of potentially invalid RINs; and (3) pay a potentially sizable civil penalty."  Bartel Decl. ¶ 11.  Mindful that Murex had "just 30 days to prepare affirmative defenses to the EPA's allegations that Murex may have unknowingly transferred fraudulent Gen-X and SRAC RINs," Bartel asked LeRow "to contact McAdams to request his participation in preparing the response and corresponding with the EPA."  *Id.* ¶¶ 11–12.

Over the ensuing weeks, McAdams exchanged numerous emails with Murex executives regarding its response to the EPA Notice.  Murex's Wright, Bartel and LeRow, and a fourth

---

[4] In summarizing these communications, the Court has omitted certain details, which the parties redacted from their public filings, out of respect for Murex's attorney-client privilege and its business interest in confidentiality.  For the same reason, where possible, the Court has recounted certain of Murex's communications with H&K at a higher level of generality and abstraction than it otherwise would.  However, where necessary to assure that a coherent portrait of H&K's work for Murex is presented, the Court has quoted some redacted portions of the EPA Notice and Murex's communications with H&K.

Murex official, Luke Parkhurst, its director of ethanol and RIN trading, were parties to these emails. LeRow's emails to McAdams attached voluminous materials. Bartel explains that he asked LeRow "to provide McAdams with a tremendous amount of information about Murex's RIN diligence policies, transactions, disputes, EPA interaction, and claims and causes of actions against other parties for RIN fraud and related issues, so that McAdams would be adequately informed when advising Murex on how to respond to the EPA." *Id.* ¶ 13 (stating that "[t]he vast majority of that information is highly confidential"). Bartel summarizes McAdams's ensuing work vis-à-vis the EPA Notice as follows:

> McAdams, armed with Murex's confidential information, helped Murex craft its response to the EPA Notice and a later assertion of additional affirmative defenses. He provided advice on formatting, legal substance, how to address certain regulatory compliance concerns, and how to avoid potentially adverse legal issues associated with Murex's RIN diligence explanations and the EPA in general.

*Id.* ¶ 14.

The emails exchanged between McAdams and Murex personnel during this period reflect, in order, the following communications.

On Saturday, January 30, 2016, McAdams emailed LeRow: "I see you called. Looking over this letter it certainly looks helpful in many respects. Clearly they are comfortable with 13 [2013] and beyond as far as affirmative defense." Bartel Decl., Ex. C.

On Sunday, January 31, 2016, Wright emailed McAdams:

> Mike,
> I would like to know your opinion of what this communication from the EPA might mean to Murex. Is it likely we have an off ramp for all RINS generated by Gen-x and Srac? Do you think this might apply to other invalid RIN generators? How about historical D5 invalid RINS that we have previously settled with customers. . . . any potential help in your opinion. Please call me this weekend or Monday if you have a moment. Thanks for your help!
>
> Bob

*Id.*

On Tuesday, February 2, 2016, Bartel emailed McAdams attaching Murex's "draft Affirmative Defense Letter for Gen-X and SRAC."  He added:  "We would do a related letter for all other advanced biofuel RINS purchased and sold by Murex.  Please give me your comments and suggestions."  The attached draft letter took the form of a certification by Bartel.  It addressed each element of an affirmative defense as identified by the EPA.   *Id.*

Later that day, McAdams responded.  After thanking Bartel for the draft, McAdams added that he would include a "fo[u]rth bullet" point in Murex's letter to the EPA, the text of which McAdams then proposed.  That bullet point addressed, *inter alia*, the means by which the RINs in question had been verified, citing the pertinent CFR subsection.  McAdams reminded Bartel that "[o]f course we need to get this out the door in 30 days.  We should make sure we beat that date and that the document is sent by a document dated carrier."  *Id.*

On Wednesday, February 3, 2016, Bartel sent an email entitled, "Assertion of Affirmative Defense" to McAdams and the other Murex officials.  The body of Bartel's email contained the revised text of the draft affirmative defense letter.  That letter was addressed to an EPA official.  It contained, as its first substantive point, the language that McAdams had proposed to Bartel, *verbatim*.  Attached to Bartel's email were schedules of A-RINs, generated by Gen-X or SRC, and various documents and reports, that Bartel proposed be sent to the EPA with the letter.  The email identified materials that Bartel proposed not to include in Murex's EPA submission.  The email explained that certain contracts and other documents contained particular notations regarding RINs whereas others did not.  *Id.*

Later the same day, McAdams replied to Bartel:

"Rick: Excellent, you gave it back to him in exactly the form he asked for it. As I like to say[,] idiot proof, if you know what I mean. All the best,"

*Id.*

On February 5, 2016, Murex submitted its initial EPA Notice response letter to the EPA. Bartel Decl. ¶ 16; *see also* LeRow Decl. ¶ 10 ("I provided McAdams a final draft of the Affirmative Defense Letter and all supporting documents, asked for his final review, and obtained his approval before submitting it to the EPA"). The letter and its many attachments were contained in a series of 16 emails that LeRow sent the EPA, each entitled "Assertion of Affirmative Defense—MUREX." Murex's letter tracked Bartel's prior draft. LeRow's emails to the EPA cce'd—in addition to her Murex colleagues—McAdams, who was identified at his H&K email address at "hklaw.com." LeRow Decl., Ex. A; *id.* ¶ 11 ("I provided H&K with . . . attachments detailing, among other things: (1) Murex's correspondence and agreements with Gen-X and SRAC; (ii) Gen-X and SRAC engineering reviews; (iii) Gen-X and SRAC attestation reports; (iv) Murex's due diligence on Gex-X and SRAC RINs; (v) Gen-X and SRAC RIN reports; (vi) master service agreements with third-party due diligence providers, also known as EPA approved Quality Assurance Plan providers ("QAP Providers"); and (vii) numerous QAP certificates validating RINs purchased by Murex from Gen-X and SRAC").

The same day, McAdams responded, stating, with respect to the attachments, that he would "print them all and review over the weekend." *Id.* ¶ 12 & Ex. B. LeRow responded:

:)

It's SOOO much information amassed over the years. You probably won't be able to go through it all. I was just trying to give them a good picture of just how much effort went into vetting these guys. I hope it works well for them to be able to make the right decision. Do you think this might encourage them to get back in touch about the meeting? I am truly hoping it will.

*Id.*

In the period after the EPA letter was submitted, Bartel attests:

> "EPA representatives engaged in direct correspondence with Murex regarding its affirmative defenses. McAdams was heavily involved at all times during these exchanges, and advised Murex how to respond in each interaction. McAdams counseled Murex on how to address each of the EPA's regulatory compliance concerns, and how to assert Murex's affirmative defenses to liability."

Bartel Decl. ¶ 16.

The emails exchanged between McAdams and Murex personnel during the period after Murex's first EPA submission reflect, in order, the following communications.

On Tuesday, February 9, 2016, Bartel emailed McAdams and the other Murex officials. He attached a new draft letter that he proposed Murex send to the EPA "covering the remainder of Gex-X and SRAC RINs." Bartel's draft letter noted that Murex had already responded to the EPA Notice "regarding potentially invalid Gen-X and SRAC RINs" for 2013 and 2014. The new letter addressed treatment of such RINs for the periods before 2013 and after 2014. Bartel's draft letter explained why each element of an affirmative defense applied to those RINs. Bartel Decl., Ex. E.

To the draft letter, Bartel attached a document, "Schedule A," which Bartel proposed as an exhibit to the second letter to the EPA. Schedule A consisted of an extended narrative regarding Murex. It contained: (1) four paragraphs recounting the evolution of Murex's quality assurance program (QAP), including how Murex became exposed to fraudulent RINs, the steps Murex took to vet the issues and its sources of supply, how Murex modified its anti-fraud due diligence practices, and the third-party auditors and consultants Murex utilized for these purposes; (2) a discussion of Murex's marketing agreements; (3) a discussion of the timetable for implementing Murex's QAP programs; and (4) a statement about Murex's future. Schedule A also described Murex's QAP program in detail and explained why, in Murex's view, it satisfied

the EPA's standards. Bartel also attached a proposed Schedule B, which reproduced the due diligence provisions of Murex's purchase and sale agreements regarding RINS. *Id.*, Ex. E. Bartel's email asked McAdams for his "comments and changes." Bartel's email also raised strategy questions about Murex's approach to the EPA, including whether yet a third letter was warranted "for the remaining RINs, including GRC?" *Id.*

On Thursday, February 11, 2016, LeRow reminded McAdams that Murex was awaiting his comments before sending a new letter to the EPA. *Id.*

On February 12, 2016, Murex received an email from the EPA. Murex Mem., Ex. D. McAdams advised LeRow, Bartel and Wright that he had "asked two of my compliance folks to check the paperwork." *Id.*, Ex. E. Later that day, McAdams wrote LeRow:

> Also, I know you and Rick have cleaned up the slide show. I want to sit with my white Collar crime guy and run him through the slides. Could you send me the latest document.

*Id.*[5]

Later that day, after LeRow sent him the slides ("Latest copy attached, Mike! Thanks!"), *id.*, McAdams wrote a long email—consisting of five single-spaced paragraphs—to LeRow, Wright, and Bartel, entitled "draft response the EPA email." *Id.*, Decl. D. At the top, McAdams wrote: "Take a look at this and tell me what you think. I believe we need to put something in front of them." *Id.* The balance of the email consisted of the text of an extended memo that McAdams proposed that Murex send to five EPA officials regarding the agency's potential enforcement action. McAdams's proposed communiqué from Murex to the EPA began:

---

[5] McAdams attests that the reference to his "white [c]ollar crime guy" was to H&K attorney Steven Gordon. Gordon was then representing a different client in a criminal investigation before the United States Department of Justice related to RIN fraud. Because the EPA did not ultimately meet with Murex, McAdams attests, Gordon never reviewed Murex's draft presentation to the agency. McAdams Decl. ¶ 19.

"Thank you for your email this morning. We certainly appreciate the gravity and sensitivity of the matter which you are currently managing. Murex has a couple of basic points we wanted to communicate to the agency during your deliberations on a path forward concerning the notified RIN noncompliance issue which we recently received from EPA."

*Id.*

McAdams's draft message to the EPA went on to amplify, in some detail, on aspects of Murex's affirmative defenses. *Id.* It concluded by noting that Murex was sending with it "a slide presentation we developed in the event we were able to meet with you directly," and offering to answer the agency's questions. *Id.*

The EPA did not, however, ultimately meet with Murex. McAdams Decl. ¶ 19.

On March 2, 2016, LeRow sought feedback again from McAdams on whether "to move forward with a proactive submission [to the EPA] on an affirmative defense on the remainder of the volume." She attached Bartel's earlier draft letters and Schedules A and B. *Id.*

Although the materials submitted on this motion do not reflect the EPA's decision, at argument, counsel represented that, at an unspecified later date, the EPA decided not to take enforcement action against Murex, provided that Murex, as it had proposed when proffering its affirmative defenses, made a limited repurchase of certain sham RINs. *See, e.g.*, Tr. 12, 34.[6]

### 5. Murex's Consultation of H&K Regarding the GRC Lawsuit

In addition to McAdams's work for Murex in connection with the EPA, Murex directed KRCL, its outside counsel in the GRC litigation, to contact McAdams "to obtain advice on RIN fraud litigation matters." Bartel Decl. ¶ 17. On February 12, 2016, McAdams and two KRCL's

---

[6] According to Bartel and LeRow, through the end of the written engagement (April 30, 2016), McAdams continued to help Murex "navigate complex legal issues involving the EPA and other RIN-related matters, Bartel Dec. ¶ 21, and Murex "used McAdams as a regulatory compliance advisor." LeRow Decl. ¶ 13. Murex has not supplied documentary corroboration of McAdams's EPA work for Murex after March 2, 2016.

lawyers (Joseph Coleman and Robert N. LeMay) spoke about such matters. *Id.* The purpose of the call, which Coleman described as "rather extensive," was "to consult with Mr. McAdams on RIN-related matters affecting the GRC [l]itigation on behalf of Murex." Coleman Decl. ¶ 5. McAdams, whom Coleman understood was a lawyer in H&K's Washington, D.C., office, stated that he was representing Murex in matters involving RINs and the EPA. *Id.* ¶¶ 4–5.

