USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/5/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THE FEDERAL DEPOSIT INSURANCE
CORPORATION,
*as receiver for* FIRST NBC BANK,

                                  Plaintiff,

                 -v-

MUREX LLC,

                                Defendant.

------------------------------------------------------------X

16 Civ. 7703 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves claims that a bank was induced to purchase receivables that the seller knew to be fictitious. The bank, First NBC Bank ("FNBC"), a state-chartered bank organized under the laws of Louisiana, originally brought this lawsuit in 2016, but on April 28, 2017, the Louisiana Office of Financial Institutions closed FNBC and appointed the Federal Deposit Insurance Corporation ("FDIC") as its receiver, pursuant to 12 U.S.C. § 1821(d)(2)(A). The FDIC now pursues these claims on FNBC's behalf.

FNBC's claims here are against Murex LLC ("Murex"), a Texas-based company that provides marketing and distribution services for ethanol producers. The FDIC claims that Murex obtained funds from FNBC by selling the bank accounts receivable representing payments owed to Murex by its customer, Abengoa Bioenergy Company, LLC ("ABC"). In fact, the FDIC alleges, those receivables—the "ABC Receivables"—were bogus. The FDIC claims that the fictitious receivables were fabricated by ABC in knowing collusion with Murex, and that the two worked together to give FNBC the false impression that ABC had bought ethanol from Murex

1

when in fact no ethanol had ever changed hands. ABC has now defaulted on more than $69 million in payments owed to FNBC under the obligations represented by the ABC Receivables. ABC has also filed for bankruptcy. In this lawsuit, the FDIC seeks to hold Murex responsible for the Receivables. Murex has moved to dismiss the FDIC's complaint for failure to state a claim.

For the reasons below, the Court grants in part and denies in part Murex's motion to dismiss.

I. **Background**

    A. **Facts**[1]

        1. **Background: Ethanol and Murex**

This suit arises out of the market for ethanol and for a derivative financial product, a "receivable," which here represents an obligation to pay for ethanol previously purchased. The FDIC alleges that, in a series of transactions between 2013 and 2015, the now-defunct bank

---

[1] These facts are drawn primarily from the Second Amended Complaint ("SAC"). For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The Court also considered the documents attached to Murex's motion to dismiss. Dkt. 107. Because these documents were incorporated into the Second Amended Complaint by reference, or are matters of public record, they are properly considered on a motion to dismiss. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit") (citation omitted). The Court considered these documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made." *Clark v. Kitt*, No. 12 Civ. 8061(CS), 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.") (emphasis omitted).

FNBC purchased 81 "baskets" of receivables from Murex. These receivables represented ABC's obligations to pay Murex for Murex's prior sales of ethanol to ABC. In total, these purchases accounted for approximately $1 billion of receivables. SAC ¶ 57. This action concerns a subset of five such purchases in which FNBC claims to have paid out a total of $69,139,825.26 in exchange for worthless receivables. *Id.* ¶ 116.

Murex is not itself a producer of ethanol. Rather, it provides marketing and distribution services for ethanol producers. *Id.* ¶ 23. ABC, an ethanol producer, was a Murex customer. *Id.* FNBC claims to have bought the ABC Receivables from Murex through an unregulated trading platform, known as The Receivables Exchange ("TRE"), which itself has now gone out of business. *Id.* ¶¶ 3, 6, 27. Sales over TRE were conducted pursuant to a Corporate Seller Program Agreement (the "CSP Agreement"), which made the buyers of receivables over the platform express third-party beneficiaries of the agreement. *Id.* ¶ 8; *see* Def. Br., Ex. 1 (the "CSP Agreement"). The FDIC's breach of contract claim, described below, arises under this CSP Agreement.

    **2.    ABC and Murex's Bogus Receivables Scheme**

The FDIC alleges that the transactions giving rise to the ABC Receivables were part of a scheme that ABC concocted to relieve its financial troubles by securing what amounted to short-term loans on terms that it would have been otherwise unable to obtain. *See id.* ¶ 30.[2] ABC is a subsidiary of a Spanish energy company, Abengoa S.A. ("Abengoa"). *Id.* ¶ 25. In 2013, during Spain's financial crisis, Abengoa had issued a series of debt instruments to stay afloat, and ABC

---

[2] ABC is currently in voluntary liquidation proceedings under Chapter 11 in the United States Bankruptcy Court for the Eastern District of Missouri. *Id.* ¶ 24.

had guaranteed those debts. *Id.* ¶ 31 (citing Declaration of Sandra Porras ("Porras Decl.")). Through Abengoa, ABC also guaranteed the debts of several Abengoa subsidiaries. *Id.* ¶ 33.

Burdened by those debts, ABC sought to obtain cash. Murex ultimately became the source of that cash. *Id.* ¶¶ 34–35. The FDIC alleges that the bogus receivables were "one piece of an undisclosed multi-step transaction," *id.* ¶ 13, designed by ABC, with Murex's knowledge, to generate cash for ABC, *id.* ¶¶ 34–35.

As alleged, the scheme worked as follows: ABC would create documents purporting to show a sale of ethanol from ABC to Murex. *Id.* ¶ 13. At the same time, Murex would purport to sell—but not actually deliver—an identical quantity of ethanol to ABC at a slightly higher price (always $.01 per gallon more). *Id.* Murex would then offer for sale on TRE, at a discount, a receivable representing the money that ABC owed Murex for the ethanol Murex had purportedly sold to ABC. *Id.* Once a buyer—such as FNBC—had purchased that receivable over TRE, Murex would remit the proceeds—less TRE's cut—to ABC. *Id.*; *see id.* ¶ 60. ABC would then pay Murex a "true up" fee to reimburse Murex for the loss it had sustained selling the ABC Receivable at a discount. *Id.* ¶ 13. ABC would then use the money it received from Murex to pay the obligations of Abengoa and its affiliates. *Id.* ¶ 64.

### 3. FNBC's Purchases of ABC Receivables

On November 21, 2013, FNBC made its first purchase of the ABC Receivables over TRE. *Id.* ¶ 56. FNBC made that purchase based on representations made by Jeff Kleinops, a TRE executive. *Id.* ¶ 53. Kleinops sent to FNBC an email attaching two documents: the "Murex Informational Memo – Abengoa" (the "Murex Info Memo") and the "Murex Informational Memo – Program" ("the Murex Info Program"). *Id.* ¶¶ 46, 48. Both memos were based on information that Murex had provided to TRE; the FDIC alleges that Murex intended that FNBC rely on this information in purchasing the ABC Receivables. *Id.* ¶¶ 49–50.

4

The memos stated that Murex had sold ethanol to ABC. *Id.* ¶ 47. The memos did not disclose that the Murex-ABC transactions had not involved the actual transfer of any ethanol. *Id.* ¶ 51. Nor did the memos disclose ABC's obligations as obligor of Abengoa's approximately $6.86 billion debts. *Id.* ¶ 52.

FNBC made a series of purchases of ABC Receivables between 2013 and 2015. The specific purchases of ABC Receivables on which the claims in this case are based took place on July 6, 7, 8, 27, 28, 29; August 21, 24, 25, 26, 27; and September 15, 16, 17, 2015. *Id.* ¶ 77.[3]

**B.     Procedural History**

On September 30, 2016, FNBC initiated this action with a complaint against Murex. Dkt. 1. In November 2016, Murex filed a motion to dismiss that complaint, *see* Dkts. 23–24, as well as a motion to disqualify FNBC's then-counsel, Holland & Knight LLP ("H&K"), *see* Dkts. 29–33. Murex sought disqualification because H&K had concurrently represented Murex and FNBC prior to FNBC's filing of this suit, and indeed H&K had made disclosures in its complaint against Murex regarding the subject of the law firm's representation of Murex. *See* Dkts. 29–33. On February 13, 2017, the Court heard argument on the disqualification motion. *See* Dkt. 60 (Transcript). On April 28, 2017, in a 61-page decision, the Court granted the motion to disqualify H&K. *See* Dkt. 74. Recognizing the possibility that FNBC's new counsel might

---

[3] The SAC is not optimally clear as to which transactions underlie its claims, as its allegations use seemingly divergent language to describe them. At one point, the SAC cites "five transactions in which FNBC lost" approximately $69M, *id.* ¶ 116, but elsewhere it describes the "unpaid receivables" as having "an aggregate face value of" approximately $78M, *id.* ¶ 58. Similarly, the SAC complains of "five transactions," *id.* ¶ 116; *see id.* ¶ 58 (chart listing five transactions), but it also describes purchases of the "receivables at issue in this action" as having taken place on 14 days in summer 2015, *id.* ¶ 77, and elsewhere states non-specifically that a "number" of receivables are "in default," *id.* ¶ 16. The precise dollar value of the receivables and the number of transactions at issue, however, are not relevant to the pending motion to dismiss.

5

pursue a differently configured complaint, the Court denied Murex's motion to dismiss, without prejudice to Murex's right later to move to dismiss a complaint filed or adopted by FNBC's successor counsel. Dkt. 75.

On May 17, 2017, the FDIC moved, pursuant to Federal Rule of Civil Procedure 25(c) and Section 1821(d)(12) of the Federal Deposit Insurance Act, to replace FNBC as plaintiff and for a 90-day stay of this case, see Dkts. 77–79, which Murex did not oppose, see Dkt. 81. On July 11, 2017, the Court granted the FDIC's motion to substitute for FNBC as plaintiff and stayed the case for 90 days. Dkt. 91. The Court also ordered that the FDIC be given access to the legal files of H&K pertaining to its representation of FNBC, provided that those files were free of any reference to H&K's earlier representation of Murex. Dkt. 92.

On October 26, 2017, consistent with the deadline set by the Court, see Dkts. 95–102, the FDIC filed a Second Amended Complaint ("SAC"), Dkt. 103. On November 9, 2017, Murex moved to dismiss the SAC. Dkt. 107. On December 1, 2017, the FDIC filed a brief in opposition. Dkt. 108. On December 15, 2017, Murex filed a reply. Dkt. 109.

### C. FDIC's Claims

The SAC asserts seven claims sounding in tort, contract, equity, and Louisiana statutory law.

In Count I, the SAC alleges that Murex violated Sections 8.2.1 and 8.3.1 of the CSP Agreement by failing to repurchase the ABC Receivables from FNBC; Murex was obligated to do so, the SAC alleges, because it had made materially inaccurate or incorrect representations about the ABC Receivables, triggering the CSP Agreement's buy-back provision.

6

In Count II, the SAC alleges that Murex's misrepresentations and omissions negligently—and in breach of a duty Murex owed FNBC to provide truthful information—caused FNBC to purchase the ABC Receivables, resulting in FNBC's, and the FDIC's, damages.

In Count III, the SAC alleges, in the alternative, that Murex intentionally and fraudulently represented facts that it knew were untrue to induce FNBC to purchase the ABC Receivables.

In Count IV, the SAC seeks, in the alternative to its claim for contract damages, the equitable remedy of rescission.

In Count V, the SAC alleges that Murex owed FNBC fiduciary duties as its agent and as the "Account Manager" of the account relationship with ABC. It alleges Murex breached those duties by misleading FNBC as to the ABC receivables.

In Count VI, the SAC alleges that Murex was unjustly enriched at FNBC's expense by virtue of the "true-up" fees it received from ABC, which allegedly used money it received from FNBC to make those payments. The SAC seeks restitution for the FDIC's losses and to impose a constructive trust on the profits earned by Murex in connection with the sale of the ABC Receivables to FNBC.

Finally, in Count VII, the SAC alleges that Murex's actions in connection with the creation and sale of the ABC Receivables violated the Louisiana Unfair Trade Practices Act (LUTPA). It seeks restitution for FNBC's losses because of that violation.

## II. Legal Standards

### A. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inferenmuce that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

### III. Analysis

The Court's analysis proceeds as follows: The Court first determines that New York law governs the SAC's claims, next considers Murex's argument that the SAC must be dismissed in its entirety because the FDIC is judicially estopped from pressing its claims in this Court, and finally considers Murex's arguments for dismissal of the SAC's contract and tort claims.

#### A. Choice of Law

The parties agree that New York law governs interpretation of the CSP Agreement and thus Murex's contract claims. They disagree, however, whether, as Murex argues, New York law also governs the SAC's tort claims.

"In making choice of law determinations in diversity jurisdiction cases, 'it is well settled that a federal court must look to the choice of law rules of the forum state,' in this case New York." *Okimoto v. Yougjun Cai*, No. 13 CIV. 4494 RMB, 2015 WL 3404334, at *4 (S.D.N.Y. May 21, 2015) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998)); *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). "Pursuant to New York's choice-of-law rules, . . . 'it is clear that in cases involving a contract with an express choice of law provision . . . a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.'" *McPhee v. Gen. Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 680 (S.D.N.Y.

8

2010), *aff'd*, 426 F. App'x 33 (2d Cir. 2011) (quoting *Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*, 307 F. App'x. 562, 564 (2d Cir. 2009) (internal quotation marks omitted)); *accord Hedgeco, LLC v. Schneider*, No. 08 Civ. 494 (SHS), 2009 WL 1309782, at *3 n. 1 (S.D.N.Y. May 7, 2009) ("In New York, courts generally will enforce choice-of-law clauses in contracts 'so long as the chosen law bears a reasonable relationship to the parties or the transaction.'" (quoting *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624 (2006)).

The FDIC does not dispute that the CSP Agreement's choice-of-law provision is enforceable. *See* Pl. Br. at 19. Rather, it contends that that provision does not extend to the SAC's tort claims, including its claim under the LUTPA. *See id.* Although "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract," "a contractual choice-of-law clause [may] be drafted broadly enough to reach such tort claims." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005); *accord Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties."); *McPhee*, 736 F. Supp. 2d at 681–82.

The CSP Agreement's choice-of-law provision is such a clause. By its terms, it applies not only to the construction of the contract, but also to "the obligations, rights and remedies of the parties under the agreement." CSP Agreement ¶ 16.11.1; *cf. McPhee*, 736 F. Supp. 2d at 682 ("Here, the express language of the clause goes far beyond indicating what law will govern the construction of the contract and instead governs the entire relationship resulting from the employment agreement."). The breadth of that choice-of-law provision is confirmed by the

9

contract's exclusive-jurisdiction provision. It provides that "any legal action or proceeding . . . with respect to or arising out of" the Agreement or any TRE transaction "shall be brought" in this district. CSP Agreement ¶ 16.11.13. Accordingly, New York law governs both the Court's interpretation of the CSP Agreement as well as the substantive law applicable to the FDIC's tort claims, which arise directly out of the rights and obligations created by the CSP Agreement.[4]

### B. Estoppel

Murex argues that the FDIC is judicially estopped from advancing any claim in the SAC because the FDIC has elsewhere characterized the ABC Receivables as valid. Because all claims in the SAC are based on the theory that the receivables are invalid, Murex argues, all such claims must be dismissed.

As this Court has recently explained, judicial estoppel applies where:

> 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel.

*Penberthy v. Chickering*, No. 15 CIV. 7613 (PAE), 2017 WL 176312, at *7 (S.D.N.Y. Jan. 13, 2017) (quoting *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quotation marks and citation omitted)). "Importantly, the former position of the party against whom estoppel is sought need not have been the '"but for" cause' of the earlier court's determination, so long as allowing that party to change positions would yield some unfair burden or benefit." *Id.* (quoting *Lia v. Saporito*, 541 Fed. App'x 71, 74 (2d Cir. 2013) (alterations omitted)).

---

[4] In light of this holding, the Court dismisses with prejudice Count VII of the SAC, which sounds only in Louisiana statutory law. The FDIC has not proposed to pursue in its stead a claim based on a New York analogue to the Louisiana statute.

10

Under these principles, the FDIC is not judicially estopped from pursuing its claims here. Murex's argument for estoppel turns on statements the FDIC and FNBC made in ABC's ongoing bankruptcy proceedings, which, Murex contends, depicted the ABC Receivables as valid obligations of ABC's. Murex contends that the FDIC's position here is inconsistent with those statements. Murex overstates the FDIC's claims here. *See* Def. Br. at 13. Contrary to Murex's reading, *see id.* & n.52 (citing SAC ¶¶ 82, 83–84, 86, 89–90, 91, 94), the SAC does not argue that the ABC Receivables are other than genuine obligations owed to FNBC (now the FDIC) by ABC. Rather, the SAC alleges that the ABC Receivables are not what Murex held them out to be when it offered them for sale on the TRE—they are less valuable in that they do not derive from actual ethanol sales. *See* SAC ¶¶ 77–82.

The FDIC's position in this case is not inconsistent, let alone clearly so, with its—or FNBC's—position in the bankruptcy case. The FDIC does not here challenge the validity of the ABC Receivables as assets upon which the FDIC, as receiver for FNBC, is authorized to seek to collect. Rather, the FDIC's argument is that ABC, aided by Murex, falsely characterized the receivables so as to induce FNBC to (effectively) loan money against them. And the FDIC seeks to hold Murex accountable for falsely marketing the receivables so that Murex will be responsible for making FNBC whole, and that Murex, not the FDIC, will be responsible for the risk, effort, and expense of collecting on that obligation from ABC, presumably in the context of the ongoing bankruptcy proceedings.[5]

---

[5] The FDIC has described its claim in the ABC Bankruptcy as "Trade payables for ethanol purportedly purchased by Abengoa Bioenergy Company." Def. Br., Ex. 9 at 2 ("Proof of Claim"). That description is consistent with its position in this litigation—that is, that ABC "purportedly," but did not actually, make such purchases.

11

Murex relies on this Court's decision in *Penberthy*, but that decision is inapposite. There, a creditor—the debtor's former wife—sued for a declaratory judgment that certain debts owed to her were domestic support obligations and thus not dischargeable in bankruptcy. *See* 2017 WL 176312, at *1. That argument was foreclosed, the Court held, because the creditor had participated in, and accepted the results of, the Chapter 11 proceeding in which the same debts at issue had been classified as dischargeable.[6] By voting to accept the plan, the creditor "necessarily took the position that the Confirmed Plan correctly classified her as a non-priority creditor (*i.e.*, one without any priority debts)." *Id.* at * 7. That position was "flatly inconsistent" with her position in the district court, in which she sought "injunctive relief and monetary damages based on the claim that the debts owed to her" were priority, non-dischargeable debts. *Id. Penberthy* is inapposite, quite simply, because the FDIC has not accepted the contrary results of any bankruptcy proceeding and because there is nothing inconsistent about the FDIC's positions in this case and the bankruptcy case.

### C. Murex's Other Arguments

The remainder of Murex's arguments are addressed to the SAC's contract and tort claims. For the reasons that follow, the Court denies the motion to dismiss the contract claim (Count I) and the tort claim alleging intentional fraud (Count III), but grants the motion to dismiss two other tort claims (Counts II and V).

---

[6] Murex does not argue that the FDIC's claim that the ABC Receivables are invalid *could have been*, but was not, litigated in the bankruptcy proceeding. *See Penberthy*, 2017 WL 176312 at *5 (citing *Cline v. Welch (In re Welch)*, No. 97-5080, 1998 WL 773999 (6th Cir. Oct. 11, 1998)).

1. **Contract Claim**[7]

The SAC alleges that Murex breached Section 8.2 of the CSP Agreement by refusing to repurchase the ABC Receivables from FNBC, which Murex was obligated to do because it had made "materially inaccurate or materially incorrect" statements with respect to the receivables. SAC ¶ 147; *see also id.* ¶ 149. Murex contends that this claim must be dismissed because its alleged misrepresentations were not, as a matter of law, material. Murex makes two arguments along these lines. First, it argues, its misrepresentations were immaterial as a matter of law such that it did not breach the operative provision of CSP Agreement, § 10.1. Second, it argues that even if made misrepresentations in breach of the agreement, these did not cause FNBC's—and now the FDIC's—damages.

At the pleading stage, neither argument is availing. First, the SAC adequately alleges that Murex's misrepresentations were material. As the SAC alleges, FNBC purchased the ABC Receivables after receiving the Murex Info Memo from TRE, which described the relationship between Murex and ABC giving rise to the ABC receivables. SAC ¶¶ 45–46. That memo, the SAC alleges, stated that Murex had in fact sold ethanol to ABC. *Id.* ¶ 47. But, the SAC alleges, the memo did *not* supply the context necessary to make that claim non-misleading: that the Murex-ABC relationship involved simultaneous sales and re-purchases by which a fictitious "receivable" was created. *Id.* ¶ 51. Nor, as alleged, did the memo disclose that ABC was the

---

[7] In Count IV, the FDIC seeks, as an alternative to its damages claim for breach of contract, the equitable remedy of rescission. The Court need not decide now whether, if the FDIC does not prevail on its claim, it will nevertheless be able to seek rescission. Similarly, the Court need not consider at this stage Count VI, which, also as an alternative to contract damages, pursues relief under a theory of unjust enrichment. To the extent Count VI is a stand-alone claim, the Court agrees with the FDIC that that claim is independent of its contract claim, and is therefore viable. *See Gordon v. Hain Celestial Grp., Inc.*, No. 16-CV-6526 (KBF), 2017 WL 213815, at *5 (S.D.N.Y. Jan. 18, 2017).

13

obligor for several related entities' debts totaling nearly $7 billion. *Id.* ¶ 52. These are viably pled misrepresentations. And they are easily distinguished from statements held immaterial in the cases on which Murex relies. *See, e.g., Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996) (holding misrepresentation regarding "that a transaction fee of a few dollars might exceed the broker's actual handling charges" immaterial).

Second, the SAC adequately alleges that Murex's misrepresentations proximately caused FNBC's losses. Murex argues that FNBC's losses stem exclusively from ABC's bankruptcy and, relying on FNBC's filings with the SEC, contends that FNBC has conceded as much. *See* Def. Br. at 18–19. That argument fails for multiple reasons. First, on this motion to dismiss, the Court may not consider the SEC filings to which Murex directs the Court for the truth of the matter asserted therein. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992). The Court may consider the documents "only to determine what the documents stated, and not to prove the truth of their contents." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015) (internal quotations omitted). Second, the FDIC's complaint clearly pleads a contrary factual theory to the one Murex posits. Murex is at liberty to seek in discovery evidence establishing that FNBC's damages stem solely from ABC's insolvency, rather than the sham nature of the ABC Receivables whose sale to FNBC Murex is alleged to have facilitated, but the Court may not so find on the pleadings, in which the FDIC makes the contrary claim. Third, the SAC claims that Murex made false representations under which it would be proper—regardless of ABC's insolvency—to hold *Murex* directly liable for FNBC's losses. It alleges, for example, that Murex failed to disclose not only the sham transactions, but also ABC's large outstanding obligations to related ABC entities. *See* SAC

14

¶¶ 30, 35–38, 52. On a motion to dismiss, it is premature to rule out as non-viable that theory of liability.

### 2. Tort Claims (Counts II, III, and V)

The SAC also alleges that Murex either negligently (Count II) or intentionally (Count III) made misrepresentations to FNBC and that these misrepresentations breached a fiduciary duty Murex owed to FNBC (Count V). Murex challenges these claims on several grounds.

First, Murex contends that the FDIC's tort claims are barred by New York's economic-loss rule.

As to the negligent misrepresentation claim (Count II), Murex's argument is clearly meritorious. "Under New York law, the doctrine applies to claims for negligent misrepresentation," and thus bars "New York negligent misrepresentation claims." *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 297 (S.D.N.Y. 2015); *see also Computech Intern., Inc. v. Compaq Computer Corp.*, No. 02–CV–2628 (RWS), 2004 WL 1126320, at *10 (S.D.N.Y. May 21, 2004) ("[T]he general rule under New York law is that economic loss is not recoverable under a theory of negligence or strict liability." (internal quotation marks omitted)).

As to the intentional fraud claim (Count III), there is some division of authority among courts in this circuit, however, as to whether the economic-loss doctrine also bars such claims. *Compare Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 416 (S.D.N.Y. 2013) (Engelmayer, J.) (relying on *Orlando v. Novurania of Am., Inc.*, 162 F. Supp. 2d 220, 226 (S.D.N.Y. 2001)), *with Weisblum*, 88 F. Supp. 3d at 297 (distinguishing *Orlando* as having "stated, without discussion or citation, that New York courts have not adopted an exception to the economic loss rule for intentional torts"); *see also EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 278 (S.D.N.Y. 2004) (noting that the court was not aware of any cases where New York courts applied the economic loss doctrine to fraud claims

15

and declining to "adopt the *Orlando* court's reasoning"); *Computech*, 2004 WL 1126320, at *10 ("In the absence of any articulation to the contrary by the New York courts, the economic loss doctrine will not be presumed to extend to fraud claims.").

Although this Court has previously followed *Orlando*, *see Kalimantano*, 939 F. Supp. 2d at 416–17, the Court's considered view, upon a fresh review of the case law and "the absence of any contrary authority from the New York state courts," *Weisblum*, 88 F. Supp. 3d at 297, is that New York's economic loss doctrine does not clearly bar intentional fraud claims. Accordingly, the Court will not dismiss the SAC's intentional fraud claim on that basis. Nor will the Court dismiss the SAC's intentional fraud claim on the ground that it duplicates the SAC's contract claims. *See* Def. Br. at 21–22. This argument is merely another variation of Murex's economic-loss argument. *See Kalimantano*, 939 F. Supp. 2d at 415–16; *Weisblum*, 88 F. Supp. 3d at 298.

Murex separately argues that the FDIC's claim in Count III of intentional fraudulent inducement must be dismissed because the SAC does not allege reasonable and justifiable reliance. "To state a claim for common law fraud under New York law, a plaintiff must allege: (1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Terra Sec. Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 447–48 (S.D.N.Y. 2010), *aff'd*, 450 F. App'x 32 (2d Cir. 2011); *see Haggerty v. Ciarelli & Dempsey*, 374 F. App'x 92, 94 (2d Cir. 2010) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553 (2009)). "To determine, on a motion to dismiss, whether a plaintiff has alleged reasonable reliance, a court may 'consider the entire context of the transaction, including . . . the sophistication of the parties, and the content of any agreements between them.'" *Terra Sec.*, 740 F. Supp. 2d at 448 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group,*

*Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)). "[W]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) (quotations omitted).

At this stage, however, the Court cannot determine that FNBC's reliance on Murex's misrepresentations was unreasonable as a matter of law. "The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). Such is the case here. Discovery may indeed demonstrate that FNBC had sufficient notice that the ABC Receivables were not as Murex allegedly held them out to be. *See, e.g.*, Def. Reply Br. at 4 n.19 (arguing that the ABC Receivables made clear that they represented sales involving "in-tank transfers," which would have been commonly understood). But that fact-intensive question cannot be resolved on the basis of the SAC alone. Discovery may alternatively establish, as the SAC alleges, that Murex "concealed the fabricated nature of both the overall transactions and the resulting debt." SAC ¶ 11; *see id.* ¶¶ 13–14, 52, 63, 70 (alleging Murex intentionally hid the details of its transactions with ABC).

Finally, Murex argues that the SAC's claim of breach of fiduciary duty (Count V) must be dismissed because Murex owed FNBC no such duty. Def. Br. at 29. The FDIC contends that Murex became FNBC's fiduciary by virtue of Sections 7.5 and 7.6 of the CSP Agreement, which made Murex the "Account Manager" for the sale of ABC Receivables and, as the FDIC casts the

agreement, set out Murex's "standard of care" in that role. *See* SAC ¶ 185; Pl. Br. at 14.[8] The Agreement obliged Murex to manage ABC's account "in substantially the same manner and with substantially the same degree of care that [Murex] uses in managing its account relationships" with the obligors of any receivable not sold through TRE. CSP Agreement ¶ 7.6.1.

While this provision imposed contractual obligations on Murex, including obligations that might have benefitted a buyer like FNBC, it did not make Murex a fiduciary with respect to FNBC. Critically, the "Account Manager Standard of Care" specifies that the "Account Manager" will "manage the account relationships with *Designated Account Debtors* in substantially the same manner and with substantially the same degree of care that [the] Account Manager uses in managing its account relationships with Account Debtors whose Receivables are not sold over the Exchange." *Id.* (emphasis added). That is, the CSP Agreement provided that Murex would treat *ABC* in the same manner that it treated any other debtor with which it had a relationship. Nothing about that Murex-ABC relationship created a fiduciary relationship between Murex and FNBC. Even assuming FNBC might invoke the obligations created by ¶ 7.6.1, the SAC does not allege that FNBC was harmed by any mistreatment Murex may have committed to the detriment of ABC. To the extent the CSP Agreement created a relationship of trust for a *buyer* of receivables, such as FNBC, it did so with *TRE*, not with the seller of such receivables. *See id.* ¶¶ 7.1, 7.2.

Accordingly, the Court grants Murex's motion to dismiss as to Count II and Count V and denies the motion as to Count III.

---

[8] The SAC's additional allegation that Murex was FNBC's "agent," and thus its fiduciary, is conclusory. It does not establish the existence of a fiduciary relationship.

## CONCLUSION

For the reasons stated above, the Court grants Murex's motion to dismiss Counts II, V, and VII. The Court otherwise denies the motion. The Clerk of Court is respectfully directed to close the motion pending at Dkt. 107.

Within one week of this decision, the parties are directed to submit a proposed case management plan consistent with the Court's individual rules.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 5, 2018
New York, New York