UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE FEDERAL DEPOSIT INSURANCE
CORPORATION, *as receiver for* FIRST
NBC BANK,

|                      |
|----------------------|
| Plaintiff,           |

        -v-

MUREX LLC,

                                Defendant.

---

16 Civ. 7703 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

This case concerns a bank's purchases of receivables from defendant Murex LLC

("Murex"), and whether the allegedly sham nature of the transactions underlying those

receivables requires Murex to buy them back. The bank, First NBC Bank ("FNBC"), originally

brought this action in 2016. But in 2017, the Louisiana Office of Financial Institutions closed

FNBC and appointed the Federal Deposit Insurance Corporation ("FDIC") as its receiver. The

FDIC now pursues these claims on FNBC's behalf.

The FDIC claims that Murex fraudulently obtained $69 million from FNBC by selling

FNBC five sets of debts purportedly owed to Murex by Murex's customer, Abengoa Bioenergy

Company, LLC ("ABC"). Those debts (the "ABC Receivables") supposedly arose from bona

fide, arm's length sales of ethanol from Murex, an ethanol distributor, to ABC, an ethanol

producer. In fact, the FDIC contends, these were sham transactions concocted by Murex and

ABC. For each alleged set of contracts reflecting sales by Murex, the FDIC alleges, Murex and

ABC entered into a separate set of contracts providing for offsetting purchases by Murex, such

that, in substance, ethanol never changed hands. The paperwork reporting the sham transactions,

the FDIC contends, was used to induce unsuspecting buyers such as FNBC to lend money to ABC, which in turn paid Murex for its participation in the scheme.  ABC has now defaulted on more than $69 million owed to FNBC, and has filed for bankruptcy.  Murex counters by defending as bona fide the transactions underlying the ABC Receivables.  It asserts that each sales contract between it and ABC was legitimate and enforceable and that offsetting "buy/sell transactions" are common in the ethanol industry.  Apart from disputing the FDIC's claims—for breach of contract, fraudulent inducement, unjust enrichment, and rescission—on the merits, Murex argues that the FDIC's claims are barred by various contract terms and by judicial estoppel.

With discovery complete, the FDIC now moves for partial summary judgment on Count I of its second amended complaint, which alleges breach of contract based on Murex's failure to repurchase the ABC Receivables.  Murex opposes this motion and cross-moves for summary judgment on all of the FDIC's claims.

For the reasons below, the Court grants the FDIC's partial summary judgment motion.  Murex's false representation that the ABC Receivables arose from bona fide, arm's length sales of actual ethanol gave rise to an absolute, unconditional, and irrevocable obligation on its part to repurchase those receivables.  It failed to do so, in breach of its agreements, and the evidence adduced in discovery would not permit a trier of fact to find otherwise.  As for Murex's motion, the Court grants it in part and denies it in part.  The Court grants the motion to the extent it seeks summary judgment on the FDIC's claims of fraudulent inducement and for unjust enrichment, but otherwise denies the motion.

This litigation will now proceed to resolve the question left open by this decision: the proper remedy for Murex's contract breach.

## I.     Background

### A.     Factual Background[1]

#### 1.     Parties

FNBC was a state-chartered bank organized and existing under the laws of Louisiana, with its registered office and principal place of business in the Parish of Orleans, Louisiana.  JSF ¶ 1.  When FNBC purchased the ABC Receivables, Ashton J. Ryan, Jr. was its chief executive officer ("CEO") and board chairman, Mary Beth Verdigets was its chief financial officer ("CFO"), and Marc Parra managed the credit department.  *Id.* ¶ 2.  On April 28, 2017, the Louisiana Office of Financial Institutions closed FNBC and appointed the FDIC as its receiver.  *Id.* ¶ 5.

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on their motions for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 217 ("JSF"); plaintiff's Local Rule 56.1 statement, Dkt. 223 ("Pl. 56.1"); defendant's Local Rule 56.1 counter-statement, Dkt. 233 ("Def. 56.1"); plaintiff's reply Local Rule 56.1 counter-statement, Dkt. 247 ("Pl. Reply 56.1"); defendant's limited amendments to its Local Rule 56.1 counter-statement, Dkt. 260 ("Def. 56.1 Amendment"); and plaintiff's limited response to those amendments, Dkt. 261 ("Pl. 56.1 Resp. to Amendment").  The Court has further considered the declaration of Kathleen M. Balderston in support of plaintiff's motion, Dkt. 224 ("Balderston Decl."), and supporting exhibits; the appendix to defendant's Local Rule 56.1 statement, Dkt. 234 ("Def. App'x") and exhibits included therein; and Ms. Balderston's reply declaration, Dkt. 248 ("Balderston Reply Decl."), and supporting exhibits.  As discussed below, the Court has also considered the declarations of James Trinh, Jeremy Mall, Richard Bartel, Dana Savage, and Luke Parkhurst, *see* Def. App'x, Exs. 22 ("Trinh Decl."), 31 ("Bartel Decl."), 32 ("Savage Decl."), 35 ("Mall Decl."), 36 ("Parkhurst Decl."), in light of the FDIC's evidentiary objections contending that these declarations are, like the ABC Receivables, "shams."

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Murex is a limited liability company with its principal place of business in Plano, Texas. *Id.* ¶ 8. Murex is a marketer and distributor of domestic ethanol, export ethanol, crude oil, Renewable Identification Numbers ("RINs"), and other gasoline blendstocks to major oil companies and regional refiners. *Id.* ¶ 9. It actively trades ethanol, crude oil, and gasoline blendstocks, but does not produce ethanol. *Id.*; Pl. 56.1 ¶¶ 5–6. When Murex sold FNBC the ABC Receivables, Robert Wright was Murex's president, Richard Bartel was its CFO, James Trinh was its controller, Luke Parkhurst was director of ethanol and RIN trading, and Dana Savage was a logistics coordinator at the company. JSF ¶ 10.

ABC, not a party here, was an ethanol manufacturer before it filed for bankruptcy on February 24, 2016. *Id.* ¶¶ 14–15. ABC owned ethanol-producing plants in the United States, *id.* ¶ 13, but was an indirect subsidiary of Abengoa, S.A. ("Abengoa"), a corporation chartered under the laws of the Kingdom of Spain, *id.* ¶¶ 11–12. Abengoa is currently in insolvency proceedings in Spain. *Id.* ¶ 11.

The Receivables Exchange, LLC ("TRE"), also not a party here, was an online auction-based exchange that aimed to connect sellers of trade receivables to a network of institutional buyers. *Id.* ¶ 16. After TRE defaulted on its secured debt in late 2015, it was foreclosed upon, acquired by a company called LiquidX, and wound down. *Id.* ¶ 17. After TRE's December 2015 strict foreclosure, one employee—Michael Gonik—remained employed there for "several months" to resolve outstanding issues, including those related to ABC. *Id.*[2]

---

[2] Murex states that the "TRE continued in its role . . . through May 11, 2016, and as late as December 2016," apparently solely on the basis that Gonik remained employed there. *See* Def. 56.1 ¶¶ 14, 193. Otherwise, the record leaves unclear, after TRE's foreclosure, how active it was, what resources it had available, and how it operated.

### 2.    The Parties' Receivables Contracts

This suit arises out of the market for ethanol and, more specifically, for a derivative financial product: a "receivable."  A party who owns a receivable—*i.e.*, the right to receive payment—may opt to sell that right in order to obtain payment more quickly than it otherwise might.  Def. 56.1 ¶ 139.  Generally, a seller must do so at a discount from the face value of the receivable because the purchasing party assumes the risk of nonpayment and may have to spend money on collection efforts.  *Id.*

Now-defunct TRE provided a platform on which holders of receivables could connect with willing buyers and, for a fee, sell those receivables at a discounted price for more readily available cash.  JSF ¶¶ 16, 20.

Murex was one such seller.  On November 4, 2013, Murex and TRE entered into a contract, titled "Corporate Seller Program Agreement," governing Murex's sales of receivables on TRE.  *See id.* ¶ 22; Balderston Decl., Ex. 14 ("Seller Agreement").  Murex and TRE later amended their Seller Agreement, once on the day they signed it, JSF ¶ 22, and again on April 9, 2015, *id.* ¶ 27.  The Seller Agreement expressly designated any buyer of a receivable sold by Murex as a third-party beneficiary of the agreement.  *See* Seller Agreement (cover page).

FNBC was a buyer on TRE.  On July 28, 2011, FNBC and TRE entered into a similar contract, titled "Corporate Buyer Program Agreement," governing FNBC's purchases of receivables over TRE.  Def. App'x, Ex. 51 ("Buyer Agreement").  Similar to the Seller Agreement, the Buyer Agreement expressly designated any seller of a receivable bought by FNBC as a third-party beneficiary of that agreement.  *Id.* (cover page).  The FDIC, as receiver for FNBC, sues Murex here in its capacity as a third-party beneficiary to the Seller Agreement, which it alleges Murex breached by failing to repurchase the ABC Receivables.

Under the Seller Agreement, Murex was "required" to, and "absolutely, unconditionally, and irrevocably agree[d] to repurchase" any receivables it sold on TRE "upon the occurrence of a "Repurchase Event."  Seller Agreement § 8.2.1.[3]  A Repurchase Event, in turn, includes situations in which (1) "any representation or warranty made by Seller under (and limited to) Section 10.1, with respect to a Traded Receivable, is materially inaccurate or materially incorrect when made, or (2) the Account Debtor fails to pay a Traded Receivable in full by the Repurchase Date, in which case a Dispute will be presumed to have arisen, unless an Account Debtor Insolvency Event has occurred on or prior to such Repurchase Date."  *Id.* § 8.2.1(i), (ii).  As to the first situation, concerning inaccurate representations and warranties, section 10.1 sets out, as relevant here, the following representations:  (1) "The Receivable arises out of a bona fide, arm's length sale of goods or services in the ordinary course of Seller's business, and the Account Debtor has accepted the goods or services billed under the related Invoice without condition"; and (2) "The Receivable does not result from a conditional sale."  *Id.* §§ 10.1.5, 10.1.6.

Under the Buyer Agreement, FNBC expressly "transfer[red] and assign[ed] . . . all of [its] Enforcement Rights against Defaulting Account Debtors and against Defaulting Sellers" to TRE. Buyer Agreement § 5.9.2.[4]  Accordingly, FNBC did "not have the unilateral right to elect not to have [TRE] collect amounts owed by Defaulting Account Debtors and Defaulting Sellers on

---

[3] As discussed below, the Seller Agreement also provides for a process by which TRE "may immediately make demand on Seller" upon the occurrence of a Repurchase Event, in which event a seller "shall immediately repurchase the Traded Receivable for the Repurchase Price thereof."  Seller Agreement § 8.2.  The Agreement provides only that TRE may make such a demand, and does not contemplate buyers doing so.  *Id.*; *see id.* § 15.2.

[4] The agreement defines "Enforcement Rights" as "all rights to enforce payment against a Defaulting Account Debtor or other obligated Person, with respect to a Traded Receivables. Enforcement Rights include any rights and remedies against any collateral and supporting obligations that may secure payment of a Defaulted Receivable."  Buyer Agreement, Ex. 1.

6

[FNBC's] behalf." *Id.* § 5.10.1.  The agreement, however, permitted FNBC to pursue such actions by "executing a Buyer Opt-Out Agreement in form and substance acceptable to [TRE] and its counsel." *Id.*  Neither agreement further defines "Buyer Opt-Out Agreement."

### 3.    Murex and ABC's Course of Dealing and Transactions

Beginning no later than 2006, Murex and ABC had a business relationship in which each sold ethanol to, and bought ethanol from, the other.  Def. 56.1 ¶¶ 131, 351.  Originally, Murex, an ethanol distributor, mostly purchased ethanol from ABC, an ethanol producer.  *Id.* ¶ 351. Later, Murex also sold ethanol to ABC.  *Id.*

Generally, when ABC bought ethanol, it made payments using factoring banks, through what ABC called its "PPB Program."[5]  In October 2013, however, ABC introduced Murex to representatives of TRE, on whose platform ABC had already been transacting for some time. JSF ¶ 18; Def. 56.1 ¶ 133.  TRE was not a bank, and was not part of ABC's PPB Program.  *See, e.g.*, Mall Tr. at 65; *see supra* note 5.  After that meeting, Murex emailed TRE with Murex's financial information, Def. 56.1 ¶ 134, and, in November 2013, Murex registered as a TRE seller, JSF ¶ 22.  From then until 2016, when ABC ultimately declared bankruptcy, Murex and ABC implemented the following arrangement using TRE.

---

[5] As the PPB Program operated, when ABC purchased ethanol—generally on 180-day payment terms—a bank, rather than ABC, would initially pay the seller the purchase price, at a discount from the full sticker price of the ethanol, and charge the seller a small transaction fee.  Def. 56.1 ¶ 124.  ABC then reimbursed the seller for the amount of the fee and the difference between the full sales price and the discounted price paid by the factoring bank, thereby making the seller whole.  *Id.*  ABC would then owe the factoring bank for the amount it paid to the seller.  ABC claims that it had used banks such as Santander, HSBC, and Citibank as factoring banks.  *Id.* ¶ 125.  TRE, however, was not such a bank, and was considered by ABC a "non PPB entity that would operate similar to the PPB lines."  Balderston Reply Decl., Ex. 160 ("Mall Tr.") at 65.  As discussed further below, the Court disregards Mall's later contradiction of this deposition testimony.  *See* Mall Decl. ¶ 12 ("TRE . . . acted as a PPB Factor"); *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014).

First, ABC would contact Murex with proposed transactions. This prompted the two to create contracts and invoices documenting paired exchanges of identical amounts of ethanol on the same day. *See, e.g.*, Balderston Decl., Exs. 17–18.[6] According to Murex's Rule 30(b)(6) witness, Murex "took [its] instructions from [ABC] in terms [of] . . . what they wanted to do." Balderston Decl., Ex. 2 ("Bartel Tr.") at 97. In each instance, Murex sold a quantity of ethanol to ABC, and ABC immediately sold the exact same quantity of ethanol back to Murex—and always for a penny per gallon less than Murex had sold that quantity to ABC. Pl. 56.1 ¶¶ 48–49; Balderston Decl., Exs. 17–18.[7] Murex maintains that each "buy/sell transaction" resulted in two actual title transfers—the first from Murex to ABC and the second from ABC back to Murex. *See, e.g.*, Def. 56.1 ¶ 49. The FDIC disputes that. But the bottom line was that, as a result of the simultaneous nature of the paired transactions, no actual ethanol was moved, and each party ended up with the exact same amount of ethanol as when it began, as well as a receivable for the amount identified in the daily purchase orders. *Id.*

Second, before either side paid the other any money, Murex took one side of this transaction—the one generating a receivable owed to Murex for the ethanol it had sold to ABC—and offered it for sale as a receivable on TRE. *Id.* ¶ 67. In each instance, the TRE listing identified the receivable as arising from the sale of ethanol from Murex to ABC, which yielded a

---

[6] As discussed below, the parties dispute the significance of these documents. The FDIC argues that these agreements lacked the requisite detail to facilitate the actual transfer of ethanol (*e.g.*, information about the specific tank in which the ethanol was stored, and whether that tank had sufficient ethanol to honor the contract). Pl. Resp. at 12–13. Murex counters that such information was unnecessary given the nature of "in-tank transfers" and default contract terms under the applicable state law. Dkt. 254 ("Def. Reply") at 5.

[7] In its Local Rule 56.1 counter-statement, Murex repeatedly disputes the FDIC's "characterization of the Abengoa Receivables as 'Same Day Transactions,'" but does not dispute that, on the same day, ABC and Murex bought and sold the same amount of ethanol at a penny-per-gallon profit to Murex. *See, e.g.*, Def. 56.1 ¶¶ 48–49.

monetary debt owed to Murex by ABC.  But in no instance was the fact revealed on TRE that ABC had concurrently engaged in a mirror-image sale to Murex, yielding a receivable to which it was entitled from Murex, for the same amount, less a penny per gallon.  *Id.*; *see, e.g.*, Balderston Decl., Exs. 9–11.[8]

Third, after—but only after—a buyer purchased an ABC receivable on TRE, Murex would remit the proceeds to ABC.  *See, e.g.*, Balderston Decl., Ex. 113 (after a TRE auction closed, Murex wrote to ABC, "[o]nce payment has been received, Murex will send wire payment" to ABC); *id.*, Ex. 7 ("After Murex has been fully paid, Murex pays Abengoa the payable amount.").  Murex's Rule 30(b)(6) witness testified that, in the event that a given receivable failed to sell on TRE, it was Murex's practice to cancel the entire transaction with ABC.  *See* Bartel Tr. at 183 ("Q. With respect to the buy/sell agreements[,] could you have done that with Abengoa, cancel the contract if you couldn't find a buyer for your receivable?"  A. "I believe we did that in several cases."  Q. "Okay.  So if it didn't sell on [TRE] you just canceled the transaction; is that correct?"  A. "That's what we would do, yes.").[9]  If a TRE sale went

---

[8] Murex notes that some invoices it posted to TRE—though none of those underlying the receivables at issue in this lawsuit—included in the description the phrase "buy sell."  *See, e.g.*, Def. 56.1 ¶ 60; Def. App'x, Ex. 28.  Murex argues that this satisfactorily alerted buyers on TRE to the true nature of these transactions.  As discussed below, that contention is largely immaterial and, in any event, unpersuasive.  Murex also notes that, of the $1.9 billion in ABC receivables that it posted on TRE, TRE (not Murex) *once* notified FNBC, on March 5, 2014, of two receivables auctions—one in which ABC auctioned a Murex receivable worth $11.96 million and the other in which Murex auctioned an ABC receivable worth $12 million.  Def. 56.1 ¶ 67; Def. App'x, Ex. 89.  As also discussed further below, this isolated incident is largely immaterial.

[9] In a declaration submitted at summary judgment, Bartel now claims that "Murex had no understanding that the Buy/Sell transactions between Murex and ABC could be cancelled."  Bartel Decl. ¶ 21.  As the FDIC notes, this directly contradicts the sworn testimony Bartel provided at his deposition.  *See, e.g.*, Bartel Tr. at 183 ("Q. "Okay.  So if it didn't sell on [TRE] you just canceled the transaction; is that correct?"  A. "That's what we would do, yes.").  The Court therefore disregards that portion of his declaration.  *See Crawford*, 758 F.3d 473 at 482.

through, however, Murex would remit the proceeds to ABC, and ABC would pay Murex a "true

up" in the amount of the discount at which the receivable sold, including the penny-per-gallon

profit promised to Murex.  Def. 56.1 ¶ 103; Bartel Tr. at 113–14 ("[T]hey paid the true-up

amount after we paid them for the payable.").

As a result, once the entire process concluded—assuming all played out as planned—the

outcome was as follows.  Murex and ABC each had exactly the same amount of ethanol they

started with.  Murex, having been paid most of the receivable's face value by the TRE buyer and

the balance in the form of ABC's true up, received a profit of one penny per gallon of ethanol

that it and ABC had, on paper, "exchanged."  ABC received an influx of cash provided, through

Murex, by the TRE buyer.  And that buyer owned a receivable entitling it to repayment, by ABC,

of the face value of the ethanol sold by Murex to ABC.  Until that payment came due, however,

ABC gained liquid cash that it could use to carry out its business.[10]  Formalities aside, therefore,

the ethanol transactions here facilitated what amounted to short-term loans to ABC, financed by

unwitting TRE buyers, for which ABC paid one penny per gallon plus the true up to make Murex

---

[10] As Bartel, Murex's CFO, described the arrangement in a November 5, 2013 email:

> We are continuing our program with Abengoa where we do simultaneous buy-sells
> resulting in a $0.01 per gallon profit to Murex:
>
> - Murex sells to Abengoa via Oiltanking in-tank transfer
> - Murex buys from Abengoa via Oiltanking in-tank transfer
>   - Murex has a receivable from Abengoa and a payable for the receivable
>     less the one cent per gallon profit
> - Abengoa's US bank [or TRE, *see* Bartel Tr. at 180] pays Murex a
>   discounted amount.
> - Abengoa pays Murex the discount directly, so that Murex has received full
>   payment on the receivable
> - After Murex has been fully paid, Murex pays Abengoa the payable amount
> - Repeat

Balderston Decl., Ex. 7 at 1.

whole.  As Murex writes in its memorandum of law:  "Murex now understands that ABC utilized its Buy/Sell transactions with Murex as a way to generate short-term liquidity for itself."  Dkt. 232 ("Def. Mem.") at 29.

### 4.  FNBC's Purchase of the ABC Receivables

Between 2013 and 2015, FNBC—through transactions on TRE—served as one such generator of liquidity for ABC.

On November 18, 2013, shortly after FNBC became an approved buyer on TRE, Jeffrey Kleinops, a TRE representative, contacted FNBC, informing it that Murex was a newly signed seller on the platform.  Pl. 56.1 ¶ 26; Balderston Decl., Ex. 8.  Kleinops noted that "Abengoa and Murex have a relationship," that "Murex sells Abengoa Ethanol, but on 180 day terms," and that Abengoa was Murex's "main obligor."  Balderston Decl., Ex. 8.  To his email, Kleinops attached Murex's and ABC's financials, as well as two other documents: "Murex Informational Memo - Abengoa.pdf" and "Murex Informational Memo - Program.pdf."  *Id.*  None of these materials disclosed that ABC also sold ethanol to Murex, let alone the offsetting nature of the ABC-Murex buy/sell transactions at issue in this lawsuit.  *Id.*

Between November 20, 2013, and September 15, 2015, FNBC bought 81 "baskets," worth about $1 billion, of receivables arising from debts owed to Murex by ABC, all on TRE.  JSF ¶¶ 25–26.[11]  Each purported to represent payment obligations arising from Murex's sale of ethanol to ABC.  Murex warranted that each such debt arose from "a bona fide, arm's length sale of goods or services in the ordinary course of [Murex's] business."  Seller Agreement § 10.1.5.  ABC appears to have made good on its payment obligations to FNBC with respect to the vast

---

[11] Murex states that FNBC acquired at least one receivable from an "Abengoa affiliate entity" through TRE on September 26, 2013.  Def. 56.1 ¶ 166.  This fact appears immaterial to the pending motions.

majority of these receivables.  *See* Mall Decl. ¶ 20; Bartel Decl. ¶ 23; Def. App'x, Ex. 48.  This

case, however, concerns the last five sets of receivables, which FNBC purchased on July 6,

July 27, August 21, August 24, and September 15, 2015—*i.e.*, the ABC Receivables.  These

total $69,139,825.26 in debt that ABC *has not*, for the most part paid.  Def. 56.1 ¶¶ 44–45.

### 5.    Abengoa's and ABC's Insolvency and Related Proceedings

#### a.    *The Abengoa Bankruptcy*

In 2011, Abengoa (ABC's Spanish parent) and ABC began to experience substantial

financial difficulties.  In late 2015, the situation worsened.  On November 25, 2015, Abengoa

and 24 subsidiaries filed for insolvency protection in Spanish court.  Def. 56.1 ¶ 308.  On

November 8, 2016, the Spanish court approved the restructuring agreement ("MRA") that

Abengoa had reached with its creditors.  Def. App'x, Ex. 76 ¶ 32.  Abengoa also filed for

Chapter 15 bankruptcy in the U.S. Bankruptcy Court for the District of Delaware.  Def. App'x,

Ex. 78 ("U.S. Bankruptcy Order").  On December 8, 2016, the Delaware Bankruptcy Court

entered an order "recognizing and enforcing" the Spanish MRA.  *Id.* at 1.  The same day, FNBC

filed a claim pursuant to its terms.  FNBC demanded payment arising from Abengoa's guarantee

of certain "Covered Receivables" owed by ABC.  Def. App'x, Ex. 79 at ECF p. 20 n.1.[12]

#### b.    *The ABC Bankruptcy*

On February 24, 2016, while Abengoa's restructuring was pending in Spanish court,

ABC also filed for Chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Eastern

District of Missouri.  JSF ¶ 15.  This commenced the "ABC Bankruptcy."  *Id.*

---

[12] Abengoa's guarantee of those payments arises from the April 2015 "Performance
Undertaking," an agreement under which Abengoa agreed to guarantee certain debts of its
subsidiaries that buyers, including Murex, had auctioned on TRE.  *See* Def. App'x, Ex. 73
("Performance Undertaking") § 1.

On March 2, 2016, TRE—which by then, as noted, had also defaulted on its secured debt and been foreclosed upon—notified FNBC that it had received "a set of documents from the Eastern District of Missouri regarding the Abengoa case."  Def. App'x, Ex. 57 ("FNBC Opt-Out Email").  Michael Gonik, TRE's sole remaining employee, noted that TRE's agreement with FNBC authorized TRE to pursue collection efforts "unless the Buyer opts out and decides to handle directly," but stated that "[m]y guess is that FNBC will undertake those duties on its own, especially now that the matter is under the BK court's mandate.  Is that correct?"  *Id.*  The same day, FNBC responded, writing "[p]lease be advised that First NBC Bank desires to formally opt out, and does hereby opt out, of any agreement for TRE to commence collection efforts with respect to any receivables purchased by First NBC Bank.  The bank will handle such matters directly."  *Id.*  There is no evidence showing whether, or how, Gonik responded.

On July 5, 2016, FNBC filed a proof of claim in the ABC Bankruptcy, asserting a proof of claim to $73,073,683.05 of ABC's debt arising from receivables that FNBC had obtained from Murex.  Def. 56.1 ¶¶ 327–328.[13]  On May 4, 2017, the FDIC filed an amended proof of claim in the ABC Bankruptcy.  Def. App'x, Ex. 84.  The amended proof of claim showed that the FDIC had replaced FNBC as the claimant and changed the "basis of the claim" from "Trade payable for ethanol purchased by ABC" to "Trade payables for ethanol purportedly purchased by" ABC.  *Compare id.*, Ex. 82, *with id.*, Ex. 84.  On November 21, 2018, the Missouri Bankruptcy Court entered an order allowing the FDIC to pursue its claim.  *Id.*, Ex. 87.

### B.    Procedural History

On September 30, 2016, FNBC initiated this action against Murex.  Dkt. 1.  In November 2016, Murex moved to dismiss the complaint and to disqualify FNBC's then-counsel,

---

[13] According to an addendum to the proof of claim, this number represented about $69.9 million in principal and $3 million in interest.  Def. 56.1 ¶¶ 327–328.

Holland & Knight LLP ("H&K").  *See* Dkts. 23–24, 29–33.  The latter motion was premised on the fact that H&K had concurrently represented both Murex and FNBC before FNBC filed this action (and that, in its complaint on behalf of FNBC, H&K had referenced facts relating to its representation of Murex in defending against a potential regulatory enforcement action).  On April 28, 2017, the Court granted Murex's motion to disqualify.  Dkt. 74.  Recognizing the possibility that FNBC's new counsel might pursue a different strategy than H&K had, the Court denied Murex's motion to dismiss without prejudice.  Dkt. 75.

On July 11, 2017, after the FDIC was appointed receiver for FNBC, the Court granted the FDIC's motion to replace FNBC as plaintiff.  Dkt. 91.  On October 26, 2017, following a 90-day stay, the FDIC filed a second amended complaint, bringing seven claims sounding in contract, tort, equity, and Louisiana statutory law.  Dkt. 103 ("SAC").  On November 9, 2017, Murex moved to dismiss the SAC.  Dkt. 107.  On June 5, 2018, the Court granted Murex's motion in part and denied it in part.  Dkt. 112.  The Court dismissed Counts II, V, and VII of the SAC, which brought claims for negligent misrepresentation, breach of fiduciary duty, and violation of Louisiana's Unfair Trade Practices Law, respectively.  *Id.* at 7, 10 n.4, 15–18.  The Court denied Murex's motion to dismiss the FDIC's other claims.

On July 3, 2018, Murex filed an Answer.  Dkt. 115 ("Answer").  On June 27, 2019, after lengthy and contentious discovery proceedings, the Court held a pre-motion conference and set a briefing schedule for the parties' contemplated cross-motions for summary judgment.  Dkt. 212.

On July 22, 2019, the parties filed a joint statement of undisputed facts.  *See* JSF.  On August 16, 2019, the FDIC filed its motion for summary judgment, Dkt. 221; a memorandum of law in support, Dkt. 222 ("Pl. Mem."); a Local Rule 56.1 Statement, Pl. 56.1; and the declaration of Kathleen M. Balderston, with supporting exhibits.

On August 28, 2019, Murex filed a cross-motion for summary judgment, Dkt. 231; a memorandum in support of its motion and in opposition to the FDIC's, Def. Mem.; a Local Rule 56.1 Statement, Def. 56.1; and an appendix of exhibits, Def. App'x.

On October 16, 2019, the FDIC filed a memorandum of law opposing Murex's cross-motion for summary judgment and replying in further support of its own motion, Dkt. 246 ("Pl. Resp."); a counter-statement to Murex's Local Rule 56.1 Statement, Pl. Reply 56.1; and the reply declaration of Ms. Balderston, with supporting exhibits.[14]

On October 25, 2019, Murex filed a reply in further support of its motion for summary judgment. Def. Reply.

On November 4, 2019, the Court granted Murex leave to file a limited amendment to its Local Rule 56.1 Statement, Dkt. 259, which Murex filed the same day. Def. 56.1 Amendment. On November 5, 2019, the FDIC filed a limited reply. Pl. 56.1 Resp. to Amendment.

## II.    Legal Standards

### A.    Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

---

[14] Also on October 16, 2019, Murex moved to strike the SAC's jury-trial demand. *See* Dkt. 244. On October 29, 2019, the FDIC responded. Dkt. 255. On October 30, 2019, the Court denied Murex's motion as premature given the pending summary judgment motions. Dkt. 257.

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.     Relevant Principles of New York Contract Law

All agreements at issue here are governed by New York law. *See* Seller Agreement § 16.11.1; Buyer Agreement § 12.12.1. Under that law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court. *See, e.g.*, *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451 (1983). So, too, is the determination whether a contract provision is ambiguous. *See, e.g.*, *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). A contract is ambiguous only where "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Goldman Sachs Grp., Inc. v. Almah LLC*, 85 A.D.3d 424, 426 (1st Dep't 2011) (citation

16

omitted); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).  A

contract is not ambiguous merely because the parties ask the Court to construe it differently.  *See*

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).

In determining the meaning of a contract, the Court "look[s] to all corners of the

document rather than view[ing] sentences or clauses in isolation."  *Int'l Klafter Co. v. Cont'l*

*Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation and internal quotation marks omitted); *see also*

*Kass v. Kass*, 91 N.Y.2d 554, 566–67 (1998).  "[W]hen parties set down their agreement in a

clear, complete document, their writing should as a rule be enforced according to its terms."

*W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162.  In other words, the Court's "primary objective is to

give effect to the intent of the parties as revealed by the language they chose to use."  *Bolt Elec.,*

*Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000).  Where the question of liability turns

on applying the unambiguous language of a contract to undisputed facts, summary judgment is

appropriate.  *See Photopaint Techs. LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003).

## III.   Discussion

### A.   The FDIC's Evidentiary Objections

At the threshold, the Court addresses evidentiary objections that the FDIC makes to five

declarations Murex offers from its employees.  *See* Pl. Resp. at 29–35.  The FDIC argues that

some statements in these declarations contradict the declarant's deposition testimony and thus

must be disregarded under the "sham affidavit" doctrine.  Murex counters that this doctrine does

not apply because its employees' declarations are offered solely in support of its affirmative

motion for summary judgment, not in opposition to the FDIC's.  It contends further that, even if

the doctrine applied, it would require disregarding only discrete statements that contradicted the

declarant's prior testimony, not entire declarations.

Under the sham affidavit doctrine, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Crawford*, 758 F.3d 473 at 482 (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). "[C]ourts in the Second Circuit are particularly reluctant to credit affidavit testimony that alleges critical, obviously material facts that were not mentioned at deposition, noting that such circumstances strongly suggest a sham affidavit." *Golden v. Merrill Lynch & Co.*, No. 06 Civ. 2970 (RWS), 2007 WL 4299443, at *9 (S.D.N.Y. Dec. 6, 2007). Relatedly, a party cannot create a triable issue of fact, and thus avoid summary judgment, by renouncing deposition testimony to the effect that he could not remember a particular fact which he now purports to remember. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997); *see also Kennedy v. City of New York*, 570 F. App'x 83, 84–85 (2d Cir. 2014) (summary order). However, this rule does not apply in two situations: (1) "where the subsequent sworn statement either does not actually contradict the affiant's prior testimony or 'addresses an issue that was not, or was not thoroughly, explored in the deposition'"; and (2) where the deposition testimony at issue "is contradicted by evidence other than the deponent's subsequent affidavit." *Torrico v. IBM Corp.*, 319 F. Supp. 2d 390, 394 n.2 (S.D.N.Y. 2004) (quoting *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43–44 (2d Cir. 2000)). If a declarant's prior testimony and summary judgment declaration are not in direct contradiction, mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment. *See Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 206 (2d Cir. 2014) ("It was error for the district court to categorically refuse to consider [declarant's] subsequent declaration; the sham issue doctrine does not go so far.").

At the outset, the Court rejects Murex's bold—and baseless—argument that the sham affidavit rule does not apply to declarations offered in support of, rather than in opposition to, a motion for summary judgment.  Def. Reply at 14.  Murex does not supply any authority for this proposition.  And it is nonsensical.  There is no conceivable reason why the law would permit sham affidavits—ones contravening the declarants' earlier sworn testimony at a deposition—where offered to aid a party seeking summary judgment, but bar them where offered to block an opponent's summary judgment motion.  True, the cases articulating the sham affidavit doctrine often speak of such declarations as baselessly attempting to "create a triable issue of fact, and thus avoid summary judgment."  *See, e.g.*, *Tube City IMS, LLC v. Anza Cap. Partners, LLC*, No. 14 Civ. 1783 (PAE), 2016 WL 5864887, at *3 (S.D.N.Y. Oct. 6, 2016).  But that is because the context in which sham affidavits are commonly offered is a party opposing an otherwise meritorious summary judgment motion.  But the purpose of the rule—which is to respect the deposition process and prevent witnesses from repudiating sworn testimony once adversarial questioning has ceased—equally applies to sham affidavits offered to procure judgment for the offering party.  To the extent statements in declarations submitted by Murex renounce earlier testimony of the declarant, the Court disregards such testimony.[15]

---

[15] *Compare, e.g.*, Bartel Decl. ¶ 21 ("Murex had no understanding that the Buy/Sell transactions between Murex and ABC could be cancelled."), *with* Bartel Tr. at 183 ("Q. "Okay.  So if it didn't sell on [TRE] you just canceled the transaction; is that correct?"  A. "That's what we would do, yes."); *compare also, e.g.*, Parkhurst Decl. ¶ 13 (describing Parkhurst's familiarity with PPB program and ABC's use of it to pay Murex invoices), *with* Balderston Reply Decl., Ex. 159 ("Parkhurst Tr.") at 62 (Q. "Do you have an understanding as to what PPB means?  A. No."), *and id.* at 63–64, 65 (same); *compare also, e.g.*, Mall Decl. ¶ 18 (ABC entered into buy/sell transactions at a loss "to increase its liquidity and reduce its costs of funds"), *with* Mall Tr. at 81 ("Q. So sitting here today you don't know what the reasoning for [ABC] selling at a loss was?  A. Correct."), *and id.* at 89 ("Q. Why would you enter into a deal where you purchased and sold ethanol at a loss and at the end of the day you had no ethanol as a result of the transactions?  A. That's a question for Central Treasury Group. . . . I couldn't speak to it, in this type of setting.  It would be speculation.").

Murex is correct, however, that the sham affidavit rule is not as broad as the FDIC urges. The FDIC asks the Court to disregard the entirety of these five declarations because discrete statements in them contradict the declarant's deposition testimony. *See* Pl. Resp. at 29 ("[A]ll of these declarations constitute sham declarations that should be stricken."). The FDIC indeed cites examples where statements in Murex witness declarations squarely contradict their deposition testimony. *See, e.g.*, *supra* note 15. But the FDIC's notion that isolated such abuses justify disregarding the declarations wholesale, *see, e.g.*, *id.* at 31–32 (citing instances of contradictory testimony "[b]y way of example"), is unsupported by the case law, which instead supports disregarding the contradicted portions of the declarations, but no more. *See, e.g.*, *Moll*, 760 F.3d at 206. Accordingly, the Court, in the analysis below, will consider the five challenged Murex declarations—*i.e.*, the Bartel, Trinh, Savage, Mall, and Parkhurst declarations—but only to the extent that each "augments, without contradicting, [the declarant's] deposition testimony, addresses issues not explored thoroughly in [those] deposition[s], or finds support in other evidence in the record." *Torrico*, 319 F. Supp. 2d at 394 n.2.

### B.      Breach of Contract

Both sides move for summary judgment on the FDIC's breach of contract claim. That claim centers on section 8.2 of the Seller Agreement, under which Murex "absolutely, unconditionally and irrevocably" agreed to repurchase the ABC Receivables if any of certain representations and warranties Murex made in section 10.1 of the Agreement proved to have been "materially inaccurate or materially incorrect when made." Seller Agreement § 8.2.1(i). The FDIC argues that various representations about the nature of the Murex-ABC transactions yielding the ABC Receivables were materially inaccurate and incorrect when made, and that because Murex has failed to repurchase the ABC Receivables, it is in breach of that obligation.

### 1.       Murex's Threshold Challenges

The Court reviews below whether the evidence adduced entitles Murex to summary judgment on its claim of contract breach.  At the threshold, however, Murex makes a range of arguments why the Court may not reach the merits issue of whether any representations were materially inaccurate when made.  These are that: (1) the FDIC lacks contractual standing to bring this claim because FNBC—into whose shoes the FDIC stepped as receiver—assigned all rights to bring such a claim to TRE; (2) FNBC, and by extension the FDIC, failed to satisfy certain conditions precedent to repurchase obligations; (3) the FDIC  lacks recourse to Murex to redress its claims; and (4) the FDIC is judicially estopped from pursuing any of its claims here. The Court addresses these arguments first.

#### a.       Contractual Standing

On summary judgment, Murex argues for the first time in this litigation that FNBC's assignment of certain enforcement rights to TRE in the Buyer Agreement forecloses its contract claims.  *See* Def. Mem. at 4–7.  Murex relies on two provisions of that agreement:  Under the first, FNBC appointed TRE to "exercise[e] Enforcement Rights or remedies of [FNBC] under this Agreement" or "any applicable Seller Agreement."  Buyer Agreement § 3.3.1; *see supra* note 4 (defining "Enforcement Rights" under the Buyer Agreement).  Under the second, FNBC "transfer[red] and assign[ed] all of [its] Enforcement Rights against Defaulting Account Debtors and against Defaulting Sellers" to TRE.  *Id.* § 5.9.2.[16]  Based on these provisions, Murex argues, FNBC never possessed the right to seek repurchase directly from Murex, and cannot do so now.

---

[16] It is undisputed that, as receiver for FNBC, the FDIC inherits only the rights and claims that FNBC could have asserted itself.  *See Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) ("[T]he plaintiff in his capacity of receiver has no greater rights or powers than the corporation itself would have.  A receiver may commence lawsuits, but stands in the shoes of the corporation and can assert only those claims which the corporation could have asserted." (citation omitted)).

The FDIC counters that Murex has waived this argument by failing to raise it until now and that, in any event, FNBC regained its right to sue either when TRE became defunct or when FNBC opted out of the Buyer Agreement's assignment provision in March 2016. *See* Pl. Resp. at 3–5. For the following reasons, the Court agrees with the FDIC.

First, Murex has waived this argument. The parties dispute whether Murex's defense along these lines is rightly cast as involving "contractual standing" or "legal capacity." *Compare* Pl. Resp. at 3–5 (legal capacity), *with* Def. Reply at 1–2 (contractual standing). Either way, such a defense, as articulated by Murex here, is subject to waiver if not raised promptly. *See, e.g.*, *Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005) ("First, Buenos Aires appears to have waived the argument that the indenture does not give Applestein *standing* to sue. Buenos Aires did not raise the argument anywhere in its answer, and we are inclined to believe that an assertion of a party's *incapacity to sue* 'should fall within the class of "threshold defenses"—issues that must be raised and disposed of at the outset of the suit.'" (emphasis added) (quoting 5A Wright & Miller, Federal Practice and Procedure § 1295 (3d ed. 2004))); *FDIC v. Horn*, No. 12 Civ. 5958 (DRH) (AKT), 2015 WL 1611995, at *9 (E.D.N.Y. Apr. 8, 2015) (collecting cases).

Here, Murex did not raise this defense until the instant motions. Although it contends that its Answer raised a standing defense, review of that pleading reveals that it did not. At two points, the Answer could generously be read to dispute an issue of standing, but only insofar as Murex there denied "sufficient knowledge or information to form a belief about the truth of the allegations" regarding "the FDIC-R's abilities and/or standing to act as receiver or to succeed all claims held by First NBC Bank." Answer ¶¶ 2, 19. But that denial of knowledge concerned the FDIC's standing to sue on behalf of FNBC, not FNBC's contractual standing under the Buyer or

Seller Agreements.  The other paragraphs in the Answer that Murex cites merely contain blanket denials of the FDIC's contract claims.  *See id.* ¶¶ 1, 18, 147–160.  Despite being on notice since 2013 that the Buyer Agreement contained the assignments at issue here, *see* Seller Agreement § 3, Murex has not identified any instances where it has raised this defense— including in its three earlier motions to dismiss.  Accordingly, Murex has waived any argument that FNBC, and by extension the FDIC, lacks contractual standing.

Second, even assuming Murex preserved its contractual-standing defense, the evidence clearly demonstrates that FNBC opted out of the Buyer Agreement's assignment to TRE.  As noted, the Buyer Agreement's assignment provision was not irrevocable; section 5.10 gave FNBC the ability to execute a "Buyer Opt-Out Agreement" permitting it to "proceed on its own to attempt collection of amounts" owed to it, so long as TRE consented.  *Id.* § 5.10.3.  The Buyer Agreement did not specify a particular form that such an opt-out agreement must take, requiring only that it be "in form and substance acceptable to [TRE] and its counsel."  *Id.* § 5.10.1.

In March 2016, FNBC executed such an agreement.  By then, TRE had been foreclosed upon and retained one employee, Michael Gonik.  JSF ¶ 17.  On March 2, 2016, Gonik affirmatively proposed to FNBC that FNBC execute its opt-out rights under the Buyer Agreement.  He wrote: "TRE's original agreement with FNBC includes language for TRE to hire attorneys, commence collection efforts, and pass on costs to the Buyer unless the Buyer opts out and decides to handle directly.  My guess is that FNBC will undertake those duties on its own, especially now that the matter is under the BK court's mandate.  Is that correct?"  FNBC Opt-Out Email.  That evening, FNBC responded:  "Michael – Please be advised that First NBC Bank desires to formally opt out, and does hereby opt out, of *any agreement* for TRE to commence collection efforts with respect to *any receivables purchased by First NBC Bank*.  The bank will

handle such matters directly." *Id.* (emphasis added). This exchange thus represents an agreement between FNBC and TRE, through its sole remaining employee, permitting FNBC to opt out of "any agreement" assigning enforcement rights to TRE "with respect to *any receivables*" that FNBC had purchased. *Id.* (emphasis added). FNBC was thus authorized to bring—and the FDIC to pursue—the instant action.[17]

Murex's arguments to the contrary are unavailing. First, it contends that there is no evidence that FNBC's email was "in form and substance acceptable" to TRE. Def. Mem. at 12. But that ignores the context of FNBC's message, which responded to a TRE email expressly inviting FNBC to confirm its decision to opt out of the Buyer Agreement's assignment provision. Given the content of TRE's request, the absence of any required form that TRE's consent was required to take, and TRE's moribund status at the time, there is no reason to regard the parties' informal exchange embodying FNBC's consent as deficient. Second, Murex states that "the email very specifically limits any opt out only to collection from ABC (Defaulting Account Debtor)—it does not constitute an agreement for FNBC to opt out of TRE's exclusive right to collect against Murex, the Account Seller." *Id.* That argument is highly unpersuasive. Neither Gonik's email nor FNBC's response mentions the terms "Defaulting Account Debtor" or "Account Seller" or otherwise limits the opt out. FNBC Opt-Out Email. Instead, it expansively reclaims FNBC's right to pursue action "with respect to any receivables purchased by FNBC Bank." *Id.* Murex's mischaracterization of that document is thus to no avail.[18]

---

[17] The sole case Murex cites on this point is therefore inapposite. *See Gupta v. Nat'l Life Ins. Co.*, No. 04 Civ. 0252 (SC), 2006 WL 2000118, at *3 (W.D.N.Y. July 17, 2006) (plaintiff assigned all substantive rights, not only enforcement rights, and had no ability to opt out).

[18] The parties also dispute the significance of an exchange in which Murex appears to have authorized FNBC to pursue collection efforts against ABC, which, under the Seller Agreement,

b. *Conditions Precedent*

Next, Murex argues that it does not have a repurchase obligation with respect to the ABC

Receivables because certain conditions precedent set out in the Seller Agreement never came to

pass. *See* Def. Mem. at 7–12. The FDIC disputes that any of the provisions Murex cites gives

rise to conditions precedent. Pl. Resp. at 6–9. The FDIC again has the better of the argument.

Under New York law, "a condition precedent is an act or event, other than a lapse of

time, which, unless the condition is excused, must occur before a duty to perform a promise in

the agreement arises." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009)

(citation omitted). Conditions precedent "are not readily assumed" and must be expressed in

"unmistakable language." *Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Cap.,

Inc.*, 821 F.3d 297, 305 (2d Cir. 2016); *see also Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir. 2008)

("New York courts are cautious when interpreting a contractual clause as a condition precedent.").

Although "talismanic words are not required," terms giving rise to a condition precedent

generally include language such as "if," "on condition that," "provided that," "in the event that,"

"subject to," and similar "linguistic conventions." *Bank of N.Y. Mellon*, 821 F.3d at 305–06; *see

Israel*, 537 F.3d at 93; *see also IBM Corp. v. United Microelectronics Corp.*, 764 F. App'x 9, 13

(2d Cir. 2019) (summary order). Moreover, "[w]here a contract explicitly states that a party's

obligations are 'unconditional,' . . . courts have generally found that any condition precedent is

inherently in conflict with such a provision." *Morgan Stanley High Yield Sec., Inc. v. Seven

Circle Gaming Corp.*, 269 F. Supp. 2d 206, 219 (S.D.N.Y. 2003) (collecting cases).

---

would otherwise would have been Murex's exclusive right. *See* Def. Mem. at 10–11 & n.67; Pl.
Resp. at 5. But that right, and those negotiations, are distinct from FNBC's rights against Murex
*vis a vis* TRE and the opt-out agreement contemplated by § 5.10 of the Buyer Agreement. Nothing
in the parties' agreements suggests that Murex's consent was necessary to authorize FNBC to
proceed directly against it in enforcing the repurchase obligations at issue in this case.

As the FDIC notes, the Seller Agreement's imposition of repurchase obligations on Murex is expressly "absolute[], *unconditional*[] and irrevocabl[e]."  Seller Agreement § 8.2.1 (emphasis added).  Murex's notion that such requirement was contingent on conditions precedent thus faces a steep uphill battle.  *See Morgan Stanley High Yield*, 269 F. Supp. 2d at 219 (condition precedents "inherently in conflict" with unconditional obligations); *36 E. 57th St. LLC v. Falic*, 117 A.D.3d 434, 435 (1st Dep't 2014) ("The guaranty that defendant signed is absolute and unconditional, 'foreclos[ing] as a matter of law the defenses and counterclaims based on . . . failure to perform a condition precedent.'" (alteration in original) (quoting *Citibank v. Plapinger*, 66 N.Y.2d 90, 93 (1985))).  Notably, in its reply, Murex presents no response this significant impediment to its argument.  *See* Def. Reply at 3–4.

Instead, Murex identifies four provisions of the Seller Agreement that purportedly impose conditions precedent to its obligation to repurchase the ABC Receivables.  Two appear in section 15.1, titled "Seller Events of Default," which sets out seven circumstances that constitute such an event.  Seller Agreement § 15.1.  Although the FDIC does not press this point, the Court doubts that these definitions of "Seller Events of Default" are even relevant to the Repurchase Events described in section 8.2.2, upon which the FDIC premises its claim.  That is because section 15.1 appears to define a set of events other than those defined as Repurchase Events.  *Compare id.*, Ex. 1 at 56 ("'Repurchase Event' means any of the events described in Section 8.2.1." (emphasis omitted)), *with id.* at 57 ("'Seller Event of Default' has the meaning given to that term in Section 15.1." (emphasis omitted)).  Because the FDIC's claim concerns a Repurchase Event, not a Seller Event of Default, and the agreements signed by the parties do not suggest that these categories are coextensive, section 15.1's definitions appear largely unrelated to the repurchase obligations at the core of this dispute.

However, even assuming that these definitions do relate to section 8.2.2's repurchase requirement, nothing in either section 15.1.2 or 15.1.3 unmistakably gives rise to a condition precedent. The former states that a seller will be considered in default when it fails to perform an obligation under the agreement and fails to cure or correct such failure "within 10 days following notice from" TRE. *Id.* § 15.1.2. The latter defines a Seller Event of Default as a "breach of any representation or warranty," which (1) the seller fails to cure within 30 days of *either* "(i) discovery of such breach by Seller *or* (ii) receipt of notice of such breach from [TRE]," and (2) "has a Material Adverse Effect with respect to Seller." *Id.* § 15.1.3 (emphasis added). Neither provision contains language suggesting a condition precedent. *See Bank of N.Y. Mellon*, 821 F.3d at 304–06 (no condition precedent where notice-and-cure provision required that one party "shall promptly notify, in writing, the other party" of material breach).[19] The absence of such language is "particularly significant" because the drafters of the Seller Agreement "elsewhere employed precisely such language to establish undoubted conditions precedent." *Id.* at 306; *see, e.g.*, Seller Agreement § 16.3.2 (buyers may assign rights to receivables, "conditioned on the Subsequent Buyer" agreeing to the terms of the Seller Agreement); Buyer Agreement § 5.10.1 (permitting buyer opt-out "only with [TRE's] consent and conditioned on the Buyer executing a Buyer Opt-Out Agreement"). Accordingly, the Court

---

[19] Moreover, section 15.1.3 expressly defines notice from TRE as only one of two possible circumstances giving rise to a Seller Event of Default—the other being a seller's own discovery of its breach. *See* Seller Agreement § 15.1.3. This definition undermines Murex's argument that these provisions "reiterate that it is TRE's *exclusive right* to determine if Murex is required to repurchase and/or is in default to a breach of warranty." Def. Reply at 3 (emphasis in original); *see, e.g.*, *LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003) (similar provision foreclosed argument that demand was a condition precedent, even in presence of language otherwise suggesting a condition precedent).

finds nothing in section 15 that unmistakably designates notice by TRE a condition precedent barring the relief the FDIC seeks.[20]

Murex is on better footing with respect to its arguments under section 8.2 of the Seller Agreement, as it at least clearly relates to Repurchase Events.  First, section 8.2.1 states: "Should any such Repurchase Event occur, [TRE] *may* immediately make demand on Seller, whereupon Seller shall immediately repurchase the Traded Receivable for the Repurchase Price thereof."  Seller Agreement § 8.2.1 (emphasis added).  And the following provision states: "Seller shall pay the Repurchase Price for any Traded Receivable to [TRE] in Good Funds by no later than 1:00 p.m. Eastern time on the second Business Day following the date that [TRE] makes demand on Seller to repurchase the Traded Receivable."  *Id.* § 8.2.2.

Murex's argument that TRE's ability to make a demand on it constituted a condition precedent, however, is incorrect.  In *Bank of New York Mellon*, the Second Circuit addressed a similar, though not identical, repurchase provision.  There, the relevant contract contained "a request-for-cure obligation, which requires the Master Servicer, and permits the Special Servicer, promptly, but in any event within three business days of 'becoming aware' of [a] material breach, to request that the Seller cure breach within 90 days of the receipt of notice."  *Bank of N.Y. Mellon*, 821 F.3d at 304.[21]  If the seller there failed to cure within 90 days, it was obliged to

---

[20] In its Reply, Murex also identifies, without argument, section 15.2 of the Seller Agreement as purportedly containing additional conditions precedent to FNBC's right to demand repurchase. *See* Def. Reply at 3 n.16.  That provision, titled "Enforcement Rights against Seller," expresses sellers' agreement that TRE will possess Enforcement Rights as to receivables traded on TRE. Seller Agreement § 15.2.  It also does not contain language suggesting a condition precedent.

[21] The relevant agreements here similarly appoint TRE as "Servicer" for all traded receivables. *See* Seller Agreement § 7.1 ("Appointment of TRE as Servicer"); Buyer Agreement § 3.3.2 ("Buyer hereby appoints TRE to act as Servicer of Trader Receivables on behalf of the Buyer thereof . . . .").

repurchase the mortgage loan at issue.  *Id.*  The Circuit held that, because "the Servicer's obligation to request cure within three business days of becoming aware of a material breach is not unmistakably cast as a condition precedent to Morgan Stanley's cure-or-repurchase obligation," it was unambiguously not a condition precedent.  *Id.*

So, too, here.  As with the section 15 provisions discussed above, section 8.2.1 does not contain language unmistakably casting these arrangements as conditions precedent, despite the contract's using such terminology elsewhere.  And unlike in *Bank of New York Mellon*, section 8.2.1 does not even frame TRE's demand as an *obligation*.  It instead provides only that TRE "*may* make demand" in the event of a Repurchase Event.  Seller Agreement § 8.2.1. Sellers' unconditional repurchase obligations, on the other hand, arise immediately "upon the occurrence of any one" Repurchase Event.  *Id.* § 8.2.  Thus, rather than imposing a condition precedent (or even an obligation) upon TRE, sections 8.2.1 and 8.2.2 merely set out the procedures by which a party seeking repurchase *may* pursue relief from a seller such as Murex once Murex becomes obliged to repurchase a receivable.[22]

As for the premise that TRE, and not a buyer, would pursue such relief, it appears merely to reflect the agreements' default position that buyers assigned their enforcement rights to TRE absent an opt-out agreement.  But, as reviewed above, FNBC here *did* opt out, on March 2, 2016, when—in response to TRE's solicitation of such action—FNBC wrote that it "hereby opt[s] out[] of any agreement for TRE to commence collection efforts with respect to any receivables purchased by First NBC Bank."  FNBC Opt-Out Email.  Accordingly, because none of the terms Murex cites unmistakably impose a condition precedent on Murex's repurchase obligations, and

---

[22] Accordingly, the reference to a demand upon Murex does not even constitute a promise, which would require "substantial performance" even in the absence of a condition precedent.  *See Bank of N.Y. Mellon*, 821 F.3d at 308.

because FNBC opted out of the default procedure by which TRE normally would have made repurchase demands, the absence of such a demand does not bar the FDIC's claims.

### c.    Lack of Recourse

Murex next argues that the entirety of the FDIC's contract claim is barred by a provision in the Seller Agreement stating that, "*[e]xcept as expressly provided in Sections 8.2* and 8.3, TRE and Buyers of Receivables shall have no recourse to Seller and Seller shall not be required to repurchase a Defaulted Receivable from the Buyer thereof." Seller Agreement § 8.1 (emphasis added). But, of course, that clause expressly provides for recourse to sellers under the terms of section 8.2—the very provision under which the FDIC claims Murex is obliged to repurchase the ABC Receivables. *See id.* Murex responds that section 8.2 is inapplicable here because TRE did not make a demand for repurchase on Murex. *See* Def. Mem. at 13. But that argument assumes the proposition rejected above—that notice and demand by TRE were conditions precedent to Murex's repurchase obligation. Because the only question presented by the FDIC's contract claim is whether Murex breached its obligation to repurchase the ABC Receivables under section 8.2, section 8.1—which expressly exempts section 8.2 from its coverage—does not bar relief.

Separately, Murex argues that a June 1, 2015 amendment to TRE's rules and procedures, which the Seller Agreement incorporates by reference, precludes obliging Murex to repurchase the ABC Receivables. *See* Seller Agreement at 1; Def. App'x, Ex. 49 ("Amended Rules"). The Amended Rules include a provision titled "Events Affecting the Payments of Traded Receivables Before the Deemed Dispute Date." *Id.* It states: "If an Account Debtor Insolvency Event occurs prior to the Deemed Dispute Date . . . , Buyer shall have no recourse to Seller, and Buyer shall be able to pursue collection efforts against the Account Debtor [*i.e.*, ABC] in accordance with the relevant Buyer and Seller Agreements." Amended Rules § 11.1.1. Murex argues that this

change to TRE's rules and procedures overrode the repurchase obligation in section 8.2.1 of the

Seller Agreement, and now limits the FDIC to pursuing its collection efforts against ABC itself,

because ABC experienced an Account Debtor Insolvency Event in October 2015 (when it

voluntarily suspended payment of its obligations to certain corn producers).  Def. Mem. at 13–15.[23]

The FDIC responds that section 11.1.1 of the Amended Rules cannot be read so broadly,

but instead more narrowly amends a similar provision found at section 8.2.1(ii) of the Seller

Agreement.  *See* Pl. Resp. at 10–11.  Under section 8.2, two circumstances can trigger a seller's

repurchase obligations: (1) a representation or warranty made by the seller turns out to have been

"materially inaccurate or materially incorrect" (the provision under which the FDIC proceeds

here); and (2) an Account Debtor (*i.e.*, ABC) fails to pay a receivable in full "by the Repurchase

Date, in which case a dispute will be presumed to have arisen, unless an Account Debtor

Insolvency Event has occurred on or prior to such Repurchase Date."  Seller Agreement

§ 8.2.1(i), (ii).  The former relates to misconduct by the seller, while the latter concerns who

bears the risk of loss if a debtor becomes insolvent between when the receivable is sold and

when the buyer becomes entitled to demand payment.  The FDIC contends that the Amended

Rules merely changed the relevant date in this second circumstance from the Repurchase Date to

the Deemed Dispute Date (each of which is defined slightly differently), but do not reflect a

further intention to insulate a seller who has misrepresented the nature of a receivable in the

unrelated event of a debtor's insolvency.  Pl. Resp. at 10–11.

---

[23] The FDIC contests whether this suspension in fact occurred and whether it would have qualified as an Account Debtor Insolvency Event under the Seller Agreement and Amended Rules, given what it contends are specific conditions precedent to the determination that such an event has occurred.  *See* Pl. Resp. at 11–12.  Because the Court holds *infra* that this limitation does not override the FDIC's right to seek recourse against Murex under section 8.2.1(i), it has no occasion to resolve that dispute.

Murex's argument on this point is more substantial than its other threshold arguments, but the FDIC's assessment ultimately carries the day. Both section 11.1.1 of the Amended Rules and section 8.2.1(ii) of the Seller Agreement relate to determining which party—the buyer or seller—will bear the risk of loss in the event that a debtor becomes insolvent between the sale of a receivable and the date on which a buyer becomes entitled to demand payment on that receivable. It is unsurprising, therefore, that an amendment to the "rules and procedures" governing the Seller Agreement would tweak the date upon which such risk passes from the seller to the buyer, using terms tracking those in the original provision governing this issue. *Compare* Seller Agreement § 8.2.1(ii) (permitting recourse to seller "unless an Account Debtor Insolvency Event has occurred on or prior to such Repurchase Date"), *with* Amended Rules § 11.1.1 (no recourse to seller "[i]f an Account Debtor Insolvency Event occurs prior to the Deemed Dispute Date"). Section 8.2.1(i), on the other hand, addresses a very different situation: one in which a seller has misrepresented the nature of the receivable it has sold. Murex does not offer any reason why the drafters of the Amended Rules would seek to reward unscrupulous or inattentive sellers for their misrepresentations on account of the happenstance that the debtor became insolvent before a buyer learned it had been misled. *See Elecs. & Telecomms. Rsch. Inst. v. Acacia Rsch. Grp., LLC*, No. 15 Civ. 3419 (VSB), 2017 WL 2389699, at *8 (S.D.N.Y. June 1, 2017) (courts must reject interpretations that lead to absurd or commercially unreasonable results).[24]

---

[24] As the FDIC notes, this result would be especially absurd in the context of sellers' warranty that "[t]o Seller's knowledge, no Account Debtor Insolvency Event has occurred with respect to the related Account Debtor." Seller Agreement § 10.1.9. Under Murex's reading, a seller that knowingly and covertly sold a receivable owed by an *already insolvent* debtor would be entirely insulated from any repurchase obligation arising from that misrepresentation under Amended Rule 11.1.1, effectively eliminating the protection afforded to buyers under section 10.1.9.

Nor has Murex coherently explained why those drafters would use the vehicle of an amendment to TRE's rules and procedures to impose a totally new—and transformative—limitation on buyers' otherwise absolute, unconditional, irrevocable repurchase rights in the event that sellers prove to have misled them.[25]  Murex's proposed application of Amended Rule 11.1.1 to foreclose such rights would thus lead to commercially unreasonable results, and is irreconcilable with the rest of the contract.  *Id.*  In contrast, the FDIC's reading of these provisions harmonizes them with each other and the balance of the parties' agreements.  *See, e.g.*, *T.M. Real Estate Holdings, LLC v. Stop & Shop Supermarket Co.*, 543 F. App'x 41, 43 (2d Cir. 2013) (summary order) (adopting contract interpretation that placed relevant clause "in harmony with the other clauses and amendments" and did not "unduly restrict" the rights of the parties).  Accordingly, the Amended Rule 11.1.1 does not bar the FDIC from recourse to Murex in attempting to vindicate its repurchase rights under the Seller Agreement.

### d.    *Judicial Estoppel*[26]

Murex's final pre-merits argument is that the FDIC is judicially estopped from pursuing its claims because the FDIC has elsewhere characterized the ABC Receivables as arising from valid, not sham, sales of ethanol.  The FDIC did so, Murex states, in its efforts to obtain payment during ABC's and Abengoa's insolvency proceedings.  And because the premise for the FDIC's claims here is that Murex and ABC's buy/sell transactions were shams, and did not involve bona fide sales of any ethanol, Murex argues that such claims must be dismissed.

---

[25] In fact, Murex has offered no response to the FDIC's arguments on this point at all.  Thus, Murex seems to have abandoned its argument as to the nonavailability of recourse under the Amended Rules.  *See generally* Def. Reply (not mentioning the Amended Rules or this argument).

[26] Murex contends that its judicial estoppel argument applies equally to the FDIC's contract and fraud claims.  *See* Def. Mem. at 37.  The analysis in this discussion applies to both.

Judicial estoppel applies where: (1) "a party's later position is clearly inconsistent with its earlier position"; (2) "the party's former position has been adopted in some way by the court in the earlier proceeding"; and (3) "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *Penberthy v. Chickering*, No. 15 Civ. 7613 (PAE), 2017 WL 176312, at *7 (S.D.N.Y. Jan. 13, 2017) (quoting *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (citation omitted)). "Importantly, the former position of the party against whom estoppel is sought need not have been the '"but for" cause' of the earlier court's determination, so long as allowing that party to change positions would yield some unfair burden or benefit." *Id.* (quoting *Lia v. Saporito*, 541 F. App'x 71, 74 (2d Cir. 2013) (summary order)). The Second Circuit limits "judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *DeRosa*, 595 F.3d at 103 (quoting *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)).

This Court, in denying the relevant parts of Murex's motion to dismiss, has already held that the position taken by the FDIC in the ABC and Abengoa bankruptcy proceedings is not inconsistent, let alone clearly so, with its position here. *See FDIC ex rel. FNBC v. Murex LLC* ("*Murex I*"), No. 16 Civ. 7703 (PAE), 2018 WL 2694431, at *6 (S.D.N.Y. June 5, 2018). Now, however, Murex proffers purported "additional facts that warrant the Court's reconsideration" of this holding. Def. Mem. at 18. Specifically, Murex argues as follows. The FDIC has, in the ABC and Abengoa bankruptcy proceedings, represented that it is owed debts by both ABC and Abengoa. In so claiming, the FDIC has relied upon the Performance Undertaking agreement, in which Abengoa guaranteed payment of certain ABC receivables purchased via TRE, including those sold by Murex. *See supra* note 12. The Performance Undertaking, which has supported certain payments to the FDIC from Abengoa in connection with those bankruptcy proceedings,

covers only "Traded Receivables under the Seller Agreement."  Performance Undertaking § 1.

And the Seller Agreement defines such "Receivables" as payment obligations "arising out of the

sale of goods or the rendering of services by Seller."  Seller Agreement, Ex. 1 at 56.  On this

basis, Murex argues, the FDIC has "represented" to the courts overseeing the bankruptcies that

the ABC Receivables arise "out of the sale of goods," not shams, and that such representations

are clearly incompatible with the FDIC's position here.

Murex's argument is unpersuasive, for several reasons.  First, the FDIC's claim in this

litigation is *premised* on Murex's obligation to "repurchase Traded Receivables" under the same

agreement.  Seller Agreement § 8.2.1.  To the extent the FDIC—in pursing recovery from the

bankruptcy estates of Abengoa and ABC in their bankruptcy proceedings—has made any

representations about the nature of the sales underlying the ABC Receivables, its representations

are consistent with its fundamental claim here, which is (on behalf of FNBC) to be made whole

for receivables that FNBC acquired based on Murex's representations.

Second, aside from the definition of the term "Receivable" embedded in an exhibit to the

Seller Agreement, Murex does not point to any affirmative representation by the FDIC, let alone

one on which any court has relied, that the ABC Receivables arose from bona fide, arm's length

sales of ethanol from Murex to ABC.[27]  Rather, as the Court recognized in denying Murex's

earlier claim of judicial estoppel, the FDIC has claimed an entitlement to "Trade payables for

---

[27] Murex represents that FNBC's proof of claim in the Eastern District of Missouri, filed
July 5, 2016, used an interest-rate calculation derived from ABC's "Terms and Conditions for
the Purchase of Ethanol," which accompanied the buy/sell transactions at issue.  Def. Mem.
at 24.  The title of this document, however, is not a factual representation by the FDIC, which, in
FNBC's shoes, has consistently alleged and argued that Murex's representations that actual sales
of ethanol took place were false and that these entities created documents to support those false
representations.  Nor is there any indication that an inconsistency between that title and the
FDIC's claims here would be unfair to Murex.

ethanol *purportedly* purchased from [ABC]," *Murex I*, 2018 WL 2694431, at *6 n.5 (emphasis added), and from Abengoa's guarantee of those payables (*i.e.*, the ABC Receivables).  That the contract documents underlying those receivables themselves referred to the sales of goods, not shams, is of no moment.  The FDIC's allegation is that Murex and ABC intended to use those contracts as props to convince buyers such as FNBC that the ABC Receivables arose from genuine sales of ethanol.  The FDIC's claims both here and in the bankruptcy proceedings assert that (1) ABC and Abengoa owe valid debts to the FDIC, and (2) contrary to Murex's representations, the transactions generating these debts did not involve actual ethanol sales, even though they were so described.  They are consistent with one another.

Accordingly, the Court rejects Murex's request to reconsider its previous holding that judicial estoppel does not bar the FDIC's claims here.

### 2.    Merits of Contract Claim

Under New York law, an action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  On their competing motions for summary judgment on this claim, the parties here dispute only the elements of breach and damages.

The FDIC argues that the evidence establishes that Murex breached the Seller Agreement, to which FNBC is a third-party beneficiary, by failing to repurchase the ABC Receivables.  Murex's obligation to do so, the FDIC argues, arose because two representations Murex made under that agreement were "materially inaccurate or materially incorrect when made."  Seller Agreement § 8.2.1(i).  These were that (1) the ABC Receivables arose "out of a bona fide, arm's length sale of goods or services in the ordinary course of [Murex's] business"; and (2) the ABC Receivables did "not result from a conditional sale."  *Id.* §§ 10.1.5, 10.1.6.  The

FDIC contends that there is no dispute of material fact over whether those representations were materially inaccurate.  That is because the undisputed facts make clear that no bona fide, arm's length sales of ethanol took place between ABC and Murex on the relevant dates and, to the extent sales could be viewed as having taken place, they were contingent on Murex's ability to sell the ABC Receivables on TRE, and therefore conditional.

Murex argues that that the undisputed facts show that neither representation on which the FDIC's claim rests was incorrect or inaccurate when made, let alone materially so.  It therefore claims that it never had any duty to repurchase the ABC Receivables, and cannot be claimed have breached the Seller Agreement by failing to do so.  Separately, Murex argues that, even if the FDIC could show that Murex had made any misrepresentations about the ABC Receivables, the undisputed facts do not permit the conclusion that those misrepresentations caused the FDIC damages.

On these issues, the Court holds with the FDIC.  Drawing all reasonable inferences and resolving any ambiguities in Murex's favor, a reasonable jury could not conclude that the sales underlying the ABC Receivables were anything other than fictitious, on-paper-only dealings. The evidence adduced leaves no room for genuine dispute that Murex and ABC's purpose with respect to these transactions was not the buying and selling of ethanol, but the creation of invoices that could be used to induce third parties to purchase the associated receivables, and thereby slake ABC's short-term need for liquidity.  And because Murex's repurchase obligation, under the Seller Agreement, is triggered solely by the material inaccuracy of its representation as to the ABC transactions' bona fides, the FDIC need not prove that this misrepresentation itself caused any damages.  Instead, its damages are those that the FDIC continues to suffer because Murex has failed to uphold its contractual obligation to repurchase the ABC Receivables despite

having unconditionally, absolutely, and irrevocably promised to do so.  Accordingly, the Court grants the FDIC summary judgment on its breach of contract claim and denies Murex's motion on that claim.

        *a.*     *Breach*

No agreement in this case defines the terms at the core of this the FDIC's claim of breach—*i.e.*, "bona fide," "arm's length," or "conditional sale."  But each is a "legal concept ubiquitous in business transactions."  *Gould v. Bank of N.Y. Mellon*, 123 F. Supp. 3d 197, 205 (D. Mass. 2015).

*Black's Law Dictionary* defines a "bona fide sale" as one "made by a seller in good faith, for valuable consideration, and without notice of a defect in title or any other reason not to hold the sale."  Sale, Black's Law Dictionary (11th ed. 2019).  In determining the bona fides of a transaction, courts look to the substance and real character of the dealing, not merely its form.  *See, e.g.*, *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984).  *Black's* defines "arm's length" as "of, relating to, or involving dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship."  Arm's Length, Black's Law Dictionary (11th ed. 2019); *see* Transaction, Black's Law Dictionary (10th ed. 2014) (defining arm's length transaction as "a transaction between two unrelated and unaffiliated parties"); *see also In re Vill. at Lakeridge, LLC*, 814 F.3d 993, 1001 n.11 (9th Cir 2016) (relying on *Black's* for definition of "arm's length transaction"), *aff'd sub nom. U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960 (2018); *Gould*, 123 F. Supp. 3d at 205 (same).

As for a conditional sale, that term appears to refer to a secured transaction in which a buyer takes possession of a good, but the seller retains formal title as security for the buyer's payment, after which title formally passes to the buyer.  *See, e.g.*, *Snyder v. Guider*,

185 N.Y.S.2d 110, 115 (Sup. Ct. 1959) (describing a conditional sale as "a credit device, whereby the buyer is the substantial owner, enjoying possession, use, control and equity of redemption, whereas the seller reserves title to the goods solely as security for payment by the buyer"). That this term here embodied its meaning as used in secured dealings is confirmed by the type of transactions listed alongside it in the Seller Agreement. These include a "delivery in bailment" and a sale "on consignment," each of which similarly concern securities in property without title transfer. *See* Seller Agreement § 10.1.6.

i. "Conditional Sales"

As to whether the relevant sales qualify as "conditional," the FDIC contends that, because the contracts gave Murex the ability to unwind or cancel an entire buy/sell transaction if the resulting receivable did not sell on TRE, each sale from Murex to ABC was "conditional" under the Seller Agreement. *See* Pl. Mem. at 17–18; *see also* Bartel Tr. at 183. Although the FDIC's argument has intuitive appeal, it does not grapple with the distinct meaning of "conditional sale" under that agreement. As noted, a "conditional sale" appears to refer to a specific type of secured transaction in which possession, but not ownership, transfers to a buyer pending payment by the buyer to the seller. That is not the case here. The FDIC itself alleges that no actual ethanol ever changed hands in connection with the five transactions, either as a matter of possession or formal ownership. And the FDIC does not cite any evidence that the transactions underlying the ABC Receivables were arranged in a conditional manner along the lines of the definition above, whereby possession but not ownership transferred pending payment. Accordingly, although the parties' ability to void each entire buy/sell transaction in the event a receivable did not sell on TRE is relevant to whether those sales were bona fide, *see infra*, that feature does not make the transactions conditional sales within the meaning of the Seller Agreement.

ii.     "Bona Fide, Arm's Length Sales"

As to whether the relevant transactions were "bona fide, arm's length" sales of goods,

however, it is beyond genuine dispute that they were not.  That is so for several reasons.

First, the evidence establishes that neither Murex nor ABC had any interest in the actual

ethanol that was the formal subject of these transactions.  On ABC's end, the transaction was

dictated by its finance group, which provided a dollar amount it wanted to generate, and which

those responsible for buying and selling ethanol then used to reverse engineer the amounts of

ethanol to be bought and sold by the offsetting contracts.  As an ABC employee responsible for

executing these trades testified, "everything was driven by a dollar amount of the transaction.

We were told [the finance group] wanted to do a $10 million transaction with Murex, a buy/sell,

so then from that $10 million of—as directed by the finance group, we would lay out purchases

and sales of product at market values with the endgame being to provide Murex with a penny

margin."  Balderston Decl., Ex. 3 ("Weber Tr.") at 55; *see also id.* at 102 ("Q. Was that the

figure you got from financing that day as to how much they wanted in buy/sells that day?  A. It

was.").  Murex, for its part, was well aware that the "endgame" of these transactions was not to

buy and sell ethanol, but to generate a penny-per-gallon profit for itself and a short-term loan,

backed by an unsuspecting third party, for ABC.  Murex's Rule 30(b)(6) witness testified that

Murex "had a long-standing relationship with Abengoa," that "the deal that we made with

Abengoa in the beginning was that they asked us, you know, for help," and that "they would pay

us $0.01 per gallon on all the invoices.  And so that's exactly how it ended up."  Bartel Tr. at 30, 74.

Further, rather than negotiating the terms of the sales of purchases of ethanol at arm's length,

Murex accepted, without negotiation or contest, the gallons, number of trades, number of

invoices, and prices that ABC's finance department, through its sales teams, set out for each

buy/sell transaction.  Pl. 56.1 ¶¶ 54–55; Bartel Tr. at 97 (unable to explain why invoices were

structured as they were because "we took our instructions from Abengoa in terms [of] how—what they wanted to do").  ABC further dictated which invoices to put on TRE and the discount rates to offer.  Pl. 56.1 ¶¶ 56–57.  "Abengoa was the one who designed these.  They said this is what we want to do.  I never had any input as to how they were going to do that. . . .  [W]e didn't come up with what the program was."  Bartel Tr. at 99.

Thus, ethanol was incidental to the essentially financial transactions here.[28]  In fact, the transactions were fastidiously designed to ensure that neither party came out with a right to a drop more or less of ethanol than it had begun with.  The ostensible sales could alternatively have been stated as being for tanks, or pipes, or sneakers, or candy bars, or widgets, or any other good—but the substance of the deal would have remained exactly the same.  The ethanol started and ended in Murex's possession, but Murex came away with a receivable that it could convert to cash for the benefit of ABC, and a penny-per-gallon profit for its troubles.

Second, and crucially, Murex's understanding that these transactions were contingent on its ability to turn around and sell the resulting receivable on TRE underscores that the goal of these swaps was the creation of receivables—not the purchase and sale of ethanol.  As noted, Murex's Rule 30(b)(6) witness, Richard Bartel, testified that it was Murex's common practice to

---

[28] Tellingly, on three of the days at issue, the parties bought and sold more ethanol through their ostensible buy/sell transactions than existed in the facility designated as the place of transfer.  For example, on August 21, 2015, Murex sold to ABC, and then immediately bought back, 16 million gallons of ethanol—despite having only five million gallons at its entire Oiltanking, Texas City facility that day.  *See* Pl. 56.1 ¶¶ 85, 108; *see also id.* ¶¶ 72, 106 (similar on July 6, 2015); ¶¶ 90, 109 (similar on August 24, 2015).  Thus, the only way this transaction could have been accomplished, even on paper, was by trading the same physical ethanol back and forth several times between the two parties.  *See* Savage Decl. ¶ 11 (Murex employee relied upon "Murex purchase contracts that showed Murex buying back similar quantities of undenatured ethanol" from ABC to "ensure that there was a sufficient quantity of undenatured ethanol" in Murex's storage facility to make the sales to ABC on the same day).  This underscores that the parties did not have any intention to actually exchange ethanol in connection with these transactions.

cancel buy/sell agreements and their supporting contracts "if [it] couldn't find a buyer for [its] receivable."  Bartel Tr. at 183; *see id.* (Q. So if it didn't sell on the Receivables Exchange you just canceled the transaction; is that correct?  A. That's what we would do, yes."); *id.* ("I believe we did that in several cases.").  This testimony is in accord with contemporaneous emails in which Bartel candidly admitted that, at all points during the entire buy/sell transaction, Murex was at risk only of losing its own profit.  Balderston Decl., Ex. 12.  That could be so only if the entire transaction hinged on obtaining funding through TRE.  If, on the other hand, both Murex and ABC had genuinely been obliged to pay each other for the full amount of the ethanol exchanged, then, in the event that a receivable did not sell on TRE, Murex would have borne the full risk of ABC's default while maintaining the obligation to pay ABC for its "sale" of ethanol. In reality, however, Murex faced no such risk.  *Id.*  That was because, absent the sale of a receivable on TRE, the underlying ethanol sales were, per tacit agreement, to be scuttled.[29] Indeed, there is no evidence in the record that Murex and ABC ever completed a transaction in which they exchanged identical amounts of ethanol, at a penny-per-gallon profit to Murex, without obtaining financing through TRE.

In his declaration submitted at summary judgment, Murex's Bartel attempts to recant this damaging concession.  He now seeks to aver that "Murex had no understanding that the Buy/Sell transactions between Murex and ABC could be cancelled."  Bartel Decl. ¶ 21.  Putting aside Bartel's disappointing disregard for the oath, a witness, as noted above, may not attempt to create

---

[29] Murex emphasizes that it "never sought to cancel any of the ABC Receivables auctions that form the basis of the FDIC-R's claims."  Def. Mem. at 29.  But that is because it successfully shifted the risk of ABC's nonpayment to FNBC (today, the FDIC) through the very transactions at issue.  Murex also pooh-poohs the FDIC's argument on this point as "hypothetical."  *Id.*  Not so:  Bartel's testimony establishes that, when the receivables did not sell on TRE, Murex and ABC generally, and concretely in at least one case, did cancel—in actual fact—the transactions. Bartel Tr. at 183 ("I believe we did that in several cases"); Bartel Decl. ¶ 21.

a factual dispute by repudiating his earlier deposition testimony.  The Court is entitled to disregard statements of this nature, *see Crawford*, 758 F.3d 473 at 482, and does so here with respect to Bartel's newfound claim not to understand that the buy/sell transactions could be cancelled.  In any event, Bartel's own declaration elsewhere further supports that ABC and Murex would simply cancel transactions that failed to garner financing on TRE.  Bartel states there that he *is* aware of Murex canceling one such transaction, at ABC's request, after a "TRE auction did not result in a purchase of receivables by a buyer."  Bartel Decl. ¶ 21.  That the buy/sell transactions could be—and, on at least one occasion, were—wholly undone if the resulting receivables failed to sell on TRE makes their nature clear.  Their sole function was not to effect the exchange of physical ethanol back and forth.  It was to create the illusion of such a trade so as to induce buyers on FNBC to provide Murex and, ultimately, ABC with cash.

In sum, the evidence adduced in discovery conclusively establishes that for each of the receivables at issue here, ABC, in an effort to obtain liquidity, dictated to Murex the amount it needed to raise on a given day.  Then, the two companies worked together to obtain that cash for ABC from third parties on TRE by creating transaction documents suggesting to outsiders that Murex had sold physical ethanol to ABC, for which ABC owed payment.  If a third party did not come forward to provide that cash, Murex and ABC scratched the deal, as though it had never gotten underway.  Both parties gained from this arrangement—ABC secured financing from third parties who were unaware of the lack of economic substance to the transactions, and Murex gained a penny for each gallon stated on the deal documents.  There is nothing inherently illegal or objectionable about such an arrangement, provided it was held out accurately to the third parties providing financing based on Murex's purported sale to ABC.  But that is not the case here.  Here, Murex went further and represented, through the Seller Agreement and on TRE, that

the resulting payment obligations had arisen from a bona fide, arm's length sale of ethanol. For the reasons reviewed above, that representation was false and misleading. The record adduced at summary judgment does not permit a contrary conclusion.

Opposing the FDIC's summary judgment motion, Murex makes three principal arguments.

First, Murex repeatedly asserts that buy/sell transactions of the type at issue here are common in the ethanol industry, and that ABC and Murex often engaged in such transactions with other parties. *See, e.g.*, Mall Decl. ¶ 10; Parkhurst Decl. ¶¶ 9–10. That may well be so. *But see* Weber Tr. ("Q. Was it in the normal course of Abengoa's business to buy and sell ethanol on the same day at a penny-per-gallon loss? A. No."). Even assuming so, however, the existence of that common practice does not assist Murex here, given various features specific to the dealings at issue. For one, there is no evidence in the summary judgment record that it was common industry practice to unwind such buy/sell arrangements where a third party did not emerge to provide funding by purchasing the resulting receivables. Nor is there evidence that ethanol firms routinely, or ever, bought and sold more ethanol from a facility than was stored at that facility on the purported transaction date. *See, e.g.*, Pl. 56.1 ¶¶ 85, 108 (Murex and ABC purported to exchange 16 million gallons of ethanol at facility which housed only five million gallons of ethanol); *id.* ¶¶ 90, 109 (similar); *id.* ¶¶ 72, 106 (similar).

More fundamentally, there is no evidence that other ethanol firms who undertook swaps of ethanol engaged in that process exclusively for the purpose of generating documentation to secure funding from a third party, as ABC here sought to secure funding through TRE. Tellingly, Murex has not identified any swap transactions by paired industry participants of that nature. Nor—critical for the FDIC's contract breach claim here—has Murex adduced evidence that other industry participants engaged in buy/sell transactions aimed solely at securing funds

and unsupported by actual ethanol in the facility at issue *while contractually representing* to the purchaser of receivables that the underlying transactions reflected "bona fide, arm's length" sales of goods.  Murex, however, did so in connection with its auctions on TRE of its ABC receivables here.  And of course, even if Murex had, improbably, identified transactions that tracked those here in all the above respects, the dispositive question would not be whether another industry participant had engaged in similar behavior.  Such a comparator could equally be in breach of contract.  It would be whether, on like facts, those contractual representations to the third party receivables purchaser had been upheld as accurate or correct.  Murex's nod to industry practices does not assist it on the record here.

Second, Murex argues that, whatever the *purpose* of these transactions was, the critical fact is that, on each day at issue, Murex and ABC exchanged title over physical ethanol located in Murex's Texas tanks, thus giving rise to legitimate, if offsetting, sales of ethanol.  Def. Reply at 4–8.  The FDIC disputes that the contract documents were sufficient to effect, in practice, any actual transfer of ethanol between Murex and ABC.  *See* Pl. Resp. at 12–14.  The FDIC notes the absence of any specific tank designations, the conflict between title-transfer terms in Murex's and ABC's respective contract documents, and the lack of any evidence that Murex and ABC ever fully executed their contracts, arguing that those deficiencies and gaps reinforce that no actual sales—let alone bona fide, arm's length transactions—took place.  *See id.*; Def. Reply at 4–8.

The slapdash quality of the documentation of these transactions indeed supports the FDIC's theory that these writings were not meant to facilitate an actual exchange, but only to substantiate Murex's representation on TRE that it had receivables for sale.  But, even assuming this documentation was legally sufficient to formally effect contractually binding sales, the bona

45

fides of a transaction are determined by their substance, not only their form.  *See In re Shulman*, 744 F.2d at 295 (collecting cases establishing that "where the public interests or the rights of third parties are involved, the relationship between contracting parties must be determined by its real character rather than by the form and color that the parties have given it." (citing *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875))); *cf. Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir. 1991) (in tax context, a "loss must be the result of a bona fide transaction; substance, not form, is the controlling factor").  And here, the sales' contingency upon a successful TRE auction, the parties' exclusive goal of using the deal documentation to generate cash from a third-party lender, and the parties' demonstrated lack of interest in trading actual physical ethanol reveals the substance of these transactions.  Far from being bona fide, arm's length sales of ethanol, these offsetting transactions merely facilitated short-term, low-interest loans from unsuspecting third parties to ABC, with Murex acting as a broker and collecting a corresponding fee.  Thus, even resolving all doubts regarding the formal sufficiency of the underlying contract documents in Murex's favor, these dealings still did not amount to bona fide, arm's length sales of goods.

Last, Murex argues that, even if the FDIC can show that its representations as to the sales' bona fides were false, it cannot show that any misrepresentation was materially so—as required by the Seller Agreement—because the receivables FNBC purchased were no less valuable than those it thought it was buying.  *See* Seller Agreement § 8.2.1(i) (requiring repurchase where "any representation or warranty made by Seller . . . with respect to a Traded Receivable is materially inaccurate or materially incorrect when made").  In support, Murex notes that ABC has not contested the validity of the debts it owes under the ABC Receivables,

and that, between 2013 and 2015, ABC made good on nearly $1 billion worth of similar

obligations arising from similar transactions. *See* Def. Mem. at 16–18; Def. Reply at 7–8.

New York law defines materiality "to mean that, counterfactually, the plaintiff would

have acted differently but for the alleged misrepresentation or omission." *City Trading Fund v.*

*Nye*, 72 N.Y.S.3d 371, 378 (Sup. Ct. 2018) (collecting cases). On the undisputed facts, Murex's

misrepresentation as to the bona fide, arm's length nature of its sale to ABC was plainly material.

On the basis of Murex's representations in the Seller Agreement, FNBC would have believed it

was buying a right to be paid by a company (ABC) that had bought actual ethanol in the regular

course of its business. In reality, however, ABC had not obtained any ethanol, but had entered

into the paper-only transactions at issue for the sole purpose of enabling it to borrow cash that it

needed to carry on its other business. Murex now acknowledges this. *See, e.g.*, Def. Mem. at 29

("Murex now understands that ABC utilized its Buy/Sell transactions with Murex as a way to

generate short-term liquidity for itself.");[30] *see also* Weber Tr. at 47, 106 (ABC undertook the

buy/sell transactions "to provide cash").

It is self-evident why a prospective purchaser of receivables such as FNBC would likely

have acted differently had it known that reality. Had FNBC appreciated the true nature of—and

the lack of economic substance to—the buy/sell transactions between Murex and ABC, it would

have been alerted to ABC's need for liquidity and appreciated ABC's difficulty generating cash

by other means. And it would have understood that the buy/sell transactions had been entered

into solely as chum to attract a de facto lender such ABC. ABC's need to generate "short-term

---

[30] Notably, the Seller Agreement does not require Murex to have been aware in real time of the inaccuracy of its representation for its repurchase obligation to arise. *See* Seller Agreement § 8.2.1 (requiring only that a representation be "materially inaccurate . . . when made").

liquidity for itself" through the selling off of one-sided receivables would plainly increase the

risk to FNBC that ABC would be unable to muster sufficient liquidity to make good on its

payment obligations. *See, e.g.*, *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real

Estate Sec. Inc.*, No. 12 Civ. 7322 (PKC), 2015 WL 764665, at *15 (S.D.N.Y. Jan. 9, 2015)

(collecting cases applying New York law and holding that "a material, adverse effect may arise

when a breach of representation and warranty increases the risk of loss"); *Wilmington Tr. v. MC-

Five Mile Commercial Mortg. Fin. LLC*, 171 A.D.3d 591, 592 (1st Dep't 2019) ("increasing the

risk of loss" qualified as "material and adverse effect" triggering obligation to repurchase loan);

*see also Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 603

(S.D.N.Y. 2012) ("Put another way, the causation that must here be shown is that the alleged

breaches caused plaintiff to incur an increased risk of loss."). And, notwithstanding the fact that

ABC kept up with its obligations for a time, that is ultimately exactly what happened: ABC

defaulted on the ABC Receivables. Thus, the Court finds no genuine dispute that Murex's

representation regarding the nature of the sales underlying the ABC Receivables was materially

incorrect when made.

b.   *Damages and Causation*

Murex next argues that, even assuming it breached the Seller Agreement, it is entitled to

summary judgment on the FDIC's contract claim because the evidence is insufficient to establish

that Murex's breach caused the FDIC damages. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l

Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("[A] plaintiff must prove that a defendant's breach

directly and proximately caused his or her damages." (emphasis omitted)). Rather, it contends,

the FDIC's damages, if any, arise from ABC's intervening bankruptcy and its resulting inability

to pay off the ABC Receivables—not from Murex's misrepresentation to FNBC about the

transactions underlying those obligations. *See* Def. Mem. at 29–31.

But that argument misconstrues the FDIC's claim, which is based on the terms of the Seller Agreement. Under section 8.2.1, Murex absolutely, unconditionally, and irrevocably agreed to repurchase the ABC Receivables if any representation or warranty in section 10.1 of that agreement was "materially inaccurate or materially incorrect when made." As reviewed above, the undisputed evidence establishes that at least one of those representations was materially inaccurate when made. *See supra* pp. 40–48. Accordingly, Murex is obligated to repurchase the ABC Receivables at the "Repurchase Price" designated by the Seller Agreement, which would make the FDIC whole. Seller Agreement §§ 8.2.1, 8.2.2; *id.*, Ex. 1 at 56. Murex, however, has refused to do so.

The FDIC has thus sustained damages, not as a result of Murex's misrepresentation *per se*, but as a result of Murex's failure to honor the contractual repurchase obligation that misrepresentation triggered. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, No. 651563/13, 2014 WL 1621046, at *5 (N.Y. Sup. Ct. Apr. 21, 2014) (permitting recovery of damages for breach of an "independent and unqualified" repurchase obligation). Courts have widely held that an unpaid, agreed-upon repurchase price suffices to establish a plaintiff's contract damages where a contract imposed a repurchase obligation. *See, e.g.*, *MASTR*, 2015 WL 764665, at *17 (allowing, under New York law, party to seek "money damages for a breach of the repurchase obligation"); *Flagstar Bank*, 892 F. Supp. 2d at 601 ("Here, moreover, the damages being sought derive in substantial part from defendants' alleged failure to repurchase the loans, a contractual remedy that was not tied to plaintiff's suffering any damages from the alleged breach."); *La Salle Bank Nat'l Ass'n v. CIBC, Inc.*, No. 08 Civ. 8426 (WHP), 2012 WL 112208, at *2 (S.D.N.Y. Jan. 12, 2012) ("[S]everal courts have found [repurchase-price] formulas to be an adequate method for calculating damages" and collecting cases);

failure to do so is the proximate cause of the FDIC's damages, which consist of the repurchase price to which the FDIC is entitled but has not yet received.

            *c.*     *Remedy*

In its opening brief, the FDIC asked the Court to "order that Murex repurchase the Abengoa Receivables." Pl. Mem. at 19. But, in its reply, it seeks damages measured by the "agreed-upon repurchase price" in the Seller Agreement. Pl. Resp. at 18–19; *but see id.* at 35 (seeking order directing Murex to repurchase ABC Receivables). And elsewhere, the FDIC continues to press for the remedy of rescission or at least "rescissory damages." *See id.* at 26–27. Murex contests whether the latter is available, but neither party's argument on that point is well-developed. *See* Def. Mem. at 38–39; Def. Reply at 13–14.

On the present record, with the parties' arguments as to this point thinly sketched, the Court elects not to resolve the debate as to the remedies to which the FDIC is entitled on its contract claim. The Court's grant of summary judgment in the FDIC's favor on that claim is, for the time being, limited to liability. The Court will resolve at a later point, if necessary, whether the FDIC is entitled to specific performance of Murex's repurchase obligation, rescission of any contract, or money damages.

## C.    Fraudulent Inducement

Murex has moved for summary judgment on the FDIC's claim of fraudulent inducement. "In New York[,] a plaintiff alleging fraud must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). "The clear and convincing evidence standard 'demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory' because 'fraud

will not be assumed on doubtful evidence or circumstances of mere suspicion.'" *Hindsight Sols.,*

*LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014) (quoting *Century Pac., Inc. v.*

*Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496

(2d Cir. 2009)).   Summary judgment is thus appropriate if "no reasonable trier of fact could find"

that clear and convincing evidence supports the FDIC's claim.   *Mount Vernon Fire Ins. Co. v.*

*Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002).

Murex argues that no reasonable jury could find, by clear and convincing evidence, that

the FDIC established the elements of a material misrepresentation, intent to defraud, reasonable

reliance, and resulting damages.   *See* Def. Mem. at 33–37.   Drawing all inferences and resolving

all doubts in favor of the FDIC, the Court concludes that there are genuine issues of material fact

regarding the first three elements of the FDIC's fraudulent inducement claim.   The Court finds,

however, that the FDIC has failed to adduce evidence showing that its damages were directly and

proximately caused by Murex's misrepresentations, as is required under New York law.

Accordingly, the Court grants Murex's motion for summary judgment as to the FDIC's claim for

fraudulent inducement.

### 1.      Material Misrepresentations or Omissions

As noted, contrary to Murex's argument, there is abundant evidence that Murex made a

material misrepresentation when it warranted, in the Seller Agreement, that each sale underlying

the ABC Receivables was "a bona fide, arm's length sale of goods or services in the ordinary

course of [Murex's] business."   Seller Agreement § 10.1.5; *see supra* pp. 40–48.   Murex reprises

its argument that this representation was accurate when made, and that any misrepresentation

was not material.   *See* Def. Mem. at 34–45.   But, for the reasons discussed above, the evidence in

fact establishes the opposite.   *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999)

("A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely

to be deemed significant to a reasonable person considering whether to enter into the transaction.").  And even if this were not so, the facts adduced by the FDIC would give rise, at a minimum, to genuine disputes on this point.  That Murex and ABC engaged in undisclosed, roundabout trades of ethanol, aimed at facilitating ABC's ability to procure cash from buyers such as FNBC, was contrary to the representations Murex made in the Seller Agreement, and was a fact that would have been "significant to a reasonable person considering whether to enter into the transaction."  *Id.*

In pursuing summary judgment on this element, Murex argues that the true nature of these transactions was disclosed (1) when Murex posted some invoices that included the words "buy sell" or "inventory x.fer"; and (2) when TRE, not Murex, informed FNBC of two pending auctions at similar but different prices, one involving sales from Murex to ABC and the other involving sales from ABC to Murex.  *See* Def. Mem. at 34 & n.216.  But the invoices Murex identifies as containing the words "buy sell" do not correspond to the ABC Receivables at issue here.  *See, e.g.*, Def. App'x, Ex. 28 (showing invoice from May 2015).  And the words "buy sell," without more, do not alert a counter-party to the illusory quality of the trades at issue.  Further, as Murex's 30(b)(6) witness testified, an "inventory transfer" does not necessarily involve a two-sided transaction.  *See* Bartel Tr. at 140 ("Q. Can you have an inventory transfer that is just a sale without a corresponding purchase?  A. Yes.  Q. Okay, so there's no way of looking at this sales invoice and determining that this was a buy/sell agreement whereas Abengoa was buying—was selling back the ethanol; is there?  A. [T]hat would require some due diligence and asking a question.").  As for the one instance to which Murex points in which TRE emailed FNBC with information about two concurrent auctions involving Murex and ABC, those transactions involved invoices that had non-identical face values and supplied no indication that

they arose from the same buy/sell transaction.  *See* Def. App'x, Ex. 89.  At a minimum—for no more need be resolved on Murex's motion for summary judgment—there are serious questions whether the invoices and TRE transactions Murex cites could have, should have, or did alert FNBC to the true nature of the buy/sell transactions underlying the ABC Receivables.

The FDIC makes a separate argument as to this element in opposing Murex's motion.  It notes that Murex, despite internally concluding that ABC was in severe financial distress, posted three additional ABC Receivables without updating TRE or potential buyers regarding ABC's financial condition.  *See* Pl. Resp. at 23–24; *see also* Balderston Decl., Ex. 12 (August 20, 2015 Murex email preceding the August 21, August 24, and September 15, 2015 sales of ABC Receivables, in which Murex's CFO projected that ABC was likely to go bankrupt).  Murex counters that it reached this conclusion based on its own assessment of publicly available information, which was equally available to FNBC when FNBC purchased the ABC Receivables in August and September 2015.  It denies possessing any non-public information regarding ABC that put it at an informational advantage over FNBC and that FNBC could not itself have accessed in deciding whether to bid on the ABC Receivables.  *See* Def. Reply at 11.

On this discrete point, Murex is correct.  Under New York law, a claim for fraudulent concealment "requires the same showing as [] that for fraudulent misrepresentation, with the additional requirement that the defendant had a duty to disclose material information."  *Nealy v U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (citing *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).  And such a duty will generally only arise in three situations:

> [F]irst, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, "where one party possesses

54

superior knowledge, not readily available to the other, and knows that the other is
acting on the basis of mistaken knowledge."

*Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653, 656–57 (2d Cir. 2015)

(summary order) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

Murex's knowledge of ABC's financial condition does not fit with any of these

situations. Murex and FNBC did not stand in a fiduciary or confidential relationship to one

another. Murex did not make a partial or ambiguous statement in 2015 concerning ABC's

financial health. And there is no evidence in the summary judgment record that Murex

possessed superior knowledge, unavailable to FNBC, as to that information. The email FNBC

cites appears to rely solely on an analysis of publicly available information, prompted by a

Bloomberg alert Murex received via email. *See* Balderston Decl., Ex. 12 at 1–2. Accordingly,

Murex's August 2015 assessment of ABC's financial health does not support the FDIC's fraud

theory. However, the FDIC's independent evidence of affirmative misrepresentations, discussed

above, prevents Murex from defeating the FDIC's fraudulent inducement claim based on this

element.

## 2.    Knowledge and Intent to Defraud

Next, Murex urges briefly that there is no evidence that it intended to defraud FNBC.

But here, too, substantial questions of material fact preclude summary judgment for Murex. *See*

*Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 719 (S.D.N.Y. 2018) ("As scienter is generally a

question of fact, '[t]he Second Circuit has been lenient in allowing scienter issues to withstand

summary judgment based on fairly tenuous inferences.'" (quoting *Press v. Chem. Inv. Servs.*

*Corp.*, 166 F.3d 529, 538 (2d Cir. 1999))). In particular, the evidence demonstrates that Murex,

knowing the nature of its dealings with ABC, nevertheless represented those transactions to be

bona fide, arm's length sales of goods on TRE. It did so without disclosing the true nature of the

two-sided buy/sell arrangement, posting only one side of the invoices showing the receivables

owed by ABC to Murex, not those owed—in the exact same amount—by Murex to ABC.  A

reasonable jury could infer from this evidence that Murex intended to induce parties like FNBC

to buy up the ABC Receivables without understanding the nature of the underlying transactions.

### 3.   Reasonable Reliance

Murex next argues that FNBC cannot show it reasonably relied on any misrepresentation

by Murex.  It again argues that FNBC had notice of the nature of the buy/sell transactions from

certain invoices posted to TRE containing the words "buy sell," and from the one instance in

which TRE notified FNBC of two concurrent receivable auctions in which Murex and ABC were

selling receivables owed by one another in similar, but distinct, amounts.  *See* Def. Mem. at 35–36.

It also cites one instance in which a potential buyer sought additional information about Murex

and ABC's transactions and "chose not to bid on the receivables after obtaining more

information."  *Id.* at 36.  Last, it argues that the evidence unequivocally shows that FNBC's

president and CEO, Ashton Ryan, was the sole decision-maker with respect to the ABC

Receivables, and that his failure to testify in this action deprives the FDIC of proof of FNBC's

actual reliance.  *Id.* at 36–37.  The FDIC responds that, given the anonymous nature of the TRE

platform, FNBC was required to rely on the information Murex provided through TRE, including

its description of the transactions giving rise to the ABC Receivables and the representations in

the Seller Agreement.  The FDIC also cites deposition testimony, to which Murex objects,

describing FNBC's internal due-diligence measures.  Considering the admissible evidence as a

whole, the Court finds that a reasonable jury could find that FNBC reasonably relied on Murex's

misrepresentations in purchasing the ABC Receivables.

"New York courts are generally skeptical of claims of reliance asserted by sophisticated

businessmen engaged in major transactions [who] enjoy access to critical information but fail to

take advantage of that access." *Allegheny Energy*, 500 F.3d at 181 (citation omitted).  However, even when such parties are involved, "[i]n assessing whether [a party] met its burden in showing justifiable reliance, we look to a number of factors including the content of its agreement with [the other party]." *Id.*; *see Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."). And a warranty in such agreement is "intended precisely to relieve the promisee of any duty to ascertain the fact for himself." *Allegheny Energy*, 500 F.3d at 181 (quoting *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.)).  Further, when misrepresentations in such an agreement "relate to matters peculiarly within the other party's knowledge . . . , the wronged party may rely on them without further investigation." *Id.*; *see Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 81 (2d Cir. 1980) ("Decisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts."), *abrogated on other grounds as recognized by Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).

Here, because Murex warranted that all transactions arose from bona fide, arm's length sales, and presented invoices on TRE lending the impression of transactions consistent with this portrait, the true nature of the ABC Receivables was "peculiarly within" Murex's ken, and FNBC was entitled to rely on those representations "without further investigation." *Allegheny Energy*, 500 F.3d at 181.

Murex's arguments do not prevent the FDIC from reaching a jury on the element of reasonable reliance.  First, as explained, the invoices containing the words "buy sell," and the

one instance in which Murex argues that FNBC became aware of concurrent receivable auctions by Murex and ABC, would not require a jury to conclude that FNBC was notified of the true nature of the ABC Receivables. *See supra* pp. 53–54. Second, that one buyer, apparently unknown to FNBC, inquired about the ABC Receivables and then decided not to acquire them does not require a jury to find that the FDIC reasonably relied upon Murex's warranties in opting for the opposite path. Last, the record contains conflicting evidence as to the process by which FNBC purchased the ABC Receivables. There is substantial evidence suggesting that Ryan, the bank's President and CEO, had broad, bordering on unilateral, discretion over that decision. *See* Def. App'x, Ex. 45 ("Taranto Tr.") at 24 ("Ashton Ryan made all of the decisions for First NBC Bank."); *id.*, Ex. 38 ("First Verdigets Tr.") at 41–47 (Ryan made decisions regarding TRE receivables and Verdigets, FNBC's CFO, did not know what he considered in bidding on such receivables); *id.*, Ex. 50 at 5 (Louisiana Office of Inspector General concluded that Ryan was "a dominant official who made most, if not all, of the operational and executive decisions"). And, as Murex notes, Ryan's refusal to testify in this action leaves indeterminate the factors he relied upon, and how he weighed them, in deciding to purchase the ABC Receivables. *See id.*, Ex. 93 ("Ryan Tr.").

But the record also suggests that, as to receivables purchased on TRE, FNBC's credit department would analyze the financial information provided via TRE to underwrite and assess it. *See* Balderston Reply Decl., Ex. 156 ("Parra Tr.") at 26–28 (FNBC would receive "financial information" from TRE, assess "multiple years" of such information through its "financial spreading software," and analyze trends, cash flow, and other factors). Marc Parra—the manager of FNBC's credit department—testified that the anonymity of parties on TRE required him to assume that no "party was working in any fraudulent capacity to, you know, trick me or

anybody else at the bank" and to "rely on—that that information [on TRE] was correct." *Id.*
at 163–64. "[I]f [that] was not correct," Parra testified, he "would have absolutely zero way of
knowing." *Id.* at 164.[32]  Accordingly, there is, at the very least, a genuine dispute of material fact
as to who at FNBC assessed the information provided through TRE, and whether FNBC in fact
relied on such information in buying the ABC Receivables.  Ryan's unavailability therefore does
not require summary judgment for Murex.

### 4.    Loss Causation

Even though the FDIC could reach the jury on the other elements of its fraudulent
inducement claim, the Court finds summary judgment for Murex warranted on this claim
because the evidence adduced would not permit a jury to find in the FDIC's favor the final
element: loss causation.

To establish a claim for fraud in New York, "the plaintiff must show that the loss was a
'direct result of the defendant's wrongful actions and [that it was] independent of other causes.'"
*Bennett v. U.S. Tr. Co. of N.Y.*, 770 F.2d 308, 316 (2d Cir. 1985).  "The absence of adequate
causation is . . . fatal to a common law fraud claim under New York law." *Id.*; *see Basis PAC-
Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 149 A.D.3d 146, 149 (1st Dep't 2017)
("To establish loss causation a plaintiff must prove that 'the *subject* of the fraudulent statement
or omission was the cause of the actual loss suffered.'" (quoting *Lentell v. Merrill Lynch & Co.,
Inc.*, 396 F.3d 161, 173 (2d Cir. 2005))).  "[A]nd a plaintiff's claim fails when 'it has not . . .

---

[32] The FDIC also cites testimony from FNBC's CFO, Mary Beth Verdigets, suggesting that the
"Credit Department," not Ryan, would have undertaken any due diligence for TRE transactions
such as those involved here.  *See* Balderston Decl., Ex. 4 ("Second Verdigets Tr.") at 81.  But as
Murex rightly notes, such testimony was elicited by leading questions that may render it
inadmissible.  *See* Fed. R. Evid. 611(c).  The Court disregards that testimony for purposes of this
decision—while noting that the credit department's involvement in TRE trading is established by
other means: Parra's independent testimony.

proven . . . that its loss was caused by the alleged misstatements as opposed to intervening events.'"  *Basis PAC-Rim*, 149 A.D.3d at 149 (alterations in original) (quoting *Lentell*, 396 F.3d at 174); *see Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002) (affirming grant of summary judgment to defendant where plaintiff produced no "evidence that those misrepresentations directly and proximately caused his investment losses" and collecting cases).

Here, Murex contends that the FDIC has not adduced any evidence, let alone clear and convincing evidence, that the FDIC's damages directly resulted from any misrepresentation by Murex.  Rather, it argues, the evidence shows that ABC had made good on nearly $1 billion in receivables sold by Murex to FNBC, over the course of around 80 transactions, over several years, but defaulted on the last five such obligations as a result of the intervening event of ABC's cash crisis and ensuing insolvency.  *See* Def. Mem. at 37.  The FDIC responds to this argument with a one-sentence footnote, stating that "[t]he FDIC-R also has established damages based upon Murex's material misrepresentations, for the reasons stated above.  *See* Section IV, *supra*."  Pl. Resp. at 24 n.15.

On this issue, the FDIC's response is inadequate.  The portion of its brief to which that footnote refers argues only that "Murex's *breach of the [Seller] Agreement* caused the FDIC-R's damages."  *Id.* at 18 (emphasis added).  But Murex does not there argue, let alone support with evidence, that Murex's *misrepresentations* caused the FDIC's damages.  Quite to the contrary, in support of its contract claim, the FDIC acknowledges that "Murex's repurchase obligation is separate and distinct from Abengoa's contractual obligation to pay the receivables," and that "Murex's discussion of the cause for Abengoa's non-payment" is thus "a meaningless digression."  *Id.* at 20.  Notably, that argument built on the FDIC's contention in its opening brief, with respect to its breach of contract claim, that "The FDIC-R does not need to prove

causation" as to its contract claim.  Pl. Mem. at 18; *see also id.* ("The FDIC-R is not required to establish that Murex's breaches caused the Abengoa Receivables to default in order to trigger Murex's repurchase obligations . . . , which the FDIC-R seeks to enforce.").  Consistent with this, as to its contract claim, the FDIC has consistently argued—and the Court has found—that its contract damages were caused by Murex's failure to honor its promise to repurchase the ABC Receivables upon the occurrence of a Repurchase Event, and that the FDIC did not have to make any further showing of causation.  *See supra* pp. 48–51.

But, in seeking to sustain its fraudulent inducement claim, the FDIC cannot rely on Murex's established contract breach, as that breach arises from the specific language of the Seller Agreement.  Rather, the FDIC must show that Murex's *misrepresentation* proximately caused the FDIC's damages here.  *See Bennett*, 770 F.2d at 316.  On that score, the FDIC's showing is nonexistent.  *See* Pl. Resp. at 24.  It has come forward with no evidence on which a reasonable jury could find, by clear and convincing evidence, that Murex's misrepresentations, as opposed to the intervening event of ABC and Abengoa's insolvency, caused the FDIC's losses.  *See Laub*, 297 A.D.2d at 32 ("Because there is no nexus between the alleged misrepresentations and plaintiff's losses, Supreme Court's grant of summary judgment dismissing the complaint was entirely appropriate."); *see also* Fed. R. Civ. P. 56(c)(1)(A).

Accordingly, the Court grants Murex's motion for summary judgment on the FDIC's claim for fraudulent inducement.

### D.    Equitable Claims

#### 1.    Unjust Enrichment

Murex argues that the FDIC's unjust enrichment claim cannot survive summary judgment because that claim is viable only "in the absence of an actual agreement between the parties," and there is no dispute here that the parties' agreements were, and remain, valid,

enforceable contracts.  Def. Mem. at 38 (quoting *Ga. Malone & Co., Inc. v. Rider*, 19 N.Y.3d

511, 516 (2012).  The FDIC responds that New York courts permit plaintiffs to plead unjust

enrichment in the alternative to claims on their contract, and that summary judgment is therefore

inappropriate.  *See* Pl. Resp. at 25–26.  On this point, Murex is correct.  The Court therefore

grants its motion for summary judgment as to the unjust enrichment claim.

To prevail on a claim for unjust enrichment in New York, a plaintiff must establish

(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good

conscience require restitution."  *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.,*

*Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citation omitted).  But "unjust enrichment is a quasi-

contract claim that can ordinarily be invoked only in the absence of a valid, enforceable contract."

*Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1200 (S.D.N.Y. 1996) (collecting

cases).  And "[t]he existence of a valid and enforceable written contract governing a particular

subject matter ordinarily precludes recovery in quasi contract for events arising out of the same

subject matter."  *Beth Isr.*, 448 F.3d at 587 (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R.*,

70 N.Y.2d 382, 388 (1987)).  That is true even where the dispute involves claims of third parties

who, despite being non-signatories to a contract, seek to enforce or benefit from its terms.  *See,*

*e.g.*, *Tesla Wall Sys., LLC v. Related Cos.*, No. 17 Civ. 5966 (JSR), 2018 WL 4360777, at *6

(S.D.N.Y. Aug. 15, 2018).  Plaintiffs may *plead* unjust enrichment and contract claims in the

alternative.  *See, e.g.*, *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 617

(S.D.N.Y. 2016) (declining to dismiss unjust enrichment claims at pleading stage because

Federal Rule of Civil Procedure 8(d) expressly permits pleading in the alternative); *Transcience*

*Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) (similar and collecting

cases).  But "[i]f at summary judgment the court concludes that the contract at issue is 'valid and

enforceable,' then 'defendants are entitled to summary judgment on the unjust enrichment claim.'" *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 595 (S.D.N.Y. 2018) (quoting *Blum v. Spaha Cap. Mgmt., LLC*, 44 F. Supp. 3d 482, 496 (S.D.N.Y. 2014) and collecting cases); *see Beth Isr.*, 448 F.3d at 586 (upholding entry of summary judgment dismissing unjust enrichment claims because "contractual relationships did exist"); *Palatkevich v. Choupak*, 152 F. Supp. 3d 201, 222 (S.D.N.Y. 2016) (entering summary judgment against unjust enrichment claim where there was no bona fide dispute as to existence of valid contract).

Here, there is no genuine dispute as to the validity of any contract. On the contrary, enforcing the Seller Agreement's terms, the Court has awarded the FDIC summary judgment on its breach of contract claim. The FDIC has not argued otherwise, contending only that its "cause of action sounding in unjust enrichment is [pled] in the alternative to its breach of contract claim and therefore is not precluded as a matter of law." Pl. Resp. at 26 (citing opinions rejecting motions to dismiss). But that flexible pleading standard does not apply at summary judgment. *See, e.g.*, *Mindspirit*, 346 F. Supp. 3d at 595. Absent a genuine dispute as to the existence of a contract governing the claims at issue, quasi-contract claims such as the FDIC's cannot survive. *Beth Isr.*, 448 F.3d at 587–88. Accordingly, the Court grants Murex's motion for summary judgment on the FDIC's claim for unjust enrichment.

## 2. Rescission

Finally, Murex moves for summary judgment on the FDIC's claim for rescission. Under New York law, "a plaintiff may obtain rescission—in lieu of actual damages—when a breach of contract is either 'material and willful' or 'so substantial and fundamental' that it 'strongly tend[s] to defeat' the purpose of the contract." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (quoting *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)). Rescission is an "extraordinary remedy" that is appropriate only "when a breach may be said to

go to the root of the agreement between the parties." *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989); *see also MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412, 413 (1st Dep't 2013) (rescission a "very rarely used equitable tool").  And "[b]ecause it is an equitable remedy, rescission is available only if damages would not be a 'complete and adequate' remedy and 'the status quo may be substantially restored' by equitable relief." *Pyskaty*, 856 F.3d at 227 (quoting *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972)).

Whether rescission is appropriate, however, goes to remedy, not liability.  Much as the Court has elected not to resolve in this opinion the appropriate remedy for Murex's breach of the Seller Agreement, it also elects not to resolve whether rescission of that contract or any other agreement is available.  The parties' briefs have not thoroughly engaged with such questions, including the propriety of such equitable relief in lieu of a remedy at law.  And the Court's entry of summary judgment as to liability on the breach of contract claim will assuredly promote focused briefing on the appropriate and available remedies.  Accordingly, the Court denies, without prejudice to Murex's right later to move against this claim, Murex's motion for summary judgment as to the rescission claim.

### 3.    Murex's Equitable Affirmative Defenses

Finally, Murex argues for entry of summary judgment on the FDIC's equitable claims— for unjust enrichment and rescission—under the doctrines of unclean hands and unreasonable delay, *i.e.*, laches.  Murex bears the burden of proving each affirmative defense.  *See, e.g.*, *In re Gucci*, 197 F. App'x 58, 59–60 (2d Cir. 2006) (summary order) (laches); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 712 (S.D.N.Y. 2012) (unclean hands).  In support of the former, it argues that FNBC did not exercise due diligence with respect to its "risky investment" in the ABC Receivables, and that the FDIC must live with the consequences of FNBC's decisions.  Def. Mem. at 39.  In support of the latter, it argues that, despite buying

64

and collecting on nearly $1 billion of receivables from ABC between 2013 and 2015, FNBC waited until after ABC had declared bankruptcy to raise any perceived problems with such receivables. *Id.* The Court has already dismissed the unjust enrichment claim. And as to the rescission claim, Murex is not entitled to summary judgment based on either equitable defense.[33]

### a.   Unclean Hands

The defense of unclean hands is inapplicable here. "Under New York law, the doctrine of unclean hands is 'never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'" *MBIA Ins.*, 842 F. Supp. 2d at 712 (quoting *Nat'l Distillers & Chem. Corp. v. Seyopp Corp.*, 17 N.Y.2d 12, 15–16 (1966)); *see TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 328 (S.D.N.Y. 2016) (same). Courts generally apply the doctrine only where they have found plaintiffs "guilty of truly unconscionable and brazen behavior." *Gidatex S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (citing repeated misrepresentations to the court and fabricated testimony as examples of such behavior).

The three sentences Murex devotes to its contention that FNBC's "risky investment" in the ABC Receivables precludes equitable relief here are patently insufficient to make out this defense. First, as noted, there are questions of material fact regarding the nature and adequacy of FNBC's due diligence concerning the ABC Receivables. *See supra* pp. 56–59; *see also* Pl. Resp.

---

[33] The FDIC argues that Murex's equitable defenses cannot be applied to its claims at law because such defenses "cannot be a defense to a legal action for damages if the action was commenced within the statute of limitations period." Pl. Resp. at 27 (quoting *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010)). This argument is moot, as the Court understands Murex to raise these defenses only with respect to the FDIC's equitable claims. *See* Def. Mem. at 39 ("Alternatively, the FDIC-R's unclean hands and unreasonable delay defeat *these equitable claims*." (emphasis added)).

at 23.  Accordingly, even assuming that a lack of due diligence could support this defense, disputed issues of fact would preclude summary judgment.  Second, and more fundamentally, even if Murex *had* established that FNBC failed "to exercise reasonable due diligence with respect to its purchase of the ABC Receivables," Def. Mem. at 39, Murex has not offered any argument or case authority—and the Court finds none—that such a lapse constitutes the "immoral, unconscionable conduct" required for the unclean-hands defense to apply.  *TufAmerica, Inc.*, 162 F. Supp. 3d at 328.  As a matter of law, Murex's defense on this point fails.

> b.    *Laches*

Nor can Murex carry its burden of showing that FNBC and the FDIC's claims are barred by the doctrine of laches.  "Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action." *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994).  Under New York law, a defendant asserting this defense must show the following: "(1) proof of delay in asserting a claim despite the opportunity to do so; (2) lack of knowledge on the defendant's part that a claim would be asserted; and (3) prejudice to the defendant by the allowance of the claim." *Rapf v. Suffolk Cnty. of N.Y.*, 755 F.2d 282, 292 (2d Cir. 1985).  "[P]rejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Gidatex*, 82 F. Supp. 2d at 134 (quoting *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996).

Murex briefly contends that FNBC unreasonably delayed commencing this action.  It notes that FNBC had purchased and collected on nearly $1 billion worth of receivables arising from purported Murex-ABC ethanol sales between 2013 and 2015, and brought this action only after ABC declared bankruptcy in 2016.  *See* Def. Mem. at 39.  But FNBC's claims arise not from the earlier transactions, but only from the final five sets of receivables, as to which it was left holding the bag.  FNBC had no reason to challenge the earlier transactions.  Moreover, as to

the claims FNBC did bring, there are genuine disputes of material fact as to whether FNBC could have brought such claims consequentially earlier than it did.  FNBC bought the receivables at issue between July and September 2015.  The FDIC contends that FNBC became aware of the true nature of the buy/sell transactions between Murex and ABC only after ABC's declaration of bankruptcy in February 2016, and sued Murex months later, in September 2016.  *See, e.g.*, Pl. 56.1 ¶¶ 41, 43.  To be sure, Murex cites evidence showing that, as early as December 2015, FNBC inquired into its repurchase rights, *see* Def. 56.1 ¶ 41, and on that basis argues that FNBC appreciated before February 2016 the problematic nature of the buy/sell transactions.  But this sparse record falls far short of establishing—let alone by the standards necessary to warrant summary judgment for Murex—"proof of delay despite the opportunity" to sue sufficient to invoke laches.  *Rapf*, 755 F.2d at 292.

Moreover, and independently, Murex has not come forward with any evidence, or even argued, that it has suffered any prejudice from the delay it terms unreasonable.  *Id.*  Absent such proof, summary judgment is not appropriate as to the FDIC's equitable claims.

## CONCLUSION

For the foregoing reasons, the Court grants the FDIC's partial motion for summary judgment, but only as to liability, on its breach of contract claim.  The Court holds that Murex is liable for its failure to repurchase the ABC Receivables in violation of the Seller Agreement.  The Court does not resolve, in this decision, the appropriate remedy for this breach.

As to Murex's motion for summary judgment, the Court denies Murex's motion with respect to the FDIC's breach of contract claim, but grants this motion with respect to the FDIC's claims for fraudulent inducement and unjust enrichment.  The Court denies without prejudice Murex's motion for summary judgment with respect to the FDIC's rescission claim.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 221, 231, 239, and 260.

An order will follow shortly as to next steps in this matter.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: November 12, 2020
       New York, New York