During the call, the KRCL lawyers and McAdams discussed "litigation and settlement strategy relating to RINs and other issues affecting the GRC litigation." *Id.* ¶ 6. Coleman attests that:

> "[C]ase strategy was developed during the telephone conference. Mr. McAdams provided in depth factual information and strategy insight with respect to RIN matters in general, including RIN-related information affecting the GRC [l]itigation. Mr. McAdams also discussed the strategy he was utilizing on Murex's behalf before the EPA related to RINs purchased by Murex. During our conversation, Mr. McAdams offered legal opinions on matters related to the GRC [l]itigation."

*Id.* ¶ 6. McAdams acknowledges sharing information on the call "about RIN transactions and the fraud perpetrated on Murex and others by parties that may have included GRC." McAdams Decl. ¶ 34. But, he attests, "I shared this information in the manner that any willing fact witness would share information with counsel for a party" and "never stated or implied to these lawyers that I was a lawyer for Murex" or "that I was licensed to practice law anywhere." *Id.*

### 6. Murex's Proposal to Expand H&K's Engagement, and H&K's Request That Murex Sign a Conflict Waiver

In mid-March 2016, Murex, "generally satisfied" with H&K's work, sought to expand H&K's engagement "beyond what H&K could reasonably provide given the $10,000 monthly fee cap." Bartel Decl. ¶ 18. Murex asked McAdams and H&K partner Kaufman to prepare a legal work budget for research, analysis, and work related to the EPA's renewable fuel standard (the "RFS legal work"). Kaufman and Emerson prepared such a budget. *Id.* In connection with

the potential representation, on or about March 14, 2016, H&K's McAdams, Kaufman, and Emerson spoke with a Murex representative for approximately 30 minutes "about the possibility of bringing an action against the EPA under the Administrative Procedures Act or other action." Kaufman Decl. ¶ 9; McAdams Decl. ¶¶ 23–24. Such work, McAdams advised Murex, "would be a separate engagement that would not be included within the scope of my initial agreement for lobbying services." McAdams Decl. ¶ 23.

Around the same time, attorneys for H&K asked that Murex sign a conflict waiver that would allow H&K to concurrently represent FNBC against Murex in the claims that, ultimately, FNBC brought in this lawsuit, related to allegedly fraudulent receivables. *See* Bartel Decl., Ex. F ("Conflict Waiver"). Before that point, Murex had been unaware that H&K was representing FNBC adverse to Murex's interests. LeRow Decl. ¶ 14.

The draft waiver was prepared by H&K. It took the form of a letter, dated March 9, 2016, from H&K partner Maines to Murex president Wright. The draft waiver was forwarded by McAdams to LeRow on March 16, 2016. McAdams's transmittal email wrote: "Apparently their [sic] is another unrelated law suit which are [sic] lawyers would like a waiver from. Would you all review this and sign please. Thank you[.]" Bartel Decl., Ex. G; Murex Mem., Ex. G. The draft conflict waiver read:

> This is to confirm your agreement, on behalf of Murex and its affiliates ("Murex"), to waive any objection to the potential conflict of interest with respect to (1) Holland & Knight's representation of First NB[C] Bank in connection with analyzing, advising, and representing it regarding its rights and obligations under various agreements whereby it acquired through The Receivables Exchange certain receivables of certain Abengoa entities including Abengoa Bioenergy Company held by Murex, and (2) Holland & Knight's ongoing representations of First NBC Bank and certain of its affiliates in unrelated matters. As you know, Holland & Knight was retained by Murex concerning unrelated regulatory matters related to the EPA and biofuels.

The applicable ethics rules permit us to represent clients with adverse, or potentially adverse interests, if each affected client consents to the representation having received in writing reasonable and adequate information about the material risks of the representation, and having been given the opportunity to consult with independent counsel.

We hereby confirm to you in writing that, under the circumstances of this matter, we have given each party the opportunity to consult with independent counsel.

Under these circumstances, if you agree that Holland & Knight LLP may undertake the concurrent representation of Murex and First NBC Bank and their affiliates in the matters described above, and that you are waiving any objection to the conflict with respect to such concurrent representations, having had the opportunity to consult with independent counsel prior to that time, please indicate your consent and waiver by signing below. Also, please return the executed copy to me as soon as possible, keeping a copy for your records.

Thank you. We look forward to working with you.

Bartel Decl., Ex. G.

On March 21, 2016, Bartel met with FNBC and discussed the transactions at issue in this lawsuit. FNBC's arguments to Murex in that meeting, Bartel attests, "included RIN-related issues." *Id.* ¶ 19; Maines Decl. ¶ 9.

Later that day, Bartel emailed McAdams and declined to sign the conflict waiver. Bartel wrote to McAdams: "This is not an unrelated lawsuit and we are not able to sign the waiver at this time. We met with Ashton Ryan, Bill Burnell and Greg St. Angelo[7] today. We discussed both Abengoa [ABC]and RINs. We hope that we may be able to sign a waiver at some time in the future." *Id.*, Ex. G; McAdams Decl. ¶¶ 26–27.

Later, H&K's McAdams prepared and delivered H&K's proposed budget, prepared by Kaufman and Emerson, for its RFS legal work for Murex. The budget anticipated legal research

---

[7] Bartel's reference to "Greg St. Angelo" appears to refer to FNBC general counsel George St. Angelo. *See* Maines Decl. ¶ 5.

and analysis on issues involving the statute of limitations, the impossibility of performance defense, various aspects of EPA's authority, and analogous environmental statute, and the preparation of an opinion letter to EPA regarding its authority to forgo requiring the replacement of RINs or imposition of civil penalties.  LeRow Decl., Ex. C; Murex Mem., Ex. F; Kaufman Decl. ¶ 16; *see also* Emerson Decl. ¶ 9 (reporting spending 2.6 hours assisting Kaufman as to "potential expansion of McAdams's lobbying work into legal work for Kaufman").  As LeRow recounted in an email to her colleagues, McAdams advised LeRow that, although he was "double checking," he did not believe that this work would "result[] in a conflict."  LeRow Decl., Ex. C (March 23, 2016 email).  Murex declined to hire H&K to do such work, on account of the "high costs" reflected in the budget and the "potential conflict raised by H&K."  Bartel Decl. ¶ 20.

## B.      FNBC's Representation of FNBC Adverse to Murex

### 1.      Background to H&K's Representation of FNBC

H&K, led by Maines, began representing FNBC in spring 2015.  Maines Decl. ¶ 4.  In mid-December 2015, Maines spoke with FNBC's general counsel Gregory St. Angelo about FNBC's purchase from Murex of receivables from ABC that had not been paid when due.  FNBC contemplated suing Murex to repurchase the unpaid receivables in the event they were not paid by ABC or repurchased by Murex, which, in December 2015, had sent a demand letter (signed by CFO Bartel) to ABC.  *Id.* & Ex. 1.

On December 22, 2015, William Mutryn, an H&K partner in the firm's Tyson, Virginia, office, ran an initial conflicts check.  It did not reveal any representation of Murex or conflict for H&K in representing clients adverse to Murex.  Maines notified St. Angelo that H&K was clear to represent FNBC.  A second conflicts check, conducted by Maines on January 11, 2016, also reveal no conflict preventing H&K from being adverse to Murex.  Maines Decl. ¶ 6.  On or

about January 26, 2016, H&K, per Maines, formalized the representation, executing an engagement letter with FNBC.  *Id.*

### 2. H&K's FNBC Team Learns of the Murex Representation and Seeks a Conflict Waiver from Murex

In early March 2016, Maines attests, he learned that McAdams had opened a matter on Murex's behalf.  *Id.* ¶ 8.  On or about March 9, 2016, Maines and McAdams spoke by telephone. *Id.*; McAdams Decl. ¶ 22.

Maines attests that he and McAdams "did not discuss the details of either representation beyond a statement by me to McAdams that I was representing FNBC in the investigation of possible litigation against Murex and the statement by McAdams to me that he had not been retained as a lawyer by, or to perform legal services for, Murex, but that he had been retained as a lobb[yist] for a three (3) month period at a fixed fee to monitor [EPA] developments concerning biofuels."  Maines Decl. ¶ 8.  McAdams attests he learned on the call that Maines "was preparing to file an action against Murex on FNBC's behalf [] alleg[ing] that Murex and ABC had conspired to and did construct fraudulent financial transactions that adversely impacted FNBC."  McAdams Decl. ¶ 22.  McAdams attests that he "told Maines that I was doing non-legal work for Murex that was trying to change the federal law related to RIN replacement and that would affect the entire country."  *Id.*

Neither Maines nor McAdams represents that McAdams notified Maines of the EPA enforcement action that the EPA had threatened, of any work H&K had done in connection with the EPA Notice, or of the February 2016 consultation between McAdams and Murex's outside counsel in the GRC litigation with McAdams.

According to McAdams, he and Maines "determined that no conflict existed," because "our matters were not related and because successful advocacy for Murex in RIN replacement

requirements would not affect Maines's advocacy in FNBC's fraudulent financial transactions action." *Id.* ¶ 22. Nevertheless, in what both Maines and McAdams attest was "an abundance of caution," Maines asked McAdams, on Maines's behalf, to ask Murex to execute a conflict waiver. The waiver had been drafted by a member of Maines's team. *Id.*; Maines Decl. ¶ 9.

As noted, on March 21, 2016, Murex declined to execute the conflict waiver. Bartel Decl., Ex. G; Maines Decl. ¶ 9.

### C. FNBC's Initial Complaint Against Murex

On September 30, 2016, five months after the end of the period covered by the firm's Engagement Agreement with Murex, H&K, on behalf of FNBC, filed the initial Complaint against Murex in this case. Dkt. 1 ("Compl.").

The Complaint listed five H&K attorneys as counsel: three from the firm's Atlanta office (including Maines) and two from New York. It brought six claims: for breach of contract, Compl. ¶¶ 46–51, breach of representations and warranties, *id.* ¶¶ 52–69, negligence and gross negligence, *id.* ¶¶ 70–73, fraud and fraudulent concealment, *id.* ¶¶ 74–81, rescission, *id.* ¶¶ 82–83, and breach of fiduciary duty, *id.* ¶¶ 84–91.

The Complaint alleged that Murex, between 2013 and 2015, had schemed to defraud it. *Id.* ¶¶ 1, 5–45. It alleged that ABC was a significant customer of Murex, which markets and provides distribution services for ethanol and other gasoline blendstocks. *Id.* ¶¶ 5–6. Murex's invoices to ABC required prompt payment and Murex depended on ABC's line of credit so that ABC could pay for the ethanol it bought from Murex. *Id.* ¶ 7. But, the Complaint alleged, ABC became "credit-constricted, and was perilously close to exceeding the limits of its credit facility," threatening its ability "to purchase ethanol from Murex." *Id.* ¶ 8. And ABC would not have been able to obtain additional credit or financing from FNBC. *Id.* ¶ 9.

The Complaint alleged that, in response, Murex and ABC conspired to circumvent the limits of ABC's existing credit facility with FNBC and to fabricate transactions for the purported sale and re-purchase of ethanol, to give ABC more working capital and to enrich Murex. *Id.* ¶ 11. Under the scheme, Murex would invent fictitious sales of ethanol to ABC on extended terms; for each purported sale, there was an offsetting purported re-purchase of the ethanol by Murex for cash. *Id.* ¶ 12. In fact, these transactions giving rise to receivables never occurred, *id.* ¶ 16; Murex and ABC had created this "fraudulent paper trail" to support the fiction that there had been bona fide sales and deliveries of ethanol. *Id.* ¶ 17.

FNBC further alleged that Murex then schemed to dupe FNBC to "unwittingly becom[]e ABC's largest creditor by marketing the phantom receivables it manufactured to FNBC as an investment." *Id.* ¶ 19. Murex carried off this scheme by contracting with an electronic auction platform run by an unlicensed broker-dealer, The Receivables Exchange, LLC ("TRE"). *Id.* ¶¶ 20–21. Using the TRE platform, Murex gradually increased ABC's indebtedness to more than $125 million, and eventually "unloaded" that debt "onto FNBC by selling FNBC the last of its receivables for the fake transactions." *Id.* ¶¶ 23–25. Between July and September 2015, Murex thereby sold FNBC more than $69 million in receivables from bogus transactions, leaving FNBC with a large loss. *Id.* ¶¶ 29–32. To further the scheme, the Complaint alleges, Murex made false statements to buyers of receivables through the auction platform, including FNBC, and failed to disclose the offsetting re-purchase transactions that made the receivables illusory. *Id.* ¶¶ 34–42.

Of note, five paragraphs in the Complaint made allegations about the EPA and RINs. The Complaint stated that Murex, by engaging in "phony transaction[s] for the purported sale of ethanol to FNBC," of having broken "numerous state and federal laws." These include "upon information and belief those of the Environmental Protection Agency ("EPA"), regulating and

pertaining to the sales and shipment of ethanol and the reporting of Renewable Identification Numbers (RINs) connected thereto." *Id.* ¶ 57. The Complaint defined RINs and summarized the EPA's regulations regarding biofuels, including the requirement that "[a]nyone who owns RINs must register with the EPA on an annual basis and obey mandated record-keeping requirements. All RINS are required to be reported to the EPA after creation." *Id.* ¶¶ 58–59. It alleged that, while "it is unclear" what portion of ABC and Murex's offsetting transactions involving ethanol sales "might be subject to federally mandated record keeping and reporting requirements," "upon information and belief Murex did not maintain any records or comply with any reporting requirements relating to the alleged underlying sale and transfer of ethanol." *Id.* ¶ 60.

FNBC's Complaint further alleged that: "Murex is involved currently with the EPA on a matter involving EPA fraud." *Id.* ¶ 62. The Complaint did not elaborate on this allegation.

As relief, FNBC's Complaint sought "actual, incidental, special and consequential damages"; an accounting; attorneys' fees and expenses; and rescission. *Id.* at 16–17.

### D. Murex's Motion to Disqualify H&K

On November 29, 2016, Murex moved to disqualify H&K as FNBC's counsel in this case, submitting a memorandum of law, Dkt. 30 ("Murex Mem."), and factual declarations and exhibits in support. *See supra,* note [1].

Specifically, Murex alleged, in early 2016, when H&K had been preparing to sue Murex on FNBC's behalf, H&K—largely through McAdams, whom Murex described as an attorney in H&K's Washington, D.C., office—had also represented Murex in defending against the threatened EPA enforcement action involving fraudulent RINs. Murex acknowledged that it had originally hired H&K to lobby solely for policy changes before the EPA, *id.* ¶¶ 6–7 & Ex. 3. But, Murex stated, its receipt in late January of the EPA Notice, giving it 30 days to prepare affirmative defenses against the claim that it had illegally engaged in transactions involving

fraudulent RINs, changed the character of H&K's representation. Thereafter, Murex stated, McAdams had given Murex legal and strategic advice how to defend itself, and, in so doing, had become privy to confidential information of Murex's. *Id.* Murex also asserted that McAdams, on February 12, 2016, had participated in a call with KRCL, Murex's outside counsel in the GRC litigation, in which the participants reviewed case strategy, Murex's EPA defense, and the interplay between the GRC litigation and the EPA's threatened action. *Id.* ¶¶ 12–13. Murex also asserted that it had received telephonic regulatory and enforcement advice from H&K partner Kaufman. *Id.* Murex noted that until March 2016, it had been unaware of H&K's representation of FNBC, and that, when asked, it had refused to waive the conflict presented by H&K's representation of FNBC. *Id.* ¶¶ 18–23.

Murex argued that disqualification was required because H&K had concurrently represented it and its litigation adversary FNBC. Murex argued that it would be prejudiced were H&K permitted to represent FNBC, in that it had provided H&K with a "tremendous amount of confidential information related in part to RIN litigation and EPA regulatory compliance litigation." *Id.* ¶ 24. Murex argued that H&K had already exploited its confidential information, in that its Complaint had alleged that "Murex is involved currently with the EPA on a matter involving RIN fraud." Before that filing, Murex stated, the EPA's inquiry had not been a matter of public record, and Murex had disclosed it only to its attorneys. *Id.* ¶ 26 (citing Compl. ¶ 62). Murex stated that it was unaware of other means by which H&K or FNBC could have learned of the threatened enforcement action. *Id.* By revealing the EPA's potential action against it, Murex stated, H&K had betrayed its duties to—and embarrassed—Murex. *Id.* ¶ 46.

### E. H&K's Response to the Disqualification Motion and Murex's Reply

On December 19, 2016, H&K—on behalf of FNBC—filed a memorandum of law opposing disqualification ("HK Mem."), along with supporting declarations and exhibits. *See supra,* note 1. H&K made three arguments against disqualification.

First, it argued, Murex had solely been a lobbying client as reflected in the Engagement Agreement. HK Mem. at 1–8. McAdams, H&K stated, is exclusively a lobbyist: While H&K's website identifies him as a J.D. graduate of American University's Washington College of Law, H&K noted, McAdams is not a licensed lawyer, he and H&K have not held McAdams out as such, and his title is Senior Policy Analyst. HK Mem. at 1–8; McAdams Decl. ¶¶ 2, 34.

Second, H&K argued, to the extent H&K and Murex had contemplated legal work, Murex was never more than a "prospective client" of H&K. No engagement letter had been executed for legal work; thus, there had never been an attorney-client relationship between H&K and Murex. H&K Mem. at 1, 8–11.

Third, H&K argued, even if H&K had represented Murex as its attorney, this lawsuit was not tainted. The subjects of this lawsuit and H&K's Murex work, H&K argued, do not overlap, in that FNBC accuses Murex of participating in fake ethanol transactions aimed at defrauding it, whereas H&K's Murex work involved a regulatory inquiry relating to fraudulent RINSs. And, H&K stated: "It does not even appear that most, if not all, of the alleged sham transactions [involving ABC] included RINs." *Id.* at 15. H&K denied that H&K had learned that "Murex is involved currently with the EPA on a matter involving RIN fraud," Compl. ¶ 62, from Murex. Relying on a declaration from Maines, H&K stated that it had learned this by some other means. *Id.* at 16–17 (citing Maines Decl. ¶ 11).

On February 6, 2017, Murex submitted a reply. Dkt. 53 ("Murex Reply"). It noted that the Engagement Agreement had predated the EPA Notice. It argued that H&K's unexpected

work defending it against enforcement action had been of a different character than the "legislative lobbying" work originally contemplated, *id.* ¶ 3, 15, and constituted legal work. *Id.* ¶ 5, 11. As to taint, Murex argued there was a risk that confidential information it had given H&K would be used against it. *Id.* ¶ 20. This risk was heightened, Murex argued, by the fact that McAdams and Maines had spoken about H&K's work for Murex in early 2016, *id.* ¶ 22, by the allegations in the Complaint regarding RINs, and by H&K's failure to erect an "ethics wall" between the two representations until November 30, 2016, after Murex had moved to disqualify. *Id.* ¶ 9.

### F. FNBC's Amended Complaint

On January 31, 2017, H&K, on FNBC's behalf, filed a First Amended Complaint ("FAC"). Relevant here, the FAC—while adding allegations regarding Murex's interactions with ABC—removed all allegations regarding RINs. This, Maines attests, was not due to Murex's disqualification motion, but to his enhanced understanding of his client's case. *See* Maines Decl. ¶ 12 ("Although I did not fully understand this at the time, I now understand that contracts for the sale of biofuels (such as the allegedly "sham" contracts between ABC and Murex that are at the core of [FNBC's claims]) may nor may not involve the transfer of RIN[]s," and that "neither the presence nor the absence of RINs on any purchase and sale documents between ABC and Murex demonstrate whether ABC and Murex did or did not engage in sham transactions."); *id.* ¶ 13 (attesting that, as a result of reviewing documents filed in ABC's bankruptcy proceeding, H&K had learned that the documents relating to the alleged sham transactions at issue did not reference RINs). To the original six claims against Murex, the FAC added seven causes of action, including under the federal racketeering statute, 18 U.S.C. § 1961,

and the Louisiana Unfair Trade Practices Statute, and for unjust enrichment, detrimental reliance, and misappropriation of proprietary information.[8]

### G. Argument and Post-Argument Submissions

On February 13, 2017, the Court heard argument. It focused on whether H&K had engaged in concurrent legal representations of Murex and FNBC, and, if so, whether there was a risk of trial taint. After argument, the Court notified counsel that it was likely to find a concurrent representation. The Court gave FNBC a week to notify the Court whether it continued to seek representation by H&K.

On February 21, 2017, FNBC, per H&K, *sua sponte* submitted a lengthy surreply opposing disqualification and re-arguing the issues of concurrent representation and trial taint. Dkt. 56 ("H&K Surreply"). The Court permitted Murex to submit its own sur-reply, which it filed on March 7, 2017. Dkt. 65.

## II. Discussion

### A. Background Principles Governing Disqualification Motions

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (citing *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). In exercising this power, the Court must "attempt[] to balance a client's right freely to choose his counsel against the need to maintain the highest standard of the profession." *Hempstead Video, Inc.*, 409 F.3d at 132 (internal quotations and citations omitted).

---

[8] On March 7, 2017, Murex moved to dismiss the FAC, Dkt. 63, much as it had earlier moved to dismiss the initial Complaint, Dkt. 24. That motion is pending.

Motions to disqualify are disfavored and subject to a high standard of proof. That is because disqualification impinges on a party's rights to employ the counsel of its choice, because a motion to disqualify has potential to be used for tactical purposes, and because, even when brought in good faith, such a motion can cause delay, impose expenses, and interfere with the attorney-client relationship. *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791–792 (2d Cir. 1983); *see also Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009); *Nyquist*, 590 F.2d at 1246; *Daudier v. E&S Medical Staffing, Inc.*, No. 12 Civ. 206 (PAE), 2012 WL 3642823, at *1 (S.D.N.Y. August 23, 2012).

On the other hand, the Second Circuit has held, any doubt should be resolved in favor of disqualification. *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975). In the end, after careful analysis, a motion to disqualify is "committed to the sound discretion of the district court," *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994), and reviewed for abuse of discretion, *GSI Commerce Solutions, Inc. v. Babycenter, LLC*, 618 F.3d 204, 209 (2d Cir. 2010).

In considering motions to disqualify, courts often benefit from valuable guidance offered by the American Bar Association (ABA) and state disciplinary rules. *See, e.g.*, *GSI Commerce Solutions*, 618 F.3d at 209. However, "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." *Hempstead Video,* 409 F.3d at 132; *Nyquist*, 590 F.2d at 1246. Conversely, "disqualification may be justified even in the absence of a clear ethical breach 'where necessary to preserve the integrity of the adversary process.'" *Nyquist*, 590 F.2d at 1246.

Where an attorney's conduct tends to taint a trial, disqualification is warranted. *GSI Commerce Solutions,* 618 F.3d at 209; *Hempstead Video,* 409 F.3d at 132–33; *see also Nyquist*, 590 F.2d at 1246 ("other ethical violations can be left to federal and state disciplinary

mechanisms"). The Second Circuit has recognized two situations in which a risk of trial taint may require disqualification. *See Nyquist*, 590 F.2d at 1246. The first arises "when an attorney places himself in a position where he could use a client's privileged information against the client." *Hempstead Video*, 409 F.3d at 133.[9] The second arises when an attorney places himself in a position where he may not exercise independent judgment on behalf of a client, for example, as a result of a representation of a separate client. This "undermin[es] the Court's confidence in the vigor of the attorney's representation of his client." *Nyquist*, 590 F.2d at 1246.[10]

When a conflict has been found between two client representations by an attorney, the standard for disqualification varies depending on whether the representations were successive or concurrent. *Hempstead Video*, 409 F.3d at 133.

The disqualification standard for successive representations turns on whether there was a "substantial relationship" between the matters. In such cases, the attorney may be disqualified if:

"(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client."

---

[9] The obligation not to disclose such information is embodied in, *inter alia*, Rule 1.6 of the New York Rules of Professional Conduct (the "New York Rules"). It states, in pertinent part, that a lawyer "shall not knowingly reveal confidential information . . . or use such information to the disadvantage of a client or for the advantage of a lawyer or a third person." Rule 1.6(a). This same language appears in the parallel provision of the Washington, D.C., Rules of Professional Conduct (the "DC Rules"), Rule 1.6(a).

[10] This obligation not to avoid such conflicts is embodied in, *inter alia*, Rule 1.7 of the New York Rules. It states, in pertinent part, that a lawyer shall not represent a client if a reasonable lawyer would conclude that either: "(1) the representation will involve the lawyer in representing different interests" or "(2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be significantly affected by the lawyer's own financial, business, property or other personal interests." Rule 1.7(a). DC Rule 1.7(a) contains the same requirement.

*Hempstead Video*, 409 F.3d at 127 (quoting *Evans*, 715 F.2d at 791).[11]

The disqualification standard for concurrent representations is stricter. "[I]t is 'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." *Id.* (citing *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976)). A concurrent representation implicates "the duty of undivided loyalty which an attorney owes to each of his clients," who are entitled to the lawyer's "'undivided allegiance and faithful, devoted service.'" *Cinema 5, Ltd.*, 528 F.2d at 1386. Where a concurrent representation is found, it will "not suffice to show that the two matters upon which an attorney represents existing clients are unrelated." *GSI Commerce*, 618 F.3d at 209. As the Second Circuit has explained: "'The lawyer who would sue his own client, asserting in justification the lack of 'substantial relationship' between the litigation and the work he has undertaken to perform for that client, is leaning on a slender read indeed.'" *Id.* (quoting *Cinema 5*, 528 F.2d at 1386). Instead, "it is incumbent upon the attorney to 'show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation.'" *Id.*; *Hempstead Video*, 409 F.3d at 133. (emphasis in original)). "This," the Second Circuit has stated, "is 'a burden so heavy that it will rarely be met.'" *GSI Commerce*,

---

[11] *See also Hull,* 513 F.2d at 571–572 (upholding disqualification under substantial relationship test); *United States v. Prevezon Holdings,* 839 F.2d 227, 240 (2d Cir. 1987) (reversing district court and holding disqualification required under substantial relationship test; it was error to shift burden to movant to show that confidences had been passed to counsel, because movant was entitled to benefit of irrebuttable presumption that confidences had been shared); *Merck Eprova AG v. Prothea,* 670 F. Supp. 2d 201 (S.D.N.Y. 2009) (JCF) (granting motion to disqualify under substantial relationship test); *Blue Planet Software, Inc. v. Games International, LLC,* 331 F. Supp.2d 273 (S.D.N.Y. 2004) (same); *Olajide v. Palisades Collection, LLC,* 2216 WL 1448859 (S.D.N.Y. 2016) (denying motion to disqualify under substantial relationship test); *Scantek Medical, Inc. v. Sabella,* 693 F. Supp. 2d 235 (E.D.N.Y. 2008) (same); *American International Group, Inc. v. Bank of America Corp.,* 827 F. Supp. 2d 341 (S.D.N.Y. 2011) (same).

618 F.3d at 209 (quoting *Glueck v. Jonathan Logan, Inc.*, 653 F.3d 746, 749 (2d Cir. 1981); *see, e.g., Stratagem Development Corp.*, 756 F. Supp. 789 (S.D.N.Y. 1991) (SWK) (disqualifying firm after determining that standard for concurrent representation applied).

**B.      Discussion**

Murex's motion to disqualify requires the Court to resolve, in sequence, three issues. First, did H&K provide legal services to, and form an attorney-client relationship with, Murex, implicating canons of professional responsibility?  Or, did H&K's services for Murex consist exclusively of lobbying work, which, under Murex's Engagement Agreement, permitted H&K to represent adverse parties in unrelated matters?  Second, assuming that H&K served as Murex's attorney, was H&K's legal representation of Murex concurrent with or successive to H&K's representation of FNBC?  Third, under the operative standard, is disqualification required?

The Court addresses these issues in turn.

**1.      Did H&K Provide Legal Services to, and Form an Attorney-Client Relationship With, Murex?**

In denying a conflict, H&K argues that Murex was solely a lobbying client and that H&K provided Murex only "lobbying services."  FNBC Br. 1.  McAdams, it notes, although identified on H&K's website as a law school graduate, lacks a law license, works solely as a lobbyist, and is held out by the firm as a "Senior Policy Analyst."  *Id.* at 1–2.  And the Engagement Agreement with Murex, H&K notes, described the engagement as a "Lobbying/ Consulting Engagement" and defined H&K's services as those of lobbyist:

> "Under the scope of this engagement H&K will provide Murex with the following: an overview of current EPA regulations and the impacts to Murex operations to date; secure meetings with key decision and policy makers at EPA regarding the implications of current regulations to your company and the RIN market in general; and H&K will seek support from the relevant congressional staff to reinforce your position with EPA if appropriate."

*Id.* at 3 (quoting Engagement Agreement ¶ 2). Further, H&K notes, in the agreement, Murex agreed that "the services for which you have engaged [H&K] are 'law-related services' and *not* 'legal services'"; that "the firm will not be acting as your lawyers in this matter but rather in a lobbying capacity using nonlawyer personnel"; that "[a]s such, the protections which accompany an attorney-client relationship do not apply," such that "the firm's lawyers would not be prohibited from providing legal services to clients in unrelated legal matters that are adverse to you." *Id.* at 3–4 (quoting Engagement Agreement ¶¶ 3–5). Finally, H&K notes, a document entitled "Terms of Engagement" which the Engagement Agreement incorporated stated:

> "We will provide consulting services only. You have acknowledged in the accompanying letter that you do not expect to receive, and we will not provide[,] any legal services as part of this engagement. Consequently, no attorney-client relationship will result from this engagement and you will not become entitled to any of the benefits of any attorney client relationship[.]"

*Id.* at 4 (quoting McAdams Decl., Ex. 4).

Given these writings, H&K argues, "it was literally as plain as the words on the page that the Engagement Agreement and the Terms of Engagement did not create an attorney-client relationship between Murex and H&K" and "did not impose on H&K the conflict of interest limitations that apply to attorney-client relationships." *Id.* at 5.

The Court has little doubt that, had H&K's ensuing services to Murex been confined to those described in the Engagement Agreement, Murex could not credibly claim that H&K had provided it legal services, formed an attorney-client relationship with it, or took on a conflicting engagement in breach of canons of professional responsibility. The codes of conduct applicable to the District of Columbia, where H&K's EPA-related work for Murex was centered, identify lobbying as a distinct discipline from the practice of law. Lobbying is defined as:

> "[A]ctivities [that] may include, but are not limited to: oral, written and electronic communications with members of Congress, congressional committees, . . .

congressional staff [and executive agencies and agency personnel] with regard to the formulation, modification, or adoption of federal legislation [and regulations]; preparation and planning activities, research, and other background work in support of such contacts; and development of . . . strategy and tactics."

Unauthorized Practice of Law Op. 19-07, "Applicability of Rule 49 to U.S. Legislative Lobbying" ("UPL Op. 19-07"); *see also* D.C. Ethics Op. 344 (2008) (extending this definition to "executive branch rule-making matters").

Moreover, as U.P. Op. 19-07 recognizes:

"U.S. legislative lobbying may involve 'preparing or expressing legal opinions.' Indeed, it may be difficult or even impossible to discuss with a client or others whether current federal law should be changed without discussing whether and how current federal law addresses an issue. However, individuals and companies who want assistance in presenting their views to the U.S. Congress understand that many lobbyists are not lawyers and that nonlawyers can function as effectively as—and in some instances more effectively than—lawyers."

UPL Op. 19-07 (comparing lobbying to "tax accounting, securities advice, and pension consulting"); *see also* D.C. Ethics Op. 344; D.C. Rule 5.7, cmt. 9; New York Rule 5.7, cmt. 9. H&K's January 20, 2016 Engagement Agreement with Murex thus was correct to recite that, when a client engages a lobbyist as such, the client does not obtain the benefits of an attorney-client relationship, including the conflict rules governing attorneys. *See* D.C. Rule 5.7, cmt. 1; D.C. Ethics Op. 344.

The "words on the page" of the Engagement Agreement, on which H&K relies for its claim that its performed only lobbying services, do not, however, describe the reality of H&K's ensuing work for Murex. H&K's representation of Murex was an example of "mission creep," in which the scope of a firm's work for its client grew beyond that described in its engagement agreement without any corresponding modification of that agreement or open acknowledgment between the firm and its client that the representation in fact had overrun the written agreement.

From the outset, in fact, H&K's work for Murex materially exceeded the scope of work described in the Engagement Agreement. That was because of a game-changing intervening event: On January 29, 2016, nine days after the agreement was signed and three days before H&K's work on its behalf was to begin, Murex received the EPA Notice. The notice raised the prospect of enforcement action against Murex based on Murex's ownership, transfer and use of fraudulent A-RINs generated by Gen-X or SRC. It cited a recent criminal prosecution of a Gen-X and SRC executive involving fraudulent RINs, threatened Murex with potential sizable civil penalties depending on its affirmative defenses, and gave Murex 30 days to respond. Minutes after receiving the notice, Murex notified McAdams and sought his help in preparing a defense. And, as the assembled record reflects, from that day forward, before H&K's lobbying work for Murex was even scheduled to begin, McAdams actively helped construct and choreograph Murex's defense.

Towards that end, McAdams reviewed the voluminous documents forwarded to him by LeRow. These materials illuminated the facts as to Murex's historical and present exposure to fraudulent RINS and Murex's evolving policies and practices with regard to RINs. McAdams commented on Murex's proposed affirmative defenses. He edited its draft submission, adding facts, argument, and a citation to the applicable EPA regulations. He drafted text for Murex to submit to the EPA in its defense, language which Murex adopted *verbatim* for its submission. He even advised on formatting. And McAdams was copied, overtly such that his name and email address at H&K were visible to the EPA, on LeRow's emails to the agency submitting Murex's affirmative defense and attachments. *See, e.g.*, LeRow Decl., Ex. A.

Contrary to H&K's argument, this work was outside the scope of the parties' written agreement. The EPA Notice post-dated the Engagement Agreement. And McAdams's work

trying to deter the EPA from bringing the action it threatened was distinct from the "regulatory consulting" matters covered by that agreement. McAdams's work developing and coordinating its client's defense was not an act of providing "an overview of current EPA regulations and the impacts to Murex operations to date," "secur[ing] meetings with key decision and policy makers at EPA regarding the implications of current regulations to your company and the RIN market in general," or "seek[ing] support from the relevant congressional staff." Engagement Agreement at 1. The agreement is silent as to any work by H&K defending a potential enforcement action. And H&K does not claim—and there is no evidence to support—that, at the time the agreement was entered, Murex and McAdams anticipated the company's receipt of a notice along the lines of the EPA Notice, let alone that they agreed that H&K would assist Murex in responding to it.

Quite the contrary: At argument on the motion to disqualify, H&K acknowledged that "the purpose of . . . McAdams'[s] retention as a lobbyist was to obtain relief that was by its nature . . . applicable to others in the industry." Tr. 29. As H&K explained, Murex hired McAdams to persuade the agency to extend the 2% cap on the exposure of all companies, including Murex, who had transacted in fraudulent RINs, so as to cover years before 2014–2016. *Id.* at Tr. 28–29 (acknowledging that Murex's purpose in hiring McAdams was "not to get one-off relief for Murex but to . . . benefit Murex [and] others who have exposure during the same time period"). McAdams's work helping Murex respond to the EPA Notice, in contrast, was not of an industry-wide nature. It was to secure relief specific to Murex: Although other industry participants appear to have received similar notices, the defense that McAdams helped Murex

present was particular to Murex and anchored in facts and supported by exhibits specific to that one client.[12]

McAdams's work for Murex in response to the EPA Notice also exceeded the definition of "lobbying" in U.P. Op. 19-07. His preparation of Murex's written defense, being advocacy on behalf of a single client, was not aimed at "the formulation, modification, or adoption of federal legislation [or regulations]." It was more than "preparation and planning activities, research, and other background work in support of such contacts." And, while McAdams and Murex certainly brought strategic thinking to bear on Murex's response, his work shaping its submission to the EPA would not naturally be described as the "development of . . . strategy and tactics." *See* U.P. Op. 19-07.

The issue then is whether this work constituted legal or lobbying services. That question is fact-intensive. *See, e.g., In Re Grand Jury Subpoenas,* 179 F. Supp. 2d 270, 285 (S.D.N.Y. 2001) (application for presidential pardon constituted lobbying). But, as to McAdams's efforts on Murex's behalf that were occasioned by the EPA Notice, the question is easily answered: This was legal work. H&K's regulatory defense of Murex fell outside the scope of its written engagement for lobbying. It fell outside of U.P. Op. 19-07's definition of lobbying. And as a review of McAdams's communications with his client's officials—and of the various Murex submissions to the EPA that McAdams edited and/or authored—reflects, McAdams's work was quintessentially that of an advocate applying legal standards to facts. Drawing on his expertise,

---

[12] In addition to covering different subject matters, H&K's lobbying and enforcement defense work covered time periods that were not fully consonant. H&K's lobbying efforts were aimed at extending, to the years 2013 and earlier, a 2% cap the agency had set, for the years 2014–2016, on the obligation to replace bogus RINS. The EPA Notice, however, threatened enforcement action for Murex's ownership, transfer, or use of fraudulent RINS during the period February 21, 2013 and December 31, 2014.

McAdams assisted Murex to fashion affirmative defenses that cited and applied each element of the EPA's five-part standard governing the transfer of RINs, *see* 40 C.F.R. § 80.1460(b)(2) & (c)(1), to Murex's particular facts in a light that was fair but favorable to his client's cause.[13]

McAdams's work—which ultimately proved successful—helping Murex prepare its written defenses before a federal regulator was, in fact, of a piece with the work that controversy lawyers whose clients are threatened with enforcement action by such a regulator commonly perform. Whether these lawyers are specialists as to a particular agency or generalist litigators, such lawyers routinely submit—or prepare for a client to submit—written submissions, styled as memoranda, white papers, and/or "Wells submissions," aimed at discouraging civil enforcement action threatened by an agency. *See, e.g.*, *In re Initial Public Offering Securities Litigation*, 2004 WL 60290, at *1 (S.D.N.Y. 2004) (explaining "Wells submission" process in which lawyers make written factual and legal advocacy submissions after SEC staff has recommended an enforcement proceeding). Federal agencies that regularly receive such advocacy submissions by lawyers in defense of a client's past conduct include the Securities and Exchange Commission, the Consumer Financial Protection Bureau, the Federal Trade Commission, the Federal Communications Commission, and the Food and Drug Administration. To such an attorney, the paragraphs that McAdams authored, and the submission that he helped craft on Murex's behalf to fend off EPA enforcement action, would be readily recognizable as legal work of this genre.

---

[13] H&K argues that the EPA sought only factual information. *See* HK Surreply at 2. But McAdams and Murex culled and provided the EPA with facts keyed to the elements of the regulatory legal standard, and these facts were sorted with reference to, and marshaled towards establishing, that standard. The application of law to fact is a characteristically legal function. *See, e.g.* Model Code of Prof'l Responsibility EC 3-5 (Am. Bar Ass'n 1980) ("The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client.")

The Court then turns to the issue of whether, all factors considered, H&K's provision of legal services to Murex gave rise to an attorney-client relationship (as opposed to, for example, having been rendered so fleetingly as perhaps not to do so). "The formation of an attorney-client relationship hinges upon the client's [reasonable] belief that he is consulting an attorney in that capacity and his manifested intention to seek professional legal advice." *See Merck Eprova AG v. Prothea*, 670 F. Supp. 2d 201, 210 (S.D.N.Y. 2009) (internal quotations omitted). No special formality is required to demonstrate the establishment of that relationship. *Id.* Courts in this District have generally considered six factors in assessing whether an attorney-client relationship existed:

> "1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the [client] in one aspect of the matter (*e.g.*, a deposition); 5) whether the attorney excluded the individual from some aspect of [the] litigation in order to protect another (or a) client's interest; [and] 6) whether the purported client believes that the attorney was representing him and whether this belief was reasonable."

*Id.* (citations omitted).

H&K and Murex each seize on different facts and each makes a sound argument as to whether it was reasonable for Murex to believe that H&K was functioning as its attorney. H&K emphasizes the lobbying-only language of the Engagement Agreement and its disclaimer of an attorney-client relationship. H&K also notes that, after McAdams began defending Murex against the enforcement action, the parties did not increase Murex's monthly retainer, suggesting perhaps that they viewed this defense as within the existing lobbying agreement. H&K also notes that McAdams, while legally trained, is a "Senior Policy Analyst," that there is no hard evidence that McAdams held himself out to Murex as a lawyer, and that McAdams attests that he did not. *See* McAdams Decl. ¶ 17.

These arguments undeniably have force.  But, on balance, the arguments on Murex's

behalf carry the day.

Most significant, McAdams performed, over a five-week period spanning late January

through early March 2016, the quintessential legal services of drafting and editing affirmative

defenses for it to submit to the EPA to try to fend off an adverse action, counseling Murex as the

application of agency regulations to the company's historical facts, and advising it as to strategy

as to its submissions.  McAdams also reviewed confidential materials and information of his

client.  *See, e.g.*, Bartel Decl. ¶ 13 (attesting that "[t]he vast majority of th[e] information [given

to] McAdams is highly confidential").  The documentary record reflects that McAdams worked

closely with his client in that endeavor.  His work on Murex's behalf was substantial, sustained,

and entailed many communications with LeRow, Bartel, and Wright.  McAdams's legal work

defending Murex was not, in other words, cabined in time to an isolated and fleeting moment.

And H&K had no other legal help in this endeavor:  No lawyer outside the firm assisted

Murex to defend itself before the EPA.  The three Murex officials whom McAdams counseled

(Wright, Bartel, and LeRow), who received his work-product, and who worked with him in

shaping the EPA submission, are all non-lawyers.[14]

Relevant too, in the course of his communications with Murex, McAdams referenced and

proposed to draw upon, as resources, his colleagues at H&K, a national law firm.  Putting aside

disputed facts, the documentary record reflects that McAdams told Murex on February 12 that he

had consulted "two of my compliance folks" and that he planned to consult "my white collar

---

[14] The record does not reflect that Murex has a general counsel or in-house lawyers.  CFO Bartel
attests that he "often engage[s] legal counsel on Murex's behalf[,] and coordinate[s] directly with
counsel during the pendency of litigation and regulatory compliance matters that require legal
assistance."  Bartel Decl. ¶ 2.

guy" (Gordon).  McAdams also utilized the services in February 2016 of H&K associate attorney Emerson.[15]  And, McAdams admits, in January 2016, when he had discussed the scope of the engagement with LeRow, "I did state that H&K could provide other services to Murex, including legal services."  McAdams Decl. ¶ 18.

Also bearing on Murex's reasonable understanding as to the nature of H&K's relationship with Murex as it evolved after the EPA Notice was McAdams's contemporaneous assistance to it with a separate legal matter:  the GRC litigation.  On the same day, February 12, 2016, when McAdams told Murex of his intended consultation with others at H&K including "my white collar guy," McAdams spent a half-hour consulting by phone with lawyers from KRCL, Murex's outside counsel in the GRC litigation.  That litigation also involved fraudulent RINs.  McAdams's discussion with these litigators covered confidential facts and strategy.  And as the KRCL lawyers attest, it involved coordinating between Murex's litigation strategy and its arguments before the EPA.  This consultation, too, was known to the Murex officers who were working with McAdams.  It would have reinforced to them—particularly as non-lawyers—that McAdams's role as to Murex had grown to encompass an attorney-client relationship.

The Murex officials who most actively interacted with McAdams uniformly attest that they understood Murex to have an attorney-client relationship with McAdams and H&K.  *See,*

---

[15]  Emerson recorded 1.8 hours of work for Murex on "RIN replacement research" in February 2016, which Emerson entered under McAdams's lobbying matter number.  This work "related to the EPA's treatment of fraudulent RINs purchased by Murex and sold to it by others."  Emerson Decl. ¶ 8.  The record is not clear as to the purpose to which McAdams put Emerson's work, but it appears to have been used to support H&K's defense of the enforcement action, because (1) the Engagement Agreement stated that H&K's lobbying engagement would only use "*non*lawyer personnel," and (2) LeRow recalls McAdams's referencing Emerson's work.  *See* LeRow Decl. ¶ 9 ("McAdams further informed me that he consulted with Steven D. Gordon, a partner in H&K's Washington, D.C. office, and discussed Murex matters with lawyers Kaufman and Emerson, when preparing his advice and opinions for Murex").

*e.g.*, Bartel Decl. ¶ 15 ("At all times during the preparation of the EPA Notice response letter, I perceived McAdams to be providing legal advice on how to effectively respond to the EPA Notice and the allegations contained therein in order to mitigate Murex's potential exposure to civil penalties and other damages.  McAdams was not, as I understood it, simply lobbying the EPA on Murex's behalf."); *id.* ¶ 14 ("He provided advice on formatting, legal substance, how to address certain regulatory compliance concerns, and how to avoid potentially adverse legal issues associated with Murex's RIN diligence explanations and the EPA in general."); *id.* ¶ 16 ("McAdams counseled Murex on how to address each of the EPA's regulatory compliance concerns, and how to assert Murex's affirmative defenses to liability."); LeRow Decl. ¶ 13 (from January 2016 forward, "I used McAdams as a regulatory compliance advisor[] and relied on McAdams'[s] legal advice when fulfilling my duties to Murex as Director of Compliance.  I would never have disclosed Murex's confidential information to McAdams had I known H&K did not intend to keep such information . . . confidential.").[16]  Viewing the evidence in totality, the Court holds, "this belief was reasonable."  *Merck Eprova AG*, 670 F. Supp. 2d at 210; *see also Leslie Dick Worldwide, Ltd. v. Soros*, No. 08 Civ. 7900 (BSJ) (THK), 2009 WL 2190207, at *8 (S.D.N.Y. July 22, 2009) (plaintiffs' belief that they had been represented by law firm "has a reasonable basis in fact, in that Plaintiffs had an interest they were seeking to advance by securing legal advice from [the firm, namely] to maximize their chances of securing a reversal in the Appellate Division of the dismissal of their case.").

 H&K makes three arguments opposing this outcome.  None alter this result.

---

[16] Murex's outside counsel at KRCL similarly understood McAdams to be a lawyer offering "legal opinions on matters related to the GRC Litigation."  Coleman Decl. ¶¶ 4, 6.  McAdams denies stating or implying to the KRCL lawyers that he was either "a lawyer for Murex" or "licensed to practice law anywhere."  McAdams Decl. ¶ 34.

*McAdams's state of mind*:  As H&K emphasizes, McAdams attests that he did not intend to function as a lawyer or believe that he was doing so on behalf of Murex.  *See* HK Surreply at 2 ("It never dawned on Mr. McAdams that Murex's forwarded email would change the scope of his engagement as a policy advisor to one providing legal services."); McAdams Decl. ¶¶ 3–4, 17.  The Court has no reason to question that such was McAdams's state of mind.  The Court fully credits that McAdams, during his work for Murex, held the good faith—if insufficiently examined—belief that he was functioning solely as a "senior policy advisor."  On the assembled record, McAdams's focus as to Murex was plainly, and commendably, on furthering his client's interest in a context in which McAdams was well-qualified to assist it.  It is also understandable that it might not have occurred to McAdams to consider whether the enforcement defense project was different in character so as to be a form of legal services.  From his perspective, defending Murex against EPA enforcement action must have seemed a natural extension of his lobbying assignment.  The enforcement defense involved the same regulator and an aspect of the same broad subject area (exposure to fraudulent RINs) into which the Murex lobbying work fit.

The operative test, however, does not turn on the lawyer's state of mind or good faith or intentions.  It is focused on the reasonableness of the *client*'s belief that there was an attorney-client relationship, including based on the services performed.  Here, for the reasons above, the Murex officials reasonably viewed McAdams, and the law firm at which he worked, as their attorneys, when McAdams helped Murex develop its client-specific affirmative defenses in the face of threatened enforcement action.

*Kaufman and Emerson's activities in March 2016*:  H&K argues that the communications and work that its partner Kaufman and associate Emerson undertook with respect to Murex in mid-March 2016 were, as both attest, in connection with a prospective engagement only.  *See*

Kaufman Decl. ¶ 9–10; Emerson Decl. ¶ 9; McAdams Decl. ¶ 23–25. They were not, H&K argues, work for an existing client. As such, H&K argues, these actions did not bespeak an existing attorney-client relationship. Further, H&K argues, because H&K and Murex did not ultimately agree to an engagement for legal services, Kaufman's and Emerson's actions did not give rise to such a relationship. On this point, the Court agrees with H&K. The finding of an attorney-client relationship between Murex and H&K is not based on Kaufman's or Emerson's interactions with Murex in March 2016.

*Policy considerations relating to the Engagement Agreement*: H&K, finally, argues that, as a policy matter, it must be allowed to rely on the Engagement Agreement terms providing that its work for Murex was of a lobbying nature and permitting it to represent legal clients adverse to Murex. To hold that the firm—on account of a "forwarded email"—became Murex's attorney, triggering canons of professional responsibility, H&K argues, would expose all law firms to unwanted legal representations: "Otherwise there is no way a law firm can protect itself, and an unexpected, unsolicited email could change an agreement for law-related services to one for legal services." FNBC Surreply at 2.

A law firm, of course, can rely on the terms of a properly drafted written engagement agreement that accurately describes the firm's work for the client. And, subject to applicable ethics rules, a law firm may be able to rely on a client's advance waiver as to the firm's potential future conflicting engagements. Ethics opinions governing the practice of law in Washington, D.C., for example, permit clients to waive in advance certain conflicts of interest, provided such waivers comply with the overarching requirement of informed client consent. *See* D.C. Ethics

Op. 309 ("the less specific the circumstances considered by the client and the less sophisticated the client, the less likely that an advance waiver will be valid").[17]

On the facts here, however, H&K cannot use the waiver provision in its agreement with Murex as a shield. The agreement simply did not cover the legal services that H&K came to provide Murex. It did not describe H&K's services to Murex as including the defense of the threatened enforcement action. And it described the firm's services to Murex as lobbying only, as proved inaccurate. Unhelpfully, the agreement's broadly worded advance waiver provision also did not identify the FNBC matter as one in which the firm sought to reserve the right to be adverse to Murex. Under these circumstances, the advance waiver agreement that H&K sought and received from its non-lawyer contacts at Murex fell well short of embodying informed client consent. *See GSI Commerce*, 618 F.3d at 212 (rejecting attempted reliance on conflict waiver provision in engagement agreement where provision did not cover precise type of conflict at issue).[18]

_____

[17] Under D.C. Ethics Opinion 309, where a conflict involves two current clients, a law firm may not advance adverse positions on behalf of these clients in the same matter, and this conflict is not waivable. *See id.* (citing D.C. Rule 1.7(a)). But an advance waiver may overcome conflicts in other circumstances, including where the firm would be adverse to a client in a different matter in which the client was separately represented. *See id.* (citing D.C. Rule 1.7(b)). For an advance waiver to be valid, the ethics opinion requires that "each potentially affected client consent[] to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation." *Id.* (citing D.C. Rule 1.7(c)). "Consent" is defined as "'a client's uncoerced assent to a proposed course of action, following consultation with the lawyer regarding the matter in question'"; "consultation" means "'communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question.'" *Id.* (citing D.C. Rules, Terminology, ¶¶ 2–3). "A waiver must be predicated upon disclosure sufficient to allow the client to make "a fully informed decision." *Id.* (citing D.C. Rule 1.7, comment 19, and *In re James*, 452 A.2d 163, 167 (D.C. 1982) (requiring "a detailed explanation of the risks and disadvantages to the client")).

[18] *Cf. Univ. of Rochester v. G.D. Searle & Co.*, No. 00 Civ. 6161 (LB), 2000 WL 1922271, at *10 (W.D.N.Y. Dec. 11, 2000) ("[C]ourts take a fairly critical view of "blanket" future conflicts waivers."); *Worldspan, L.P. v. The Sabre Group Holdings, Inc.,* 5 F. Supp. 2d 1356 (N.D. Ga.

Contrary to its suggestion, H&K was not, at all, powerless to prevent this situation. To "protect itself," H&K need only have declined the assignment of defending Murex against the threatened enforcement action. Nothing obliged H&K to accept that project. Alternatively, before taking on Murex's defense before the EPA, H&K could have amended the Engagement Agreement to accurately describe the firm's work for Murex and—assuming informed client consent—to provide for an advance waiver as to other matters, such as the FNBC litigation. H&K did not do so before undertaking Murex's defense. And, when H&K, after its defense of Murex began, finally alerted to its dual representations and sought a waiver from Murex of the conflict with the FNBC representation, Murex refused to consent to H&K's suing it.

The predicament in which H&K finds itself, in which it faces the consequences from a conflict perspective of having taken on work outside the Engagement Agreement, was therefore of its own making. And, contrary to H&K's depiction of itself as a victim of a "forwarded email," the record reflects avoidable human and systemic lapses within H&K at two junctures that gave rise to its present predicament. The first caused H&K's Washington, D.C., office unknowingly to take on work for a client, Murex, whom its Atlanta litigators were preparing to sue on FNBC's behalf. The second caused H&K's work for Murex to expand into legal services beyond the scope of the Engagement Agreement, triggering attorney-client conflict rules.

First, when McAdams opened the Murex matter in January 2016, he ran a conflict check. It disclosed that conflicts searches as to Murex had been recently done by two H&K partners.

_____

1998) ("[F]uture directly adverse litigation against one's present client is a matter of such an entirely different quality and exponentially greater magnitude, and so unusual given the position of trust existing between lawyer and client, that any document intended to grant standing consent for the lawyer to litigate against his own client must identify that possibility, if not in plain language, at least by irresistible inference including reference to specific parties, the circumstances under which such adverse representation would be undertaken, and all relevant like information.")

one, from December 2015, by Mutryn; the other, from earlier in January 2016, by Maines, who was then representing FNBC with an eye towards suing Murex. Maines Decl. ¶ 5. The conflicts search summary furnished to McAdams read, in red oversized letters:

> **"You must contact the individuals in each section below to determine whether your prospective new matter would create a conflict of interest."**

McAdams Decl., Ex. 1.

McAdams, however, did not follow up with Mutryn or Maines about the "potential conflict," or, apparently, with H&K's ethics and conflicts personnel. McAdams Decl. ¶ 16. This, McAdams attests, was "based on my understanding that the nature of my work, nonlawyer lobbying, would not present an attorney-client conflict." *Id.* Nor, when it accepted Murex as a client, did anyone else at H&K make the connection between the firm's two representations. It does not appear that the results of McAdams's conflicts inquiry—which revealed the possible conflict with Mutryn's and Maines's work and directed that those lawyers be contacted—went to anyone at H&K besides McAdams.

As a result of McAdams's assumption that, given his lobbyist role, he was incapable of providing services that might be held legal in nature, during the weeks that followed, McAdams alone appears to have been aware that H&K might have a client with interests adverse to Murex.[19] And as a result of the unawareness of the rest of the firm that its client FNBC intended to sue its prospective client Murex, H&K never critically examined in January 2016 whether taking on Murex as a client was advisable. For the same reason, H&K's ethics and conflicts

---

[19] The H&K lawyers representing FNBC do not appear to have run a conflicts check for Murex in between the check Maines conducted on January 11, 2016, and the execution of the engagement letter with FNBC on January 26, 2016. McAdams and Murex executed their engagement letter between those dates.

specialists never knew to remind McAdams of the importance of ensuring that his Murex work stayed strictly within the lobbying-only parameters of the Engagement Agreement.

Second, after McAdams was forwarded the EPA Notice, he did not notify anyone at H&K before starting to defend Murex against it. He jumped in to assist, tacitly viewing the new project as another species of lobbying. H&K's management was thus unaware that McAdams had taken on a new project that might fall outside the scope of the Engagement Agreement. As H&K's counsel acknowledged at argument: "He appears to have kept that to himself." *See* Tr. 43. This deprived H&K's leaders of the ability to assess whether the new project was covered by the agreement; whether it was of a legal or lobbying character; and, if the former, whether it had potential to conflict with H&K's other client work such as for FNBC. *See id.* (agreement by H&K counsel with Court that there "is a systems problem at Holland & Knight . . . when the connection isn't made by anybody but Mr. McAdams until after the enforcement representation is done" and that "[t]his can't be a best practice").

In light of these breakdowns, H&K cannot deflect responsibility for the firm's "mission creep" with respect to Murex onto "a forwarded email." And H&K's notion that the agreement's description of McAdams's work as lobbying and not "legal services" would automatically carry over to any additional work McAdams might later take on for Murex is wrong. Had McAdams drafted a brief for Murex for submission to a court, advised on a lawsuit, or appeared before a judge, the Engagement Agreement would not transform these lawyerly acts into "lobbying services." That McAdams's advocacy here was aimed at dissuading an agency, not a court, from adverse action does not change that principle.

The Court thus rejects as hyperbole H&K's claim that an adverse ruling here would leave law firms without "protect[ion]" where an employee receives "an unexpected, unsolicited email"

asking the firm to take on a new project.  The answer is for firms to have systems, cultures, and informed personnel that assure that decisions as to client matter intake and expansion are made collaboratively, consultatively, and carefully with due regard for the conflict consequences.[20]

The Court, therefore, holds that H&K—commencing January 29, 2016 and lasting at least until March 2016, when McAdams's enforcement defense work on Murex's part was demonstrably ongoing—had an attorney-client relationship with Murex.

## 2. Did H&K Concurrently Represent FNBC and Murex?

The Court considers next whether H&K's attorney-client representation of Murex was concurrent with its representation of FNBC.  It was.  The firm's representation of FNBC in preparing to sue, and later suing, Murex began in December 2015 and has continued until today.  The firm's defense of Murex vis-à-vis the EPA, spanning January 29 through March 2016, was subsumed by that period.  Indeed, when H&K, in March 2016, asked Murex to consent to the FNBC representation, the two representations were both ongoing, and H&K's draft waiver letter described the two representations as "concurrent."  Bartel Decl., Ex. G.

That H&K did not bring suit on FNBC's behalf until after its representation of Murex had terminated does not change this result.  The status of the relationship is assessed at the time the conflict arises; the standard for concurrent representation applies where counsel at the same time had represented clients with conflicting interests even if the dual representation ceased before the filing of the disqualification motion.  *See Merck Eprova AG*, 670 F. Supp. 2d at 209 (numerous citations omitted).  This principle is based on the rationale that "if the rule was otherwise, an

---

[20] H&K's decision to be both a law firm and a lobbying shop and—at least here—to reserve the right to be adverse in litigation to its lobbying clients would appear to require it to be particularly vigilant as to conflict issues.  That model presents an inherent risk, which materialized here, that a representation that starts as lobbying will shape-shift into a legal one, giving rise to conflicts.

'attorney could always convert a present client into a "former client" by choosing when to cease to represent the disfavored client.'" *Id.* (citations omitted).[21]

### 3. Is Disqualification Required?

The Court, finally, considers whether to disqualify H&K. Although disqualification is disfavored, any doubt should be resolved in favor of disqualification. *Hull*, 513 F.2d at 571. In light of the Court's finding that H&K concurrently represented Murex and FNBC, H&K must show the absence of an actual or apparent conflict in loyalties, "a burden so heavy that it will rarely be met," *GSI Commerce*, 618 F.3d at 209 (internal citations omitted). *See supra*, p. 30.

After careful review of the parties' arguments, the Court finds that H&K has failed to carry this burden. In two independent respects, H&K's continued representation of FNBC would unacceptably taint this proceeding.

First, H&K's initial Complaint—accusing Murex of regulatory and legal violations involving RINs and outing the fact of the EPA's potential adversity to Murex—created, at a minimum, the appearance of disloyalty by H&K to its former client Murex. Allowing H&K to persist in suing Murex would indulge and invite such conduct and put the Court's imprimatur on it.

Second, H&K gained access as a result of its representation of Murex to significant confidential information. Permitting H&K to serve as FNBC's counsel creates a risk that this would be used at trial to Murex's detriment.

*(a) Appearance of Disloyalty*

---

[21] This is colloquially referred to as the "hot potato" rule, which holds that counsel may not avoid a disqualifying conflict by dropping the less desirable client like a "hot potato." *See, e.g.*, *id.*; *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 453 (S.D.N.Y. 2000) (Kaplan, J.).

In its initial Complaint on FNBC's behalf, H&K injected the subject matter of its prior representation of Murex into this case. Across five paragraphs, H&K's Complaint made factual allegations about Murex's exposure to fraudulent RINs and its regulatory consequences—the very subject as to which H&K had recently helped Murex defend itself before the EPA. The Complaint recited the EPA's RINs regulations; accused Murex of breaking "numerous state and federal laws," including "upon information and belief those of the [EPA] regulating and pertaining to the sales and shipment of ethanol and the reporting of [RINs] connected thereto"; and pled that, although it was "unclear" what portion of the transactions involving ethanol sales between ABC and Murex implicated fraudulent reporting of RINs, "upon information and belief Murex did not maintain any records or comply with any reporting requirements relating to the alleged underlying sale and transfer of ethanol." Compl. ¶¶ 57–60. Finally, the Complaint stated: "Murex is involved currently with the EPA on a matter involving EPA fraud." *Id.* ¶ 62.

H&K's Complaint thus put—or attempted to put—Murex's exposure to RIN fraud, its alleged regulatory non-compliance, and its interactions with the EPA with respect to such fraud squarely at issue in this litigation. Based on the initial Complaint, H&K was necessarily taking the position that these matters were relevant to FNBC's claims and indicating that, if permitted to do so, H&K would establish at trial Murex's alleged misconduct with respect to RINs. For this reason, had the motion to disqualify been resolved based on H&K's initial Complaint, H&K would have failed even the more permissive test applicable where a firm has successively represented two now-adverse clients. That test turns on whether there was a "substantial relationship" between the subject matters of the two representations. *See supra*, p. 29. H&K's Complaint itself pled such a relationship.

After Murex moved to disqualify H&K and noted the Complaint's allegations about its regulatory exposure regarding RIN fraud, H&K sought to walk back this aspect of its pleading. On January 31, 2017, three weeks after Murex filed its reply brief in support of disqualification, H&K filed an Amended Complaint. The Amended Complaint excised the paragraphs referring to IN fraud and Murex's EPA dealings. Maines, H&K's lead counsel, attests that this excision was unrelated to the pending disqualification motion. It was prompted, he attests, by his better understanding of FNBC's case. Maines attests that "[a]lthough I did not fully understand this at the time" of the initial Complaint, he "now understand[s]" that the presence or absence of RINs is not relevant to whether the biofuel sales on which FNBC's suit is based were sham transactions. Maines Decl. ¶ 12. Maines also attests that he now understands that "it makes no difference whether or not the transactions [from which FNBC obtained receivables] referenced RIN numbers." *Id.* Maines further attests that FNBC's lawsuit is based on transactions between July and September 2015, whereas RIN fraud, as he now understands it, was "prevalent" in earlier years. *Id.* Finally, Maines attests, from ABC's bankruptcy proceedings, he has now learned that the documents underlying the transactions giving rise to FNBC's receivables did not reference "any RINs." *Id.* ¶¶ 13–14.

For purposes of resolving this motion, the Court credits Maines's explanations as to H&K's reasons for dropping the allegations regarding RINs.[22] And because Murex does not seriously contest the point, *see* Tr. 20, 22, the Court also accepts that whether a particular ethanol

---

[22] There is, however, tension between Maines's claim that he only recently appreciated that Murex's RIN issues are irrelevant to FNBC's claims and McAdams's recollection that, in March 2016, more than 10 months earlier, when he and Maines discussed their respective client representations, they agreed the matters were "not related" and that successful advocacy by McAdams before the EPA would not affect Maines's litigation for FNBC. McAdams Decl. ¶ 22.

sale generating receivables for FNBC was reported to have RINs associated with it would have no bearing on whether that transaction was bona fide or a sham.

But while H&K is at liberty to modify its operative pleadings to eliminate its allegations against Murex on these points, it cannot airbrush away the fact that its initial Complaint accused Murex of legal and regulatory violations in connection with the subject, fraudulent RINs, of H&K's regulatory representation of Murex. At a minimum, H&K's inclusion of these damaging and unnecessary allegations against Murex creates an appearance of the law firm's disloyalty—if not a degree of hostility—towards a former client which had exercised its right to decline to waive the conflict presented by H&K's representation of FNBC.

On the facts admitted by Maines, it is difficult to view H&K's decision to include those extraneous allegations about Murex's regulatory troubles as other than a gratuitous swipe at Murex. Maines admits that, had he then better understood the nature of FNBC's case against Murex, he would have recognized the RIN and EPA allegations as irrelevant and not included them in FNBC's Complaint. Maines does not explain why he earlier had viewed these matters as germane to FNBC's case. And H&K's briefs do not articulate a coherent—or any—basis for having viewed Murex's regulatory history with respect to RINS as relevant to the receivables fraud claimed by its financial institution client.

To a neutral observer, it could therefore appear that when H&K included the allegations of extraneous regulatory misdeeds by Murex in its Complaint, the firm was attempting to "dirty up" Murex for no good reason. Such an observer could view H&K's willingness to blacken the eye of its former client on the subject of the firm's representation and of tenuous relevance to the FNBC litigation as calling into question the firm's loyalty to that client. Such an observer could also question whether the H&K litigators who included these allegations had been mindful of the

firm's duty of loyalty to Murex, a client of a different H&K office. Such an observer could note, too, that—according to McAdams—as of when H&K's Complaint tarred Murex for regulatory lapses with respect to RINs, lead counsel Maines had long known that the firm's work for Murex had involved that very subject, the EPA and RINs: While Maines claims to have known only the general fact that McAdams had lobbied for Murex, *see* Maines Decl. ¶ 8, McAdams attests that he had specifically told Maines in March 2016 that his lobbying involved "the federal law related to RIN replacements." McAdams Decl. ¶ 22.

Under these circumstances, to allow H&K to continue to represent FNBC would give the appearance of absolving H&K for its seemingly casual disregard of a former client's reputational and legal interests. It would put the Court's imprimatur on H&K's decision to needlessly call out its former client for regulatory violations within the scope of the firm's earlier representation. It would invite questions whether, going forward, H&K could be counted on honor its duty of loyalty and to respect Murex's other confidences. Exercising its discretion, the Court will not permit such a compromised representation to go forward.

H&K's representation is separately tainted by its inclusion of this paragraph in the Complaint: "Murex is involved currently with the EPA on a matter involving RIN fraud." Compl. ¶ 62. Although the single-sentence paragraph 62 does not literally allege a threatened or actual EPA enforcement action against Murex relating to such fraud, that is the most logical reading of this oblique prose. Murex represents that, before the Complaint, it had not been publicly known or reported that the EPA had threatened Murex with enforcement action. *See* LeRow Decl. ¶ 14 ("When I read FNBC's Complaint, and H&K's commentary about Murex's involvement with the EPA on a RIN related matter I was shocked. To my knowledge, the only

way FNBC could be aware of Murex's receipt of the EPA Notice and related responsive action is through H&K'S disclosure of confidential information"); Bartel Decl. ¶ 15.

Murex therefore infers that H&K learned of the EPA's threatened enforcement action from its own representation of Murex. It accuses H&K of outing that threatened action via the insinuating language in paragraph 62. H&K has not come forward with an alternative source for that information. All other facts alleged in the Complaint regarding Murex's exposure to fraudulent RINs can be traced to public sources, including as a result of Murex's participation in lawsuits such as the GRC Litigation relating to RIN fraud. *See* Maines Decl. ¶ 15 (citing cases). But H&K has been unable to pinpoint from where it learned that Murex was "involved currently with the EPA on a matter involving RIN fraud." Compl. ¶ 62. Maines denies learning of the threatened EPA enforcement action "from McAdams or anyone else at H&K." *Id.* ¶ 11. As to his own knowledge, he attests, generally, that "everything I learned about Murex's business, its involvement with the EPA regarding RINS" was gleaned from other sources, including Murex's filings in the GRC litigation, other publicly available lawsuits to which Murex is a party, public sources, discussions with non-parties, and a related internet search. *Id.* But Maines did not, and apparently cannot, specifically identify the source from whom or which he, or someone else at H&K, derived the allegation in paragraph 62.

Under these circumstances, there is an appearance of a breach of loyalty, and of the duty to maintain client confidences, on H&K's part which H&K has failed to rebut. The Court need not find that H&K's FNBC litigation team in fact obtained that information from the firm's representation of Murex. It suffices to find that there is a strong circumstantial basis for that inference, and that H&K, whose burden it is to rebut it, has not done so. Permitting H&K to remain as counsel adverse to Murex would thus unacceptably taint this proceeding, by permitting

a firm which had seemingly disclosed adverse confidential information about a client to continue to sue that client and potentially again breach its duty of loyalty.

*(b) Murex's Confidential Information*

Murex separately pursues disqualification on the ground that H&K could benefit at trial from confidential information it obtained while representing Murex. As noted, after receiving the EPA Notice, Murex gave McAdams extensive confidential information about its operations. McAdams—working with LeRow, Martel and Wright—reviewed and distilled this information in fashioning Murex's affirmative defenses. Much of Murex's confidential data was also sent to the EPA, in attachments to LeRow's 16 transmittal emails, on which McAdams was cc'd.

H&K argues that this information is irrelevant, because it relates to RINs, which, as H&K now appreciates, have no bearing on FNBC's case. Maines explains: "[I] t makes no difference whether or not the transactions referenced RIN numbers or whether Murex itself may have been misled by others [] into purchasing fraudulently created RINs." Maines Decl. ¶ 12; *see also id.* ¶ 13; Tr. 38–39, 48. H&K argues that, because FNBC's theory is that the sales that yielded the receivables it acquired were fictitious, trial will turn on whether that was so and whether Murex's warranties regarding the receivables were therefore false, issues as to which the existence of RINs is irrelevant. Maines Decl. ¶ 14; HK Surreply at 4.[23]

Were the sole issue at trial whether the receivables sold to FNBC were bona fide or fictitious, the Court would agree with H&K that there is no realistic prospect of trial taint. The presence or absence of RINs on a reported ethanol sale generating receivables is irrelevant to

---

[23] H&K further notes that FNBC has agreed not to offer evidence at trial as to RINs or Murex's EPA dealings if H&K remains its counsel. *See* Moyse Decl. ¶ 6 (FNBC will not introduce evidence regarding RINs "to establish any element of any claim in its case" if the Court allows FNBC to remain represented by HK); *see also* HK Surreply 5; Tr. 58.

whether the sale was fictitious. Murex does not seriously contest the point, or claim that RINs are central to this case. *See* Tr. 20; *id.* at 22 ("There are much more important issues, to be real honest, your Honor, and RINS is way down the list.")

But FNBC's Amended Complaint puts more at issue. Its 13 claims go beyond breach of contract to include negligent misrepresentation, breach of fiduciary duty, fraud, breach of the implied covenant of good faith and fair dealing, breach of Louisiana's Unfair Trade Practices Act, and tortious interference with contract. *See* FAC ¶¶ 170–293. FNBC also accuses Murex of racketeering, claiming that Murex, ABC and TRE constituted an "association-in-fact enterprise," "with the common purpose of engaging in a fraudulent course of conduct." *Id.* ¶¶ 251–252. FNBC seeks, in addition to actual and consequential damages, "exemplary" (*i.e.*, punitive) damages. *Id*. at 62.

The Court cannot foresee the direction that trial in this case may take. But, read on its face, the Amended Complaint's broad-ranging claims and prayer for punitive damages would appear to put at issue Murex's state of mind, its good faith, its compliance efforts and history, and its corporate culture. The confidential materials that Murex—through its director of compliance LeRow—shared with H&K bear on these subjects. They were, in fact, shared to help Murex to develop a defense to allegations that parallel those here: Before the EPA, Murex sought to explain how it unknowingly came to trade in fraudulent RINs and the due diligence and compliance measures it had taken to guard against knowingly doing so. Here, Murex can reasonably be expected to defend on grounds including that, if any of ABC's receivables prove fictitious, Murex was similarly unaware in real time of this despite a law-respecting culture and adequate diligence and compliance protocols.

Under these circumstances, there is a real risk that trial here would be tainted were H&K personnel privy either to Murex's materials, or to Murex's submissions to the EPA based upon them, to represent Murex's litigation adversary here.  The materials that LeRow sent McAdams revealed Murex's due diligence efforts; Murex's agreements with outside due diligence providers; its correspondence and agreements with third parties; and the materials chronicling the company's development of an anti-fraud quality assurance program.  Murex's submission to the EPA, developed in part by McAdams, drew upon (and attached some of) these materials.  Were lawyers for FNBC in this case privy to these materials, they might be better able to foresee, preempt, and/or combat Murex's defenses relating to its good faith, its compliance history and systems, and its state of mind.  *See* Murex Surreply at 22 ("Murex's ordinary business practices and regulatory compliance practices are likely to be called into question during this case, particularly in light of the scope of the allegations in the Amended Complaint").  Possibly, too, these materials would give H&K insights as to LeRow, who, among other Murex personnel, would appear a central witness to the extent Murex's anti-fraud compliance efforts are at issue.  As the documentary record on the disqualification motion reflects, McAdams actively communicated with LeRow during its representation of Murex.  H&K's earlier interactions with LeRow as to Murex's due diligence practices might give it a leg up in examining her at a deposition or trial.

H&K portrays its exposure to these materials as minimal.  It represents that in November 2016, after Murex moved to disqualify, the firm erected an "ethics wall" between the Murex and FNBC matters, to bar access by its FNBC team to materials relating to the Murex representation.  Heim Decl. ¶ 4.  H&K also notes that a review of H&K's electronic database does not reflect that personnel assigned to the FNBC matter have accessed the firm's electronic Murex records, apart

from the Engagement Agreement. *Id.* ¶¶ 8–10. H&K further notes that—save the March 2016 call between McAdams and Maines—its FNBC litigators have not interacted with the personnel who assisted Murex. And McAdams and Maines both deny that McAdams shared with Maines confidential information about his Murex representation. McAdams Decl. ¶¶ 30–31; Maines Decl. ¶ 17; *see also* Emerson Decl. ¶ 11; Kaufman Decl. ¶ 12.

The Court credits these representations and that the screen now in place is sufficient to guard, going forward, against access to Murex materials by H&K's FNBC team. The Court is mindful, too, that, although "[a]n attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated attorneys' share client confidences," the presumption of confidence sharing within a firm is rebuttable. *Hempstead Video*, 409 F.3d at 133. The Second Circuit has rejected a bright-line rule that would attribute all conflicts by lawyers to their firms. Such a rule, it has explained, would have the virtue of clarity, but would "ignore[] the caution that 'when dealing with ethical principles . . . we cannot point with broad strokes. The lines are fine and must be so marked." *Id.* at 135; *see also Benevida Foods, LLC v. Advanced Magazine Publishers, Inc.*, 2016 WL3453342 (S.D.N.Y. 2016) (LTS) ("speculation . . . will not suffice to grant a motion to disqualify"; issue is whether "the facts present a real risk that the trial will be tainted."). The Court instead is to inquire with care into the existence and extent of screening within the law firm and to probe into the relationships under review, including to gauge whether the records of the firm personnel[24] on the conflicting engagement were "effectively segregated" from others at the firm. *Hempstead Video*, 409 F.3d at 134.

_____

[24] That McAdams was not titled as a lawyer is irrelevant for conflict-imputation purposes. Disqualification may be based on information known by persons in a firm other than practicing lawyers. *See, e.g.*, *Cohen v. Strouch*, 2011 WL 1143067 (S.D.N.Y. 2011) (DLC) (disqualifying lawyer in case of concurrent representation based on firm's affiliation with lawyer "of counsel";

H&K's showing here, however, is inadequate to rebut the presumption of access by its FNBC lawyers to Murex's confidences for a simple reason: H&K's FNBC lawyers have *already* been exposed through this litigation to significant portions of Murex's communications with H&K and to Murex's submissions to the EPA drawing upon them. For reasons not apparent, H&K elected to have its FNBC litigation team defend against—and be the exclusive authors of its briefs on—the motion to disqualify.[25] As this decision reflects, that motion turns on whether H&K's work for Murex consisted solely of lobbying that would not give rise to a potentially preclusive conflict, as H&K has argued, or whether it also entailed legal services. Unavoidably, resolution of this point has required the Court to closely review the communications between Murex and H&K and Murex's submissions to the EPA and associated exhibits, to the extent those materials have been provided to the Court. Such materials, as reflected above, include submissions detailing Murex's affirmative defenses and exhibits describing its due diligence and anti-fraud quality assurance processes. *See, e.g.*, Bartel Decl., Exs. C–E; LeRow Decl., Exs. A–B; Murex Mem., Exs. D–F.

To prevent public exposure of Murex's confidences, these evidentiary submissions (and the briefs citing or quoting them) were publicly filed in redacted form, but the unredacted versions were accessible in full to the lawyers for FNBC and Murex. H&K has not represented that any mechanism was put in place to assure that the lawyers on its FNBC team did not access or review Murex's confidential communications with H&K submitted in connection with the disqualification motion. On the contrary, although a separate H&K lawyer argued before the

disqualification extends to individuals associated with firm in non-lawyer capacities, *e.g.*, a law clerk) (citing *Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 567 F.2d 225, 235 (2d Cir. 1977)).

[25] At argument, H&K's counsel stated that H&K "didn't see the need for outside counsel" to represent FNBC on the motion to disqualify. Tr. 2.

Court on that motion, Maines and the other four lawyers who appear on H&K's Complaint and Amended Complaint appear on the firm's brief opposing disqualification. And Maines himself signed H&K's surreply brief opposing disqualification. Those briefs comment on the nature of McAdams's work for Murex and respond to Murex's characterizations of it. Although H&K's briefs do not quote from the redacted materials, they strongly suggest that the firm's lawyers on the disqualification motion have reviewed them. *See, e.g.*, H&K Surreply at 3.

Absent a representation by H&K that its FNBC team was cordoned off from Murex's confidential materials reflecting and arising from H&K's representation of Murex, the Court is compelled to find that H&K's FNBC team has been exposed to these materials. And after close review, the Court's firm judgment is that these materials would reveal information and insights as to Murex and its operations that could assist the prosecution of FNBC's case and that counsel for Murex's litigation adversary should not have.

Disqualification is, therefore, required to avoid the risk that counsel's access to Murex's confidential information would, even if inadvertently or unconsciously, affect counsel's conduct of this litigation. *See Cheng v. GAF Corp.*, 631 F.2d 1052, 1058 (2d Cir. 1980); *Fund of Funds Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 233 n.12, 234–235 (2d Cir. 1977).

#    #    #

In exercising its discretion to disqualify H&K, the Court is mindful that this ruling will cost FNBC its counsel of choice and delay progress of this lawsuit. The Court does not reach this decision lightly. But the interest in assuring the integrity of this litigation must be paramount. And there is no basis to find that Murex pursued disqualification for tactical reasons,

as opposed to in good faith. On the contrary, Murex made its objection to being sued by H&K known immediately when H&K first raised this prospect in March 2016.[26]

## CONCLUSION

For the reasons stated above, the Court grants Murex's motion to disqualify Holland and Knight. The Clerk of Court is directed to terminate the motion pending at Dkt. 29.

An order will follow shortly as to next steps in this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 28, 2017
New York, New York

---

[26] The record does not reflect whether H&K notified FNBC of the potential for a claim of conflict in March 2016, when H&K's FNBC team first learned of the firm's dual representation